UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------- X

UNITED STATES OF AMERICA,

     v.

MICHAEL MENDLOWITZ,
     a/k/a "Moshe Mendlowitz,"

and

RICHARD D. HART,
     a/k/a "Rick Hart,"

          Defendants.

------------------------------------- X

Case No. 17 Cr. 248 (VSB)


**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT
MICHAEL MENDLOWITZ'S MOTION TO SUPPRESS, FOR RETURN
OF PROPERTY, FOR IDENTIFICATION OF BRADY
<u>MATERIAL AND FOR A BILL OF PARTICULARS</u>**


SMITH VILLAZOR LLP
Patrick J. Smith
Rodney Villazor
Sarah Zimmer
1700 Broadway, Suite 2801
New York, New York, 10019
(212) 582-4400

*Attorneys for Defendant Michael Mendlowitz*

Dated: January 22, 2018

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ................................................................................. 1

STATEMENT OF FACTS ...................................................................................... 3

      A.    The Indictment ................................................................... 3

      B.    Personal Background ......................................................... 4

      C.    Commerce Payment Systems and the CPS Premises ............................. 4

      D.    The July 2015 CPS Search ................................................... 6

      E.    The Government Dumps 8 Terabytes of ESI on the Defendants in June 2017 ................................................................... 8

      F.    The Defense Presses the Government for Information Concerning the Search and the Post-Search ESI Review ............................... 9

      G.    The Government Brushes Aside Fourth Amendment Concerns and Refuses to Return Non-Responsive Documents ..................................... 10

      H.    The "Responsive" Documents Disclosed on November 30, 2017 .......... 11

ARGUMENT .................................................................................................. 12

    I.    THE CPS SEARCH VIOLATED THE FOURTH AMENDMENT .................. 12

      A.    Applicable Standards ........................................................ 13

          1.    The Fourth Amendment Requires Particularity .......................... 13

          2.    The Fourth Amendment Requires Reasonableness for Off-Site Review and Return of Files Outside the Warrant's Scope ................................................................... 15

          3.    The Exclusionary Rule for Fourth Amendment Violations ......... 18

      B.    The CPS Warrant Was An Impermissible General Warrant .................. 19

      C.    The Government's Two and One-Half Year Retention of Non-Responsive ESI and Untimely Review Make The Execution of the CPS Warrant Unreasonable .................................................. 20

      D.    The Court Should Apply the Exclusionary Rule to Deter Further Unreasonable ESI Procedures .............................................. 23

    II.    THE GOVERNMENT MUST PROMPTLY RETURN OR DESTROY ALL NON-RESPONSIVE MATERIAL ...................................................... 25

    III.    THE GOVERNMENT SHOULD BE COMPELLED TO IDENTIFY BRADY MATERIAL ................................................................. 27

i

# TABLE OF CONTENTS
(continued)

Page

IV.   THE GOVERNMENT MUST BE COMPELLED TO PROVIDE A BILL
OF PARTICULARS AND AN EXHIBIT LIST ................................................ 29

    A.   Applicable Standards .............................................................................. 29

    B.   The Government Must Provide Particulars of Mr. Mendlowitz's
Alleged Fraudulent Conduct .................................................................... 30

    C.   The Government Must Identify the Alleged Co-Conspirators ............... 32

    D.   Discovery Does Not Provide Sufficient Notice ...................................... 34

CONCLUSION ........................................................................................................... 35

## TABLE OF AUTHORITIES

Page(s)

### CASES

*Coolidge v. New Hampshire,* 403 U.S. 443 (1971) ................................................................ 13

*Herring v. United States*, 555 U.S. 135 (2009)..................................................................... 18

*Mapp v. Ohio*, 367 U.S. 643 (1961).......................................................................................... 18

*Marron v. United States*, 275 U.S. 192 (1927) .................................................................... 14

*Maryland v. Garrison*, 480 U.S. 79 (1987)............................................................................. 14

*Mathews v. United States,* 917 F. Supp. 1090 (E.D. Va. 1996)....................................... 26

*Rakas v. Illinois*, 439 U.S. 128 (1978).................................................................................... 26

*United States v. $515,060.42 in U.S. Currency,* 152 F.3d 491 (6th Cir. 1998) ........................... 26

*United States v. Abrams*, 615 F.2d 541 (1st Cir. 1980) ................................................... 14

*United States v. Aguiar*, 737 F.3d 251 (2d Cir. 2013) ...................................................... 18

*United States v. Ajemian*, No. 11-CR-1091, 2012 WL 6762011 (E.D.N.Y. Dec. 27, 2012)........ 33

*United States v. Alston*, No. 15-CR-435, 2016 WL 2609521 (S.D.N.Y. Apr. 29, 2016) ............. 15

*United States v. Bin Laden*, 92 F. Supp. 2d 225 (S.D.N.Y. 2000)......................................... 32, 33

*United States v. Bortnovsky*, 820 F.2d 572 (2d Cir. 1987) ........................................ 29, 30, 31, 34

*United States v. Buck*, 813 F.2d 588 (2d Cir. 1987) ..................................................... 15

*United States v. Burke*, 718 F. Supp. 1130 (S.D.N.Y. 1989)........................................ 26

*United States v. Chen*, 378 F.3d 151 (2d Cir. 2004).................................................... 30

*United States v. Chuang*, 897 F.2d 646 (2d Cir. 1990)................................................ 26

*United States v. Comprehensive Drug Testing, Inc.*, 579 F.3d 989 (9th Cir. 2009) .................... 24

*United States v. Comprehensive Drug Testing, Inc.*, 621 F.3d 1162 (9th Cir. 2010) ............. 16, 17

*United States v. Coppa*, 267 F.3d 132 (2d Cir. 2001)................................................... 28

*United States v. Davidoff*, 845 F.2d 1151 (2d Cir. 1988) ........................................... 32

*United States v. Debbi*, 244 F. Supp. 2d 235 (S.D.N.Y. 2003)................................................ 9, 17

*United States v. Dupree*, 781 F. Supp. 2d 115 (E.D.N.Y. 2011) ................................................ 27

*United States v. Galpin*, 720 F.3d 436 (2d Cir. 2013) ........................................................ 15, 16

*United States v. Ganias,* 755 F.3d 125 (2d Cir. 2014) *rehearing en banc*, 12-240
   (2d Cir. May 27, 2016)  ......................................................................................... *passim*

*United States v. Ganias*, 824 F.3d 199 (2d Cir. 2016)....................................................... 16, 17

*United States v. George,* 975 F.2d 72 (2d Cir. 1992) ........................................................ 15, 19

*United States v. Jones*, 132 S. Ct. 945 (2012)...................................................................... 18

*United States v. Leary,* 846 F.2d 592 (10th Cir. 1988)........................................................... 26

*United States v. Levine,* 249 F. Supp. 3d 732 (S.D.N.Y. 2017)................................................ 35

*United States v. Lino*, No. 00-CR-632, 2001 WL 8356 (S.D.N.Y. Jan. 2, 2001) .................. 31, 34

*United States v. Matias*, 836 F.2d 744 (2d Cir. 1988) .................................................... 23

*United States v. Metter*, 860 F. Supp. 2d 205 (E.D.N.Y. 2012) ........................................ 9, 15, 17

*United States v. Miller,* 430 F.3d 93 (2d Cir. 2005) .......................................................... 15

*United States v. Nachamie*, 91 F. Supp. 2d 565 (S.D.N.Y. 2000) ....................................... 32, 333

*United States v. Otero*, 563 F.3d 1127 (10th Cir. 2009)....................................................... 14

*United States v. Rajaratnam*, No. 09-CR-1184, 2010 WL 2788168
   (S.D.N.Y. July 13, 2010) ................................................................................ 29, 30, 32, 34

*United States. v. Rigas*, 258 F. Supp. 2d 299 (S.D.N.Y. 2003) .................................................. 27

*United States v. Rigas*, 490 F.3d 208 (2d Cir. 2007) .................................................................. 29

*United States v. Rodriguez-Aguirre,* 264 F.3d 1195 (10th Cir. 2001) ......................................... 26

*United States v. Rosa*, 626 F.3d 56 (2d Cir. 2010) ...................................................................... 19

*United States v. Santarelli*, 778 F.2d 609 (11th Cir. 1985) .......................................................... 16

*United States v. Savin*, No. 00-CR-45, 2001 WL  243533 (S.D.N.Y. Mar. 7, 2001) ............. 31, 32

iv

*United States v. Schwimmer*, 692 F. Supp. 119 (E.D.N.Y. 1988) .................................................. 26

*United States v. Shi Yan Liu*, 239 F.3d 138 (2d Cir. 2000)................................................. 14, 18, 23

*United States v. Skilling*, 554 F.3d 529 (5th Cir. 2009), *aff'd in part and vacated in part on other grounds*, 561 U.S. 358 (2010)................................................................................................. 28

*United States v. Soliman*, No. 06-CR-236, 2008 WL 4757300 (W.D.N.Y. Oct. 29, 2008)............................................................................................................. 17

*United States v. Stein*, 435 F. Supp. 2d 330 (S.D.N.Y. 2006) ...................................................... 33

*United States v. Stevens*, 985 F.2d 1175 (2d Cir. 1993) .............................................................. 27

*United States v. Tamura*, 694 F.2d 591 (9th Cir. 1982)........................................................... 14, 17

*United States v. Thomas*, 981 F. Supp. 2d 229 (S.D.N.Y. 2013)............................................. 27, 28

*United States v. Trie*, 21 F. Supp. 2d 7 (D.D.C. 1998) ............................................................... 34

*United States v. Usher*, No. 17-CR-19, 2017 WL 5633315 (S.D.N.Y. Oct. 12, 2017) ............... 35

*United States v. Vilar*, No. 05-CR-621, 2007 WL 1075041 (S.D.N.Y. Apr. 4, 2007) ........... 15, 20

*United States v. Voustianiouk*, 685 F.3d 206 (2d Cir. 2012) ...................................................... 18

*United States v. Wey*, 256 F. Supp. 3d 355 (S.D.N.Y. 2017) ................................................ *passim*

*United States v. Young*, 745 F.2d 733 (2d Cir. 1984) ................................................................. 14

*United States v. Zemlyansky,* 945 F. Supp. 2d 438 (S.D.N.Y. 2013) ....................... 14, 15, 19, 26

*Weeks v. United States*, 232 U.S. 383 (1914) ............................................................................. 18

## Rules and Statutes

*U.S. Const. amend. IV* ................................................................................................................ 13

Fed. R. Crim. P. 16 ................................................................................................................ 10, 27

Fed. R. Crim. P. 41 ................................................................................................................ 25, 28

Defendant Michael Mendlowitz respectfully submits this memorandum of law in support of (1) a motion to suppress evidence seized during the execution of a search warrant; (2) a motion to return property; (3) a motion to compel the government to identify all *Brady* material; and (4) a motion for a bill of particulars and an exhibit list.

## PRELIMINARY STATEMENT

On July 28, 2015, federal agents executed a search warrant at the office of Commerce Payment Systems ("CPS"), a credit-card processing company of which defendant Michael Mendlowitz was an owner and manager.  By the time the search at CPS's Hewlett, New York offices was finished, federal agents had indiscriminately seized reams of hard copy documents and virtually every byte of electronically stored information ("ESI") on the premises.  But the warrant authorizing the search was defective because it failed to state in any meaningful way the nature of the alleged offenses, depriving the executing agents of guidance in what should be seized, and improperly directed the seizure of every document and of any and all computers, regardless of their use and what they might contain.

Worse, despite a clear constitutional obligation promptly to search the seized ESI to determine which materials actually fell within the scope of the warrant, the government has been unable to describe the steps it took to conduct this constitutionally mandated review and continues its searching to this day.  Faced with a discovery production of 8 terabytes of ESI chock full of obviously irrelevant material, the defense made several written requests for identification of materials within the scope of the warrant and for a description of the search procedures applied.  Only after repeated prodding from the defense together with a demand for the return of unresponsive material did the government, on November 30, 2017, finally begin to identify approximately 7,800 items as purportedly within the scope of the warrant.  The

1

government otherwise provided little meaningful information and rejected Mr. Mendlowitz's demand for the return of non-responsive materials.

The circumstances of the government's post-search off-site review are highly suspect and point to the conclusion that the review was untimely, incomplete and is ongoing.  The staggering 8 terabytes of ESI in the discovery—roughly 75,000,000 pages—makes clear that the government opted to produce everything it seized without regard to responsiveness.  Rather than producing in discovery those documents that it determined were responsive, the government performed a data dump of ESI under the guise of being "thorough."  The sheer volume of ESI itself strongly indicates that the government did not, because it could not, review the seized electronic evidence for responsiveness in a timely fashion.  Also suspect is the fact that it took the government more than two months from the first defense inquiry to identify the roughly 7,800 documents that it later described as "responsive."

It seems straightforward that if the government has identified only 7,800 documents after two and one-half years, the balance of the ESI seized in the search must be suppressed.  There is no basis for the government to retain, search or use any materials not responsive to the CPS search warrant, and all such non-responsive materials should be returned or destroyed.  Indeed, given applicable authority, the Court should also order suppression of the belatedly identified 7,800 responsive documents.  If the review was untimely and, as seems apparent, is ongoing, it is unreasonable under the Fourth Amendment.  At a minimum, these suspicious circumstances require an evidentiary hearing to determine whether the government complied with its post-search Fourth Amendment obligations.

In addition, and in view of the large dataset at issue here, the Court should order the government to: disclose *Brady* material, provide a bill of particulars and an exhibit list of the documents it intends to introduce in its case-in chief no less than 60 days before trial.

## STATEMENT OF FACTS

### A.  The Indictment

On May 2, 2017, Mr. Mendlowitz was arrested after a federal grand jury returned a 29-page indictment against him and co-defendant Richard Hart.  That same day, Mr. Mendlowitz had his initial appearance and was arraigned before this Court.  He was released on bond and remains under the supervision of U.S. Pretrial Services.

The Indictment alleges that, from 2009 to July 2015, Mr. Mendlowitz, Mr. Hart and other co-conspirators were involved in a scheme to defraud the merchant-customers of CPS. (Indictment ¶ 2).  The alleged scheme forms the basis of three counts—one count of conspiracy to commit mail and wire fraud (Count One), one count of mail fraud (Count Two) and one count of wire fraud (Count Three).  (*Id.* ¶¶ 1-3, 38-39, and 40-41).  Mr. Mendlowitz was the "president and chief executive officer of CPS," "supervised and oversaw all CPS departments and operations" and was allegedly "closely involved" in orchestrating a scheme to fraudulently overbill merchant-customers.  (*Id.* ¶ 12).  Among the alleged means to direct this fraud, Mr. Mendlowitz allegedly engineered false marketing materials (*Id.* ¶¶ 16-20), directed sales representatives on recorded calls to provide falsehoods and misleading statements to merchant-customers (*Id.* at ¶¶ 21-25) and would conceal changed rates by creating monthly statements and monthly notices to customers that "many customers did not know existed" and were "accessible to the customer for only three months."  (*Id.* ¶ 27).

3

### B.  Personal Background

Michael Mendlowitz is a 43-year-old businessman.  He resides in Woodmere, New York with his wife, Shira Mendlowitz, and their seven children.  Mr. Mendlowitz and his family attend synagogue at the Congregation Aish Kodesh in Woodmere, where Mr. Mendlowitz is a cantor who leads prayers and conducts weekday, Shabbat and holiday services.

Born in New York City, Mr. Mendlowitz attended high school and college and boarded at the Ner Israel Rabbinical College in Pikesville, Maryland.  He studied Talmud texts and rabbinical literature and earned his bachelor's degree in Talmudic Law.  After his college graduation in 1998, Mr. Mendlowitz obtained his Master of Business Administration degree from Johns Hopkins University in 2000.

During his college and MBA programs, Mr. Mendlowitz worked to support himself financially.  He worked part-time for his father's small card processing company where he gained hands-on experience handling and processing credit and debit transactions for 500 merchant-customers.  Mr. Mendlowitz also started a small wholesale business distributing health and beauty products to local retail stores and pharmacies.

### C.  Commerce Payment Systems and the CPS Premises

In 2001, Mr. and Mrs. Mendlowitz left Maryland and resettled their family in Woodmere, New York.  Although his wholesale health and beauty product business continued to thrive, Mr. Mendlowitz explored the card processing industry where he saw opportunities for growth.  In January 2005, Mr. Mendlowitz launched Commerce Payment Systems, Inc., wholly owned by him and organized as an S Corporation, with offices in Cedarhurst, New York.  His father-in-law, Michael Davidson, a certified public accountant for over 20 years, handled Commerce Payment Systems, Inc.'s tax filings.

By May 2006, Mr. Mendlowitz moved the business to offices located at 1465 Broadway, Hewlett, New York (hereinafter the "CPS Premises").  He initially leased the CPS Premises in his own name.  Mr. Davidson subleased an individual office within the CPS Premises for his own accounting practice ("Davidson Premises") along with other sub-tenants of Mr. Mendlowitz.  Mr. Mendlowitz grew the company over the next four years with his own salesforce and a merchant-customer base of 5,000 accounts by 2009.

In 2009, the growing success of Commerce Payment Systems, Inc. garnered the attention of EVO Merchant Services, LLC (hereinafter "EVO"), one of the country's largest and most experienced card processing companies.  Mr. Mendlowitz was introduced to EVO CEO Jeff Rosenblatt, and by April 2009, Mr. Mendlowitz partnered with EVO as co-owner of the newly formed Commerce Payment Group, LLC, which carried the business forward and continued using the "Commerce Payment Systems" name.  Mr. Mendlowitz's staff was principally responsible for sales, marketing, and growth.  EVO handled operations, including building fee billing templates, and lent its expertise in risk management and compliance.  Mr. Mendlowitz was and remains a 20% owner of Commerce Payment Group, LLC and was, at all relevant times, a manager with day-to-day responsibility for the affairs of Commerce Payment Group, LLC.

On April 23, 2009, Mr. Mendlowitz and his father-in-law, through Route 340 Corp., a family-owned business entity, entered into a five-year lease for the CPS Premises with a clause for escalating rent through the lease term.  (Declaration of Patrick J. Smith, dated Jan. 22, 2018 ("Smith Decl.") Ex. 1).  At around that same time, Commerce Payment Systems, Inc. entered into a sublease with Route 340 Corp. for the CPS Premises.  This new Route 340 Corp. lease and the Commerce Payment Systems, Inc. sublease relieved Mr. Mendlowitz of individual liability, but Mr. Mendlowitz maintained control of the CPS Premises.  On January 1, 2012, the

Commerce Payments Systems, Inc. sublease agreement with Route 340 Corp. was amended to increase its rent to $11,500 to adjust for the yearly rental increases in Route 340 Corp.'s lease with the owner.[1]  (Smith Decl., Ex. 2).

Commerce Payment Group, LLC proved to be a success.  The blend of EVO's deep experience in the card processing industry and Mr. Mendlowitz's entrepreneurship led to substantial growth over the next six years.  By 2015, CPS had serviced over 65,000 merchants since its inception and was a direct processor for Visa, Mastercard, Discover and American Express.

### D.  The July 2015 CPS Search

On July 23, 2015, federal agents obtained a search warrant[2] from the Eastern District of New York to search the CPS Premises and the Davidson Premises.  (Smith Decl., Ex. 3).  United States Secret Service ("USSS") Agent Brandon W. McCaw, an agent for "more than one year," submitted an affidavit in support of the application for the search warrant.  (Smith Decl., Ex. 4 ¶ 2).  The probable cause showing is based mainly upon an allegation of "over-billing;" namely, the inclusion of allegedly "improper" fees on monthly statements that made the total monthly bill higher than stated on sales calls and allegedly higher than the merchant agreements permitted.  *Id*. at ¶ 19.  The McCaw affidavit identifies three alleged victims who were "over-billed," but there is no allegation that these particular customers did not receive or have access to their monthly statements.  *Id*. at ¶¶ 25-27.  Rather, Agent McCaw claims that while the gross amount

---

[1] Route 340 Corp. leased 5,818 square feet with rent starting at $13,151.67 in the first year and escalating to $14,802.33 by the fifth year.  (Smith Decl., Ex. 1 at 2).  Commerce Payment Systems initially subleased 5,110 square feet for $9,000, but its rent increased to $11,500 in 2012.  (Smith Decl., Ex. 1 at 1-2, Ex. 2 at 1).

[2] On May 13, 2015, federal agents obtained a search warrant (15-mj-0444) from a federal magistrate judge in the Eastern District of New York to search the CPS Premises and Davidson Premises.  (Smith Decl., Ex. 4 ¶ 17).  The agents did not execute this warrant within the 14 allotted days because, among other reasons, David Devers, a CPS employee, was arrested and began cooperating with the government in May 2015.  *Id.*

of the monthly charge was accurately disclosed, the manner in which the fees were presented on the bill was misleading and that the overall fee was too high.

The warrant itself identified property to be located and seized that constituted evidence of this ill-defined overbilling fraud.  (Smith Decl., Ex. 3, Att. B).  Among the numerous items agents were instructed to seize were (1) documents bearing, among others, "Commerce Payment Systems," "EVO Merchant Services" or "similar names" (*Id.* at ¶ 10) and (2) "Computer(s), computer hardware, software, related documentation, and passwords" (*Id.* at ¶ 12).

With regard to seizure of ESI, Agent McCaw outlined a vague search protocol purportedly to be employed by agents at an off-site location.  This protocol included a review of ESI "for information responsive to the warrant" with no time restrictions and identified "various techniques" that "may" be used to determine what ESI is responsive.  (Smith Decl., Ex. 4 ¶¶ 42-43).  Agent McCaw also added the catch-all qualification that law enforcement "may need to conduct a complete review of all the ESI from seized devices or storage media . . . to locate all data responsive to the warrant."  *Id*. at ¶ 44.  Upon completion of the review for responsive ESI, Agent McCaw claimed that: "[i]f the government determines that the electronic devices are no longer necessary to retrieve and preserve the data [and not subject to seizure], the government will return these items, upon request."  *Id*. at ¶ 46.

On July 28, 2015, USSS agents from the Electronic Crimes Task Force executed the search warrant.  (Smith Decl., Ex. 5).  In the five days between obtaining and executing the search warrant, it is unclear whether agents were briefed on any constitutional restraints, the protocols set forth in Agent McCaw's affidavit or any binding authority imposing reasonableness on the off-site review.  At the CPS Premises, agents seized ESI contained within numerous computers, hard drives and servers along with miscellaneous documents.  *Id.*

**E.  The Government Dumps 8 Terabytes of ESI on the Defendants in June 2017**

On June 12, 2017, the government made discovery available to Defendants for inspection and copying subject to the Court's Protective Order dated June 6, 2017.  (Smith Decl., Ex. 6).  In its cover letter, the government detailed approximately 8 terabytes available as Rule 16 discovery and provided two indices (Index 1 and Index 2), each of which is broken down into subparts for Defendants' reference.  *Id*.  In pertinent part, the government identified Index 2 as containing the ESI from the search warrants and that "[e]mails and other documents were selected from those computers at different stages of the investigation, and so are ***often duplicative*.**"  *Id.* at 3 (emphasis added).  The pertinent items in Index 2 are:

- Item 9 – approximately 2.8 TB of data comprised of the "largest collection of documents, emails and attachments" extracted from computers seized during the execution of a search warrant on July 28, 2015.  *Id.*;

- Item 10 – approximately 432 GB of data contain email extracted from CPS servers, and "***[m]ost of these emailboxes are duplicated*** in item 9."  *Id.* (emphasis added)*;*

- Item 11 – approximately 432 GB of data which contain email extracted from CPS servers, and "***[m]ost of these emailboxes are duplicated*** in item 9."  *Id.* (emphasis added); and

- Item 14 – 4.5 TB of forensic images from all drives recovered on July 28, 2015.

There is no explanation to account for the difference between the 2.8 terabytes in Item 9 and the 4.5 terabytes in Item 14 despite each coming from computers seized on July 28, 2015.  Given the massive amount of ESI, as well as the technical challenges in conveying and analyzing the data, our review could not begin until well into August 2017.  The government was silent as to whether the ESI it produced was actually responsive to the warrant.

**F.  The Defense Presses the Government for Information Concerning the Search and the Post-Search ESI Review**

Shortly after Rule 16 discovery was available, we began the challenging task of reviewing the massive volume of ESI.  Notwithstanding the government's assurance that "most" email boxes listed in Items 9-11 were "duplicative," we were unable to accurately determine which ESI was duplicative and thus, not necessary to review.  This massive undertaking is ongoing.

On September 26, 2017, we expressed our concerns to the government that its ESI protocol and execution of the search warrant crossed the bounds of reasonableness.  (Smith Decl., Ex. 7).  It seemed inconceivable that the government could have actually reviewed 8 terabytes of ESI and determined that all the produced materials were responsive and within the scope of the warrant.  We suspected that the massive data dump was a result of either (1) a deeply flawed review that determined all ESI was responsive, or (2) an incomplete examination for responsive ESI that the government sought to gloss over by dumping all ESI under the guise of meeting its discovery and *Brady* obligations.  *Id.*  Accordingly, we requested the following:

(1) *The date the search and review of CPS ESI began*.  Failure to begin the review in a timely fashion is grounds for suppression.  *See United States v. Debbi*, 244 F. Supp. 2d 235, 238 (S.D.N.Y. 2003) (finding an eight-month delay unconstitutional); *United States v. Metter*, 860 F. Supp. 2d 205, 215 (E.D.N.Y. 2012) (finding 15-month delay before even beginning to review a defendant's hard drive was unconstitutional).

(2) *The identity of the federal agents involved in the search and review process or taint review process.*  For any evidentiary suppression hearing, we will ultimately need to know which agents may need to testify to afford us the ability to meet our *Touhy* obligations and allow ample time to address scheduling issues.

(3) *Explain the various techniques employed to determine which files or other ESI contain evidence or fruits of the Subject Offenses.*  In particular, please set forth (i) how the agents determined which documents and other materials to collect in response to the search warrants; (ii) with respect to the searches or reviews of electronic evidence seized and reviewed later, the search terms used to identify which

files were responsive to the search warrants, and the dates and times any such electronic searches were conducted; (iii) what protocols were used to identify which documents or files that were seized but that were unresponsive to the search warrants; and (iv) what safeguards and/or limitations were in place at the time of the search to prevent the collection of materials not responsive to the search warrants.

(4) *Confirmation that the notes of the search and review and taint agents are preserved.*

(5) *Confirmation that the search and review of ESI is complete.* The search warrants were authorized in June/July 2015, well over two years ago and any continued search and review would be unreasonable.

(6) *The identification of ESI in the produced Rule 16 discovery that is responsive to any federal search warrant.*

(7) *The identification and return of ESI and documents not responsive to any federal search warrant*

*Id.*

Having received no response for five weeks, we followed up on October 31, 2017. (Smith Decl., Ex. 8).

### G. The Government Brushes Aside Fourth Amendment Concerns and Refuses to Return Non-Responsive Documents

After two further weeks of silence, the government finally sent us a response on November 15, 2017. (Smith Decl., Ex. 9). The government refused to provide any details of its search protocols, claiming that "a number of those questions ask for information that falls outside the ambit of Fed. R. Crim. P. 16 or other applicable authority."[3] *Id.* at 1. It did insist, however, that its search "commenced approximately two months after the execution of the Search Warrant, and was completed before charges were brought against your client in April 2017," an assertion it would walk back only a few weeks later. *Id.* What remains unknown to

---

[3] The government has resisted other efforts for such disclosures only to be required to disclose at an evidentiary hearing. *See, e.g., United States v. Wey*, 256 F. Supp. 3d 355, 373-76 (S.D.N.Y. 2017) (outlining evidentiary hearing findings of FBI ESI review procedure).

date are other critical details of the off-site ESI review, such as who processed and loaded the digital data; whether a taint team was utilized to screen potentially privileged material; what techniques were employed to identify potentially pertinent documents; how often and when were the techniques employed; and precisely when the substantive review for pertinent documents was completed (if at all).

The government also refused to return any non-responsive material to Mr. Mendlowitz on the grounds that he did not own the seized material, a contention that Mr. Mendlowitz notified the government was incorrect in a letter dated November 27, 2017.  (Smith Decl., Ex. 10).  The government further claimed that it had a set of responsive documents, but copying was delayed because of unidentified "file format and mechanical issues."  (Smith Decl., Ex. 9).

**H.  The "Responsive" Documents Disclosed on November 30, 2017**

On November 30, 2017, after five months of defense counsel review and no visibility into the off-site ESI review, the government sent us two letters.  In one letter, the government reiterated its position that Mr. Mendlowitz had no standing to seek a return of the unresponsive ESI and advised that three of the seized servers were returned to counsel for CPS.  (Smith Decl., Ex. 11).  In a second letter, the government produced two disks containing "documents identified as responsive to the search warrant executed on July 28, 2015."  (Smith Decl., Ex. 12).  To our surprise, these two disks appear to contain about 7,800 documents.  When asked to confirm that our estimate of responsive documents was accurate and complete, the government replied that the disks contained documents identified as responsive "***to date***"—plainly indicating that the review was ongoing, and that the government felt at liberty to continue to rummage through the ESI database at its leisure—and that "[i]f that changes, we will let you know."  (Smith Decl., Ex. 13).  To our further surprise, the purportedly responsive set of materials contain numerous

irrelevant and obviously non-responsive documents.  For example, the purportedly responsive document production contains:

- advertisements for discounted airfare;

- confirmation of tickets for professional sporting events; and

- weekly newsletters of current events.

Also troubling, is our identification of potentially attorney-client privileged email between Mr. Mendlowitz and legal counsel that evidently escaped any taint review.

On January 18, 2018, pursuant to Local Criminal Rule 16.1, the parties had a telephonic conference to discuss the concerns set forth in our letter dated September 26, 2017.  The government ultimately declined to provide any further details beyond what was set forth in its November 15, 2017 letter.  (Smith Decl., Ex. 9).

## ARGUMENT

## I.   THE CPS SEARCH VIOLATED THE FOURTH AMENDMENT

The warrant suffers from two fatal flaws that transformed it into a general warrant and provide grounds for suppression.  First, the warrant itself lacks the necessary particularity; namely, it neither adequately describes the subject offenses nor gives unambiguous guidance as to what evidence should be seized.  Second, the seizure, continued retention and untimely searches of seized ESI far exceeds the limits of Fourth Amendment reasonableness.

Particularity, rooted in the Fourth Amendment, requires that warrants state clearly the items to be seized to prevent agents granted seizure authority from executing a general search. Warrants typically lack particularity when they either fail to tell the agents what crime is at issue or contain catch-all provisions instead of itemizing what may be seized.  Here, the warrant suffers from both constitutional infirmities.  It inadequately describes the crime as a "fraudulent

12

credit-card and debit-card processing scheme" without any of the necessary detail on how the scheme allegedly operated.  The warrant also contains impermissible catch-all provisions to permit agents to seize every scrap of paper and byte of data.  The actual execution of the warrant, netting a massive 8 terabytes of data, is a tell-tale sign that the warrant was a general one on its face and in its execution.

The Fourth Amendment's reasonableness requirement places limitations on the post-search review and retention of ESI that was seized to accommodate the government's inability to review large amounts of data at the time of initial execution of a warrant.  These limitations require the government to commence promptly and to work diligently to complete the post-search review.  Perhaps most importantly, the government must return or destroy non-responsive material.  Here, none of these things happened.  Not only should the Court order suppression of the vast majority of the ESI that the government concedes is non-responsive, the Court should also order suppression of the responsive set of materials because of the abusive manner in which the government has approached this matter.

The Court should hold an evidentiary hearing for the purpose of developing facts to show the government's failure to act reasonably in the execution of the search and the post-search off-site review.

### A.  Applicable Standards

#### 1.  *The Fourth Amendment Requires Particularity*

The Fourth Amendment guarantees that "no Warrants shall issue . . . without particularly describing the place to be searched, and the persons or things to be seized."  *U.S. Const. amend. IV*.  This serves to ensure that "those searches deemed necessary should be as limited as possible."  *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971).  As the Second Circuit

observed in *United States v. Young*, the particularity requirement traditionally serves three related purposes: (1) "preventing general searches"; (2) "preventing the seizure of objects upon the mistaken assumption that they fall within the magistrate's authorization"; and (3) "preventing the issuance of warrants without a substantial factual basis."  745 F.2d 733, 758-69 (2d Cir. 1984).  Requiring particularity "makes general searches . . . impossible . . . [and leaves] nothing . . . to the discretion of the officer executing the warrant."  *Marron v. United States*, 275 U.S. 192, 196 (1927); *see also Maryland v. Garrison*, 480 U.S. 79, 84 (1987) ("By limiting the authorization to search to the specific areas and things for which there is probable cause to search, the requirement ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit.").

The particularity requirement is founded on the proscription against the English Crown's use of general warrants.  *United States v. Zemlyansky,* 945 F. Supp. 2d 438, 452 (S.D.N.Y. 2013).  In other words, agents cannot be entrusted with "unguided discretion" as to what items may be seized.  *Id.* at 453.  A warrant must "contain sufficient specificity 'to permit the rational exercise of judgment [by the executing officers] in selecting what items to seize.'"  *Id.* (*citing United States v. Shi Yan Liu*, 239 F.3d 138, 140 (2d Cir. 2000)).  The particularity requirement has taken on greater importance in the digital era, when the personal computer now has the ability "to store and intermingle a huge array of one's personal papers in a single place."  *United States v. Otero*, 563 F.3d 1127, 1132 (10th Cir. 2009).[4]

---

[4] In the days before computers and mass storage of electronic "papers," no government official could validly claim a general right to engage in "wholesale seizure for later detailed examination of records not described in a warrant." *United States v. Tamura*, 694 F.2d 591, 595 (9th Cir. 1982); *see United States v. Abrams*, 615 F.2d 541, 543 (1st Cir. 1980) (indiscriminate seizure of documents "in order that a detailed examination could be made later" was "exactly the kind of investigatory dragnet that the Fourth Amendment was designed to prevent").

While there is no "fixed test" for determining whether a warrant lacks particularity, there are "two factors that, above others, tend to define a warrant's insufficient particularity." *United States v. Vilar*, No. 05-CR-621, 2007 WL 1075041, at *22 (S.D.N.Y. Apr. 4, 2007) (Karas, J.):

> First, warrants are generally found to be insufficiently particular where nothing on the face of the warrant tells the searching officers for what crime the search is being undertaken.  Second, warrants will frequently lack particularity where they include a general, catch-all paragraph of provision, often one authorizing the seizure of any or all records of a particular type.

*Id.* (citations omitted).   Either deficiency standing alone may render the warrant unconstitutional.  *Zemlyansky*, 945 F. Supp. 2d at 453 (citing *United States v. George*, 975 F.2d 72, 75-76); *United States v. Galpin*, 720 F.3d 436, 445-46 (2d Cir. 2013) (outlining particularity requirements for specific offenses for which there is probable cause, detailed description of place to be searched and specific items to be seized); *see, e.g., United States v. Buck*, 813 F.2d 588, 591 (2d Cir. 1987) (finding warrant "*all* in general boilerplate terms, without either explicit or implicit limitation on the scope of the search") (emphasis in original).

### 2.   *The Fourth Amendment Requires Reasonableness for Off-Site Review and Return of Files Outside the Warrant's Scope*

"The   touchstone   of   the   Fourth   Amendment   is   reasonableness   .   .   ." *United States v. Miller,* 430 F.3d 93, 97 (2d Cir. 2005); *United States v. Metter*, 860 F. Supp. 2d 205, 211-15 (E.D.N.Y. 2012) (finding that the government must "complete [its off-site] review . . . within a reasonable period of time"); *see also United States v. Alston*, No. 15-CR-435, 2016 WL 2609521, at *3 (S.D.N.Y. Apr. 29, 2016) ("While Rule 41 prescribes no particular time period for data extraction in these circumstances, the time needed to complete off-site copying or review is subject to the rule of reasonableness.").  Accordingly, any off-site review of ESI must

be scrutinized under Fourth Amendment principles.  *See United States v. Ganias*, 824 F.3d 199, 209 (2d Cir. 2016) (*en banc*) (*Ganias II*); *see, e.g., United States v. Santarelli*, 778 F.2d 609, 615-16 (11th Cir. 1985) ("agents acted reasonably when they removed the documents to another location for subsequent examination . . . *so long as any items found not to be relevant were promptly returned*" (emphasis added)).  The government's own internal policy guidance imposes this same reasonableness requirement for ESI searches.  *See* Exec. Office for U.S. Attorneys, Searching and Seizing Computers and Obtaining Electronic Evidence in Criminal Investigations, 77 (2009),  *available at*  https://www.justice.gov/criminal/cybercrime/ docs/ssmanual2009.pdf, DOJ Manual, at 92 ("The Fourth Amendment does require that forensic analysis of a computer be conducted within a reasonable time.").

In the "computer age," courts have become increasingly concerned that the government's ability to seize entire hard drives for off-site examination may "become a vehicle" for unconstitutional "general" searches.  *United States v. Comprehensive Drug Testing, Inc.*, 621 F.3d 1162, 1177 (9th Cir. 2010).  Where a warrant authorizes government officials to search through large quantities of electronic files, the Fourth Amendment's particularity requirement assumes even greater importance.  *United States v. Galpin*, 720 F.3d at 446.  That is because the "seizure of a computer hard drive, and its subsequent retention by the government, can give the government possession of a vast trove of personal information about the person to whom the drive belongs, much of which may be entirely irrelevant to the criminal investigation that led to the seizure." *Ganias II*, 824 F.3d 199, 217 (2d Cir. 2016) (*en banc*).

In *United States v. Ganias*, an opinion that predates the July 2015 search warrant, the Second Circuit made clear that the Fourth Amendment does not permit officials executing a warrant to "seize and indefinitely retain every file on [a] computer for use in future criminal

investigations." *United States v. Ganias (Ganias I)*, 755 F.3d 125, 137 (2d Cir. 2014) *rehearing en banc*, 12-240 (2d Cir. May 27, 2016); *see also United States v. Soliman*, No. 06-CR-236, 2008 WL 4757300, at *8 (W.D.N.Y. Oct. 29, 2008) (agents on notice that they must cull through seized materials and "identify and return those materials not covered by the warrant").  That Second Circuit panel expressly found that "the government's retention of copies of Ganias's personal computer records for two-and-a-half years deprived him of exclusive control over those files for an unreasonable amount of time." *Ganias I*, 755 F.3d at 137-38; *see also United States v. Wey*, 256 F. Supp. 3d 355, 405-08 (S.D.N.Y. 2017) (noting that government's four-year retention of all seized documents may in and of itself be a constitutional violation).[5]

To satisfy the reasonableness test, once the government completes its review, it must return all non-responsive information which "it ha[d] no probable cause to collect" in the first instance.  *Comprehensive Drug Testing*, 621 F. 3d at 1177; *see also Ganias I*, 755 F.3d at 136.  Admittedly, there is no "one size fits all period" as recognized in the Federal Rules of Criminal Procedure.  *Ganias I,* 755 F.3d at 136 (citing to *Comprehensive Drug Testing, Inc.*, 621 F. 3d at 1171) (noting Rule 41 recognizes severable variables—*e.g.*, storage capacity of media, difficulties created by encryption or electronic booby traps, and computer-lab workload—that may influence the duration of a forensic analysis).  Nevertheless, complexity and volume of ESI review is not an "independent basis for retaining any electronic data other than those specified in the warrant." *Id.*; *see also Tamura*, 694 F.2d. at 596-97 (six-month delay in returning documents outside warrant's scope, after having located the relevant documents, was "an unreasonable and

---

[5] The government must also begin its review of the seized materials within a reasonable time.  Significant delays have been deemed a "flagrant[]" violation of the Fourth Amendment warranting "blanket suppression." *Metter*, 860 F. Supp. 2d at 215-16 (requiring suppression after finding 15-month delay in reviewing hard drive images was unconstitutional); *United States v. Debbi*, 244 F. Supp. 2d 235, 238 (S.D.N.Y. 2003) (holding that a failure to review search material for eight months violated the Fourth Amendment).

therefore unconstitutional manner of executing the warrant").   Without vigilance for reasonableness, the practice of over-seizing electronic records for later off-site review would lead to general and indefinite retention of all electronic papers, which the government could simply store and "efficiently mine for information years into the future."   *See United States v. Jones*, 132 S. Ct. 945, 955-56 (2012) (Sotomayor, J., concurring).

### 3. *The Exclusionary Rule for Fourth Amendment Violations*

To provide a deterrent safeguard, the Supreme Court has held that, absent some exception, evidence seized in violation of the Fourth Amendment must be suppressed.  *Weeks v. United States*, 232 U.S. 383 (1914); *Mapp v. Ohio*, 367 U.S. 643 (1961); *Herring v. United States*, 555 U.S. 135 (2009) (exclusionary rule forbids use of improperly obtained evidence at trial).  "[W]holesale suppression" is generally considered an extraordinary remedy, appropriate only when (1) government agents "effect a widespread seizure of items that were not within the scope of the warrant," and (2) "do not act in good faith."  *United States v. Shi Yan Liu*, 239 F.3d 138, 140 (2d Cir. 2000).

When officers act in "good-faith" reliance on binding law in effect at the time of the violation, there is typically no culpable police conduct to deter.  *United States v. Aguiar*, 737 F.3d 251, 259 (2d Cir. 2013); *see also Wey*, 256 F. Supp. 3d at 405-07 (rejecting good faith argument, in part, due to the government's lengthy and ever-expanding search of the electronically stored files it held after the original search).  In every case, "[t]he burden is on the government to demonstrate the objective reasonableness of the officers' good faith reliance." *United States v. Voustianiouk*, 685 F.3d 206, 215 (2d Cir. 2012) (internal quotation omitted).

**B.  The CPS Warrant Was An Impermissible General Warrant**

Here, the CPS warrant's description of the crime under investigation is so ill-defined that it fails to provide the necessary guidance for agents exercising on-site discretion in identifying evidence of a crime versus legitimate business activity.  The warrant cites to boilerplate Target Offenses labeled as a "fraudulent credit-card and debit-card processing scheme" and is otherwise devoid of any details as to how victims were allegedly fraudulently overbilled or deceived.  What exacerbates this defect is that CPS is a card processing company and virtually every item at the CPS Premises is part of the card processing operation leaving agents with no clue as to what item is part of the ordinary CPS business and what is a fruit or instrumentality of the alleged Target Offenses.  Since there is no allegation that the card-processing services bargained-for were not provided, the alleged scheme necessarily involves only some aspects of CPS business, not the entire operation.

Agent McCaw's affidavit, not incorporated by reference in the warrant, cannot cure these deficiencies.  "It is clearly established that supplementary documents, including affidavits . . . can particularize a warrant *only* if attached and incorporated into the warrant by reference." *Zemlyansky*, 945 F. Supp. 2d at 453 (emphasis in original) (*citing United States v. Rosa*, 626 F.3d 56, 64 (2d Cir. 2010) ("[W]e may no longer rely on unincorporated, unattached supporting documents to cure an otherwise defective search warrant.")).  The warrant, with Attachments A, B, C and D lack any details defining the alleged Target Offenses.[6]  *See, e.g., Wey*, 256 F. Supp. 3d at 381-84 (noting that warrant did not contain "'deliberate and unequivocal language

---

[6] Even Agent McCaw's affidavit, if incorporated, could not save this overbroad warrant. *United States v. George,* 975 F.2d 72, 76 (2d Cir. 1992).  At best, the McCaw affidavit highlights the unremarkable fact that there were differences between the initial customer agreement and bills provided to the alleged victims.  In view of what appears in the affidavit to be disclosure of the actual charges, there is precious little detail on how this so-called fraud could have operated.  The executing agents would have fared no better in terms of particularity had the warrant incorporated the affidavit.

of incorporation.'") (citations omitted); *Vilar*, 2007 WL 1075041, at *38 (finding search protocol in affidavit "irrelevant" because it was not incorporated by reference in the warrant).

The warrant also features impermissible catch-all provisions that permitted the agents to seize every scrap of paper and byte of ESI of CPS's business operation, swamping any attempt at particularity. Item 10 of Attachment B permits the seizure of documents or records merely bearing the names "Commerce Payment Systems," "Commerce Payment Group," "Merchant Commerce," "Empire Payments," "Evolution Bankcard," "Optimal Bankcard," "EVO Merchant Services," "EVO Payments International," "Michael Mendlowitz," or "***similar names.***" (Smith Decl., Ex. 3, Att. B (emphasis added)). Meanwhile, Item 1 allows for the seizure of every business document related to CPS's credit card processing business, and Item 12 authorizes the seizure of "[c]omputer(s), computer hardware, software, related documentation*,* and passwords." Taken together, it is difficult to envision what at the CPS Premises would not have been subject to seizure. The massive discovery production of 8 terabytes, and suspect production of 7,800 "responsive" documents, is unmistakable corroboration that agents, left with these overly broad definitions, executed a general warrant. *See, e.g., Vilar*, 2007 WL 1075041, at *23 (finding warrant violated particularity requirement).

In sum, the warrants are not particularized in violation of the Fourth Amendment, presenting a sufficient basis to suppress all evidence seized.

### C. The Government's Two and One-Half Year Retention of Non-Responsive ESI and Untimely Review Make The Execution of the CPS Warrant Unreasonable

Here, the government's seizure and indefinite retention of all ESI, responsive or not, and its ostensible position that it can continue to search all ESI, flout the reasonableness requirements of the Fourth Amendment. Treating the warrant like a general warrant, the government seized

all of CPS's ESI in July 2015 and made minimal effort to comport with the Fourth Amendment's touchstone of reasonableness.  The 8-terabyte data dump of ESI—roughly 75,000,000 pages[7]— evinces the lack of effort to review for responsiveness for more than two years, and the belated "responsive" subset "to date" serves only as a token effort at post-hoc compliance.  In short, the government cannot seize all ESI, do next to nothing to determine responsiveness, all the while reserving the right to continue its post-search review and then credibly argue it has acted reasonably.

Our efforts to ascertain the reasonableness of the government's search and seizure of ESI have been met with smokescreen tactics.  Brushing off our straightforward inquiries after weeks of delay as unsupported by Rule 16 and "other applicable authority" reflects unfamiliarity with the details of the search and a cavalier attitude toward Mr. Mendlowitz's constitutional rights.  Quite frankly, the stonewalling only adds to the suspicion surrounding the circumstances of this search.

The government's untimely production of 7,800 "responsive" documents is equally troubling.  By expressly stating that this ESI production consists of the documents identified as responsive "to date," the government concedes that it continues to knowingly possesses ESI material that is *unresponsive* to the search warrant and that it may disclose additional responsive ESI as it reserves the right to continue searching.  This squarely defies both *Ganias I* (binding at the time of the July 2015 search) and the standards later enunciated in *Ganias II* and is akin to the government's failures in *Wey*.

---

[7] One terabyte is equal to 1,024 gigabytes, and there are approximately 75,000 pages in 1 gigabyte.  *See* http://www.sdsdiscovery.com/resources/data-conversions (last visited on Nov. 28, 2017).

In that case, the federal agents unreasonably continued to search all seized ESI, not just ESI first deemed responsive, with newly refined search terms as the investigation evolved. *Wey*, 256 F. Supp. 3d at 406. At the *Wey* hearing, "the government appeared to take the somewhat surprising position that it would be well within the government's rights to search retained electronic materials that it had *already deemed unresponsive* to the Warrants using '[a]ny word' the Court could think of as a search term." *Id.* at 405. It would appear the government continues to assert that same dubious position. An evidentiary hearing will assist in understanding whether similar unreasonable behavior has taken place here.

Also pointing to the need for a hearing, as well serving as confirmation that the government seized everything, conducted little to no review and simply dumped data on the defense, is the large quantity of highly irrelevant and very private personal information in the data. For example, just some of the categories of non-responsive ESI produced in discovery include: (1) tax returns for third-party companies and third-party individuals bearing no relation to the investigation or the charged offense conduct; (2) audit work papers of third party individuals; (3) health insurance forms of CPS employees; (4) CPS human resource-related items; (5) invitations for family religious ceremonies; and (5) personal items concerning Mr. Mendlowitz's family including a deeply personal discussion of a Mendlowitz family tragedy between Mr. Mendlowitz and an EVO employee. Also troubling, is that in the November 30, 2017 production of purportedly responsive ESI, we have already identified numerous instances of unresponsive junk email, spam advertisement, and email of what appears to be an attorney-client privileged communication between Mr. Mendlowitz and an attorney.

### D. The Court Should Apply the Exclusionary Rule to Deter Further Unreasonable ESI Procedures

The Court should apply the exclusionary rule to deter and curb the government's unconstitutional ESI search and seizure practices. The traditional remedy is to suppress only the non-pertinent ESI. *See United States v. Matias*, 836 F.2d 744, 747 (2d Cir. 1988). However, the instant circumstances certainly point to the drastic but necessary remedy of blanket suppression of all ESI. This is appropriate when there is a "flagrant disregard" of the warrant. *Id.* (citations omitted). Blanket suppression is warranted when (1) government agents "effect a widespread seizure of items that were not within the scope of the warrant," and (2) "do not act in good faith." *See Shi Yan Liu*, 239 F.3d at 140. Courts must also weigh the benefits of deterrence against the cost of suppression. *Ganias I*, 755 F.3d at 140.

The seizure of 8 terabytes of ESI is unambiguously widespread, and there is a myriad of documents that unmistakably fall outside the bounds of the warrant. The central issue is whether the government acted in good faith. Of the facts already known, there is little indicia of good faith. The government already acknowledges that it continues to possess almost 8 terabytes of non-responsive ESI in open defiance of *Ganias I*, which was binding authority when the search occurred in July 2015. The government also concedes that it had, at some point, determined that less than 8,000 documents were responsive to the search warrant but failed to turn them over until six months into discovery. It also takes the seemingly open position that it will continue to search ESI for responsiveness despite the admonitions in *Wey* against unilaterally returning to the proverbial well to search.

Meanwhile, the benefits of deterrence are great, and the costs minimal. Indeed, the deterrent effect in this case will be more powerful. In *Wey,* there was a facially flawed search

warrant, a sloppy ESI review and significant government personnel changes that any agent can dismiss as factually unique.  This case, however, has much more widespread application to the practice of over-seizing ESI but not promptly searching it.  Forceful application of the exclusionary rule under these circumstances can "provide a bulwark against the execution of general warrants."  *Wey*, 256 F. Supp. 3d at 408.  In fact, the remedy of excluding all seized ESI in this case will provide a clear line of reasonableness for all federal law enforcement.

To temper any concern that "no one size fits all" or that a redline will unduly hamper law enforcement, *Ganias II*'s recognition of the good-faith exception provides the appropriate recourse.  If law enforcement is close to violating the reasonableness standard but otherwise has been diligently reviewing ESI, law enforcement need simply seek a second warrant setting forth the circumstances necessitating additional time for ESI review.  That simple but elegant solution would neither be problematic for agents diligently working nor too burdensome for federal magistrates.[8]

Finally, the cost of suppression in this case is minimal.  *See, e.g., Ganias I*, 755 F.3d at 140-41 (finding benefit of deterrence outweighing cost of suppression).  Like *Ganias I*, Mr. Mendlowitz has not been charged with any crimes that pose serious public safety concerns.  The ESI to be suppressed is not unique and was readily obtainable by subpoena or search warrant.  And the benefit of deterrence—to compel the government to tailor reasonable ESI procedures to safeguard Fourth Amendment rights—vastly outweighs the cost of one case involving an alleged credit-card scheme to defraud merchant-customers in which there is no dispute that each merchant received the card-processing services they paid for.

---

[8] The government already operates under comparable protocols to seek additional judicial approval in any court in the Ninth Circuit.  *See, e.g., United States v. Comprehensive Drug Testing, Inc.*, 579 F.3d 989, 998-1006 (9th Cir. 2009) (outlining Ninth Circuit guidelines).

## II.   THE GOVERNMENT MUST PROMPTLY RETURN OR DESTROY ALL NON-RESPONSIVE MATERIAL

Out of the massive amount of material seized, the government has identified only approximately 7,800 items as responsive to the warrant.  Despite two demands for the return of property, the government has both refused to comply with the obligations imposed by the Constitution and its own warrant application, and has refused to justify its continued retention of non-responsive materials.  Instead, the government weakly offers that Mr. Mendlowitz is not an owner of the material.  But as the sole owner of Commerce Payment Systems, Inc., the identified sole subtenant of the CPS Premises, a 20% owner and Manager of Commerce Payment Group, LLC, and the person with day-to-day managerial control of the CPS Premises, Mr. Mendlowitz is a person "aggrieved" for Rule 41(g) purposes by this unlawful search and seizure.  As the government promised in it application for the warrant, once the government determines that ESI is not responsive to the warrant, it is supposed to return the data "upon request."  (Smith Decl., Ex. 4 ¶ 46).  Indeed, the government cannot credibly assert that continued seizure of all material deemed ***non-responsive*** to the warrant can in any way be justified.  Pursuant to Fed. R. Crim. P. 41(g) and Mr. Mendlowitz's prior written requests, the Court should order the government to promptly return or destroy said non-responsive material in its possession.

The government's sole basis to refuse to return the non-responsive material is its erroneous view of Mr. Mendlowitz's Rule 41(g) standing.  The government makes the threadbare assertion that "it does not appear [Mr. Mendlowitz has] standing."  (Smith Decl., Ex. 9).  But that is belied by common sense and applicable authority.[9]  For Rule 41 standing, a

---

[9] The government also posits that "the materials seized in the search belong entirely to Commerce Payment Systems, EVO and Michael Davidson."  (Smith Decl., Ex. 9).  However, the government's focus on ownership of materials, whether it is CPS, EVO or Davidson, is misplaced.  "Requiring proof of *ownership,* as opposed to *lawful possession,* is . . . not required under [Rule 41]."  *United States v. Rodriguez-Aguirre,* 264 F.3d 1195, 1206 (10th Cir. 2001).

claimant need only allege "a colorable ownership, possessory or security interest in at least a portion of the defendant property." *United States v. $515,060.42 in U.S. Currency,* 152 F.3d 491, 497 (6th Cir. 1998). It is a "comparatively low standing threshold." *Mathews v. United States,* 917 F. Supp. 1090, 1104 (E.D. Va. 1996). As noted, Mr. Mendlowitz unquestionably has the colorable possessory interest in all seized non-responsive material at issue.

To the extent the government attempts to argue that Mr. Mendlowitz has no standing to make a suppression motion, that is likewise without merit. "[W]hether a corporate officer has a reasonable expectation of privacy to challenge a search of business premises focuses principally on whether he has made a sufficient showing of a possessory or proprietary interest in the area searched." *United States v. Chuang*, 897 F.2d 646, 649 (2d Cir. 1990); *see also Rakas v. Illinois*, 439 U.S. 128, 143 at n. 12 (1978) (noting "one who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of this right to exclude"). For example, in *United States v. Schwimmer*, the defendant, a business owner, had a reasonable expectation of privacy in the company's suite of offices given his ownership and control of the company, his participation in the company's affairs, and his office at the company's suite of offices. 692 F. Supp. 119, 124-25 (E.D.N.Y. 1988); *see also Zemlyansky*, 945 F. Supp. 2d at 452 (defendant had standing as the shareholder and president); *United States v. Leary,* 846 F.2d 592, 595–96 (10th Cir. 1988) (corporate officers and employees have legitimate expectation of privacy in corporate office).

Moreover, the government's own Indictment makes plain that Mr. Mendlowitz has standing. In *United States v. Burke,* the judge found that each defendant had standing based, in part, on the allegations that one had "overall managerial responsibility" and participated in "day-to-day operations"; a second likewise had managerial responsibility and the third was an

immediate supervisor of sales staff.  718 F. Supp. 1130, 1135 (S.D.N.Y. 1989); *see also*

*United States v. Dupree*, 781 F. Supp. 2d 115, 147–48 (E.D.N.Y. 2011) (finding defendants had

reasonable expectations of privacy where indictment alleges one defendant is president and CEO

and the others were CFO and COO.  The government alleges that Mr. Mendlowitz was the

"president and chief executive officer," "the owner of a minority share of [Commerce Payment

Group]" and that he "supervised and oversaw ***all CPS departments and operations***."

(Indictment ¶ 12) (emphasis added).

For the same reasons that Mr. Mendlowitz has standing to raise a colorable Rule 41(g)

claim, he also has a reasonable expectation of privacy.

## III.   THE GOVERNMENT SHOULD BE COMPELLED TO IDENTIFY BRADY MATERIAL

Under Rule 16(a)(1)(E) of the Federal Rules of Criminal Procedure, the prosecution must

provide a defendant with access to documents and other information within the "government's

possession, custody, or control" that are "material to preparing the defense."  Fed. R. Crim. P.

16(a)(1)(E); *see also United States. v. Rigas*, 258 F. Supp. 2d 299, 306 (S.D.N.Y. 2003) ("Rule

16(a)(1)(E)(I) entitles a defendant to documents or other items that are material to preparing

argument in response to prosecution's case-in-chief.").  Under Rule 16, a document is material if

"it could be used to counter the government's case or bolster a defense."  *United States v.

Stevens*, 985 F.2d 1175, 1180 (2d Cir. 1993).  Due process requires the government to disclose

favorable material evidence to a criminal defendant.  *United States v. Thomas*, 981 F. Supp. 2d

229, 238 (S.D.N.Y. 2013).

The central question of whether the government has satisfied due process in its *Brady*

disclosures is whether it is disclosed "in time for its effective use at trial."  *United States v.

*Coppa*, 267 F.3d 132, 135 (2d Cir. 2001).  Importantly, "the government cannot hide *Brady*

material as an exculpatory needle in a haystack of discovery materials."  *Thomas*, 981 F. Supp.

2d at 239 (*citing United States v. Skilling*, 554 F.3d 529, 577 (5th Cir. 2009)), *aff'd in part and*

*vacated in part on other grounds*, 561 U.S. 358 (2010).  In *Skilling*, the government produced,

among other things, a set of "hot documents" that were potentially relevant to Skilling's defense.

*Skilling*, 554 F. 3d at 577.

 Here, the government's data dump of 8 terabytes of ESI with the representation that it is

currently unaware of any *Brady* material raises questions of fairness and due process.  First, the

government contends that much of the 8 terabytes is duplicative and that duplicative parts came

from the Secret Service in "several different tranches" to the U.S. Attorney's Office.  But

without precision or de-duplication, we cannot reasonably be expected to forego reviewing any

of these duplicative "tranches" and meet our ethical obligations to Mr. Mendlowitz.  Second, the

government has represented that it completed its review of ESI and "is unaware of any *Brady*

material regarding" Mr. Mendlowitz.  Yet, in the hundreds of hours spent reviewing discovery,

we have discovered numerous examples of exculpatory material, such as unambiguous

disclosure of rates to merchant-customers.  Additionally, the government's own cooperating

witness even recorded statements from CPS employees that clearly evince CPS's policy for

truthful disclosures to merchant-customers but, outrageously, the government has not identified

this evidence as potential *Brady* material.

 Based on the foregoing, the government's representation of its lack of knowledge of any

*Brady* material appears to be based only on a superficial understanding of its own evidence or a

glib interpretation of *Brady*.  Accordingly, we request that the Court compel the government to

deduplicate its entire discovery production eliminating the purported duplicative tranches from

the Secret Service, identify all ESI responsive to the search warrant, update its discovery index and identify *Brady* material within the revised, condensed discovery production.

## IV.   THE GOVERNMENT MUST BE COMPELLED TO PROVIDE A BILL OF PARTICULARS AND AN EXHIBIT LIST

The Indictment, while grandiose in the alleged breadth and scope of the card processing fraud allegations, provides few details about Mr. Mendlowitz's actual role in the scheme.  In a letter dated September 26, 2017, we requested that the government provide particular information, such as each alleged false or misleading statements made to merchant-customers or EVO, each alleged false and deceptive marketing statement, and the identities of merchant-customers who did not know of their on-line access to CPS statements.  (Smith Decl., Ex. 7).  The government declined to provide a bill of particulars claiming that the Indictment was "an extremely specific document" and that the aforementioned 8 terabytes of discovery "is also highly detailed."  (Smith Decl., Ex. 9).  The government's characterization of the Indictment and discovery, however, are self-serving, and a bill of particulars is warranted, as is an exhibit list.

### A.  Applicable Standards

Rule 7(f) of the Federal Rules of Criminal Procedure permits a defendant to seek a bill of particulars "in order to identify with sufficient particularity the nature of the charge pending against him."  *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987) (finding the failure to grant a bill of particulars impaired the defendant's preparation of his defense, which constituted reversible error).  "Such a bill 'enables a defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense.'" *United States v. Rajaratnam*, No. 09-CR-1184 (RJH), 2010 WL 2788168, at *1 (S.D.N.Y. July 13, 2010) (quoting *United States v. Rigas*, 490 F.3d 208, 237 (2d Cir. 2007)).

An order for a bill of particulars is appropriate when the charges of an indictment are "so general that they do not advise the defendant of the specific acts of which he is accused." *Rajaratnam*, 2010 WL 2788168, at *1 (quoting *United States v. Chen*, 378 F.3d 151, 163 (2d Cir. 2004)).   While the government can discharge its obligation of sufficiently notifying a defendant of the charges against him by providing the information either through the indictment "or in some acceptable alternate form," it cannot fulfill this obligation "by providing mountains of documents to defense counsel" without providing guidance as to which documents are relevant.  *Bortnovsky*, 820 F.2d at 574-75.

### B.  The Government Must Provide Particulars of Mr. Mendlowitz's Alleged Fraudulent Conduct

The Indictment describes a vast conspiracy masterminded by Mr. Mendlowitz but is stingy on any actual details of his alleged involvement.  As CEO and president, the government ascribes Mr. Mendlowitz's overall managerial responsibilities as proof that he knowingly orchestrated the conspiracy.  (Indictment ¶ 12).  The Indictment alleges that Mr. Mendlowitz "caused CPS to include false and misleading" marketing material (*Id.* at ¶ 16); "took steps to conceal" information from merchant-customers (*Id.* at ¶ 17); and "directed CPS's sales representatives to follow specific scripts, which contained false, fraudulent and misleading statements."  (*Id.* at ¶ 22).  What the Indictment fails to allege, however, are the actual steps or actions taken by Mr. Mendlowitz to allegedly mastermind the scheme.

The Indictment, for example, does not identify a single misstatement by Mr. Mendlowitz to any merchant-customer or EVO employee or, importantly, his role in preparing, making or authorizing any such misstatements.  *See Rajaratnam*, 2010 WL 2788168, at *2 (granting bill of particulars in part because, "[i]n complex conspiracy cases . . . the potential for unfair surprise

and the difficulty of preparing a defense are amplified"); *United States v. Savin*, No. 00-CR-45 (RWS), 2001 WL  243533, at *4 (S.D.N.Y. Mar. 7, 2001) (finding indictment insufficient where it failed to "provide detailed notice of the conspiracy allegations and the means and methods of the conspiracy").

At the very least, the government needs to identify Mr. Mendlowitz's alleged misrepresentations, or his actions in causing those misrepresentations, to consumers and EVO employees.  Absent these particulars, Mr. Mendlowitz remains unaware of the specific acts of which he is accused.  *Savin*, 2001 WL 243533, at *3 (finding indictment insufficient where government alleged that the defendant "pilfered his client's money through an unspecified series of 'intercompany transfers' without identifying the amounts, dates, means, corporate entities, or co-conspirators involved").  Without knowledge of the specific alleged misrepresentations, it is impossible for Mr. Mendlowitz to prepare a defense to the fraud claims.  *See Bortnovsky*, 820 F.2d at 574-75 (finding defendants were "hindered in preparing their defense by the district court's failure to compel the government to reveal crucial information: the dates of the fake burglaries and the identity of the three fraudulent documents"); *United States v. Lino*, No. 00-CR-632 (WHP), 2001 WL 8356, at *7 (S.D.N.Y. Jan. 2, 2001) ("Courts consistently order the filing of particulars directed to the details of misrepresentations or fraudulent acts.").

Further obstructing Mr. Mendlowitz's inability to mount a defense to the fraud charges is the Indictment's failure to provide any indicia of the identities of purported victim merchant-customers.  The Indictment alleges that Mr. Mendlowitz caused three pages of merchant applications to be withheld from merchant-customers but does not specify any time frame or type of merchant.  (Indictment ¶ 27).  The Indictment dismisses the CPS merchant-customers' on-line monthly statements disclosing rates as "statement[s] that many customers did not know existed"

but fails to give any hint as to which merchant-customers were ignorant of the on-line features.
*See United States v. Davidoff*, 845 F.2d 1151, 1154 (2d Cir. 1988) (reversing conviction because
defendant was prejudiced by denial of bill of particulars identifying all victims of and companies
involved in alleged extortionate scheme); *Rajaratnam*, 2010 WL 2788168, at *2 (granting bill of
particulars for alleged conspiracy "spanning six years" and "involving dozens of stocks [and]
dozens of co-conspirators"); *Savin*, 2001 WL 243533, at *7 (ordering government to release the
dates and times of allegedly fraudulent "intercompany transfers" that occurred over a six-year
period); *United States v. Bin Laden*, 92 F. Supp. 2d 225, 236 (S.D.N.Y. 2000) (in a case where
"the charged conspiracies involve[d] a wide range of conduct, occurring over a long period of
time, in various countries around the world," overt acts described in general terms "provide[d]
too little information to the [d]efendants and their counsel to permit them reasonably to focus
their trial preparations").

### C.  The Government Must Identify the Alleged Co-Conspirators

For many of the same reasons, Mr. Mendlowitz is entitled to the identification of his
alleged co-conspirators known to the government in order to prepare a defense and avoid
prejudicial surprise.  In *United States v. Nachamie*, the court identified six factors to consider in
determining whether disclosure of unindicted co-conspirators is required.  91 F. Supp. 2d 565,
572 (S.D.N.Y. 2000).  The factors include: (1) the number of co-conspirators; (2) the duration
and breadth of the alleged conspiracy; (3) whether the government otherwise has provided
adequate notice of the particulars; (4) the volume of pretrial discovery; (5) the potential danger to
co-conspirators and the nature of the alleged criminal conduct; and (6) the potential harm to the
government's investigation.  *Id.* at 573-74.  These factors weigh in favor of granting Mr.
Mendlowitz's request.

First, the potential number of co-conspirators is considerable. According to the government, many or all CPS personnel were knowing participants. More importantly, as mentioned above, the sheer volume of the discovery haystack hides the needles providing adequate notice of the co-conspirators. Finally, unlike in criminal conspiracies involving crimes of violence, narcotics trafficking, or gun-running, neither Mr. Mendlowitz—nor any of his alleged co-conspirators—are alleged to pose a potential danger to others. *See United States v. Stein*, 435 F. Supp. 2d 330, 359 (S.D.N.Y. 2006) ("[The government] may not obstruct defendant's access to a potential witness unless that is necessary to protect the witness's safety.").

Accordingly, because the *Nachamie* factors weigh in favor of a bill of particulars regarding the identities of the alleged co-conspirators, the Court should direct the government to provide this information. *See Nachamie*, 91 F. Supp. 2d at 573-74 (ordering government to provide names of known-but-unindicted co-conspirators); *see also United States v. Ajemian*, No. 11-CR-1091 (VM), 2012 WL 6762011, at *2 (E.D.N.Y. Dec. 27, 2012) (requiring government to show cause justifying withholding co-conspirator information "[g]iven the large number of named co-conspirators (and unspecified number of unnamed co-conspirators), the extended duration of the alleged conspiracy, the volume of pre-trial disclosures, the apparent lack of potential harm to co-conspirators, and the fact that the potential harm to the government's investigation is limited by the impending trial date"); *Bin Laden*, 92 F. Supp. 2d at 241 ("quite long-running" alleged conspiracy of "nearly ten years, and allegedly ongoing" involving "a large number of co-conspirators" and "extremely voluminous" discovery justified a bill of particulars "revealing the names of all persons whom the government will claim at trial were unindicted co-conspirators").

**D.  Discovery Does Not Provide Sufficient Notice**

Voluminous discovery, by itself, is not a sufficient justification for the government to avoid its obligation of identifying with particularity the charges alleged in the Indictment.  *See Bortnovsky*, 820 F.2d at 575 (rejecting government's argument that voluminous discovery provides an excuse for avoiding disclosure of the particulars of its charges).  In fact, here, as in other cases, the overwhelming 8 terabytes of ESI complicates, rather than informs, Mr. Mendlowitz's efforts to discover the particulars.  *Rajaratnam*, 2010 WL 2788168, at *2 ("The government may not 'rely solely on the quantity of information disclosed'; 'sometimes, the large volume of material disclosed is precisely what necessitates a bill of particulars.'").  The latest production of the "responsive" set is equally of limited use and addresses none of the deficiencies in the lack of allegations of Mr. Mendlowitz's particular acts in furtherance of the conspiracy.

This is especially true here, where Mr. Mendlowitz is accused of masterminding the scheme.  Providing particulars would allow Mr. Mendlowitz to narrow, or at least prioritize, what needs to be reviewed for trial in order to prevent surprise.  *See Lino*, 2001 WL 8356, at *3. As one court observed, a defendant "faced with false statement charges should not have to waste precious pre-trial preparation time guessing which statements he has to defend against" when the government "knows precisely the statements on which it intends to rely and can easily provide the information."  *United States v. Trie*, 21 F. Supp. 2d 7, 21 (D.D.C. 1998).  The government cannot contend that Mr. Mendlowitz should surmise the particulars of the allegedly criminal conduct because such statements are inconsistent with the presumption of innocence.  *Id.*  Thus, regardless of the scope of discovery, the government is required to provide the requested particulars.

In addition to a bill of particulars, the Court may also order the government to provide a witness list and an exhibit list 60 days prior to trial to cure the prejudice and provide sufficient notice of the charges. *See, e.g., United States v. Levine,* 249 F. Supp. 3d 732, 733 n.1 (S.D.N.Y. 2017) (ordering government to provide a witness and exhibit list 50 days before trial as well as a bill of particulars); *United States v. Usher*, No. 17-CR-19, 2017 WL 5633315, at *3 (S.D.N.Y. Oct. 12, 2017) (approving government's proposal to produce initial trial exhibit lists three months prior to trial in lieu of a bill of particulars). Such relief is warranted here.

## CONCLUSION

For the foregoing reasons, the Court should conduct an evidentiary hearing, order the government to identify *Brady* material and grant Mr. Mendlowitz's motions to suppress, to return property and for a bill of particulars.

Dated:  New York, New York             SMITH VILLAZOR LLP
        January 22, 2018

                                        By: /s/ Patrick J. Smith
                                            Patrick J. Smith
                                            Rodney Villazor
                                            Sarah Zimmer
                                            1700 Broadway, Suite 2801
                                            New York, New York, 10019
                                            (212) 582-4400

                                            *Attorneys for Defendant*
                                            *Michael Mendlowitz*

35