UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                :

UNITED STATES OF AMERICA,
                :

      v.
                :   Case No. 17 Cr. 248 (VSB)

MICHAEL MENDLOWITZ,
    a/k/a "Moshe Mendlowitz,"
                :

and
                :

RICHARD D. HART,
    a/k/a "Rick Hart,"
                :

        Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

# REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANT MICHAEL MENDLOWITZ'S MOTION TO SUPPRESS, FOR RETURN OF PROPERTY, FOR IDENTIFICATION OF BRADY <u>MATERIAL AND FOR A BILL OF PARTICULARS</u>

SMITH VILLAZOR LLP
Patrick J. Smith
Rodney Villazor
Sarah Zimmer
1700 Broadway, Suite 2801
New York, New York, 10019
(212) 582-4400

*Attorneys for Defendant Michael Mendlowitz*

Dated: March 29, 2018

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

ARGUMENT ........................................................................................................... 2

I.     THE CPS WARRANT, SEARCH EXECUTION, AND OFF-SITE ESI
REVIEW VIOLATED THE FOURTH AMENDMENT ...................................... 2

    A.    Mr. Mendlowitz Had A Reasonable Expectation of Privacy in the
CPS Desktops and the CPS Servers ............................................................ 2

        1.    Mr. Mendlowitz Has Standing as the Co-Owner, President
and CEO .................................................................................... 2

        2.    Mr. Mendlowitz Signed Leases for the CPS Premises .................. 6

        3.    Mr. Mendlowitz Had De Facto Control Over the CPS
Premises ..................................................................................... 7

        4.    Mr. Mendlowitz, as a Person Aggrieved, Has Rule 41
Standing to Seek Return of ESI .................................................... 8

    B.    The CPS Warrant Remains a General Warrant ........................................ 8

        1.    The CPS Warrant Lacks Particularity ........................................... 8

        2.    Agents Could Not Have Relied on a Facially Deficient CPS
Warrant in Good Faith ............................................................... 10

    C.    The Off-Site ESI Review Was Unreasonable Under the Fourth
Amendment ........................................................................................... 12

    D.    The Government Unreasonably Continues to Retain Seized ESI ............ 15

    E.    Blanket Suppression of Seized ESI Is an Appropriate Remedy .............. 16

II.    THE GOVERNMENT CONTINUES TO HIDE BRADY MATERIAL IN
A DISCOVERY HAYSTACK ........................................................................ 17

III.   EXHIBIT AND WITNESS LISTS OBVIATE THE NEED FOR A BILL
OF PARTICULARS ....................................................................................... 18

CONCLUSION ..................................................................................................... 19

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*In re Grand Jury Subpoena Duces Tecum, Dated January 2,*
*1985*, 767 F.2d 26 (2d Cir. 1985) ................................................................. 3

*Kyles v. Whitley,*
514 U.S. 419 (1995) ................................................................................... 14

*Mathews v. United States,*
917 F. Supp. 1090 (E.D. Va. 1996) ............................................................ 8

*United States v. $515,060.42 in U.S. Currency,*
152 F.3d 491 (6th Cir. 1998) ..................................................................... 8

*United States v. Burke,*
718 F. Supp. 1130 (S.D.N.Y. 1989) ........................................................... 3

*United States v. Cannone,*
528 F.2d 296 (2d Cir. 1975) ..................................................................... 19

*United States v. Chalmers,*
474 F. Supp. 2d 555 (S.D.N.Y. 2007) ...................................................... 19

*United States v. Chuang,*
897 F.2d 646 (2d Cir. 1990) ....................................................................... 4

*United States v. Dupree*,
781 F. Supp. 2d 115 (E.D.N.Y. 2011) ....................................................... 3

*United States v. Ganias,*
755 F.3d 125 (2d Cir. 2014), *rehearing en banc, Ganias II, 824 F.3d at 220-21* .................... 16

*United States v. Ganias,*
824 F.3d 199 (2d Cir. 2016) ................................................................. 8, 16

*United States v. Jones,*
132 S. Ct. 945 (2012) ............................................................................... 16

*United States v. Kazarian,*
2012 WL 1810214 (S.D.N.Y. May 18, 2012) ........................................... 5

*United States v. Leung,*
40 F.3d 577 (2d Cir. 1994) ......................................................................... 3

*United States v. Matias,*
836 F.2d 744 (2d Cir. 1988) ..................................................................... 16

*United States v. Nagle*,
803 F.3d 167 (3d. Cir. 2015)................................................................ 5, 6

*United States v. Payne*,
63 F.3d 1200 (2d. Cir. 1995)................................................................ 14

*United States v. Rosa*,
626 F.3d 56 (2d Cir. 2010)................................................................ 9, 11

*United States v. Schwimmer*,
692 F. Supp. 119 (E.D.N.Y. 1988) ...................................................... 4, 5

*United States v. Shi Yan Liu*,
239 F.3d 138 (2d Cir. 2000)................................................................ 10

*United States v. Thomas*,
981 F. Supp. 2d 229 (S.D.N.Y. 2013)................................................... 17

*United States v. Vilar*,
No. 05-CR-621, 2007 WL 1075041 (S.D.N.Y. Apr. 4, 2007).................. 10

*United States v. Voustianiouk*,
685 F.3d 206 (2d Cir. 2012)................................................................ 10

*United States v. Wey*,
256 F. Supp. 3d 355 (S.D.N.Y. 2017)................................................. 2, 11

*United States v. Zemlyansky,*
945 F. Supp. 2d 438 (S.D.N.Y. 2013).............................................. 4, 5, 10

**Statutes**

Title 18, United States Code, Sections 1343 and 1349................................. 8

Defendant Michael Mendlowitz respectfully submits this reply memorandum of law in support of his (1) a motion to suppress evidence seized during the execution of a search warrant; (2) a motion to return property; (3) a motion to compel the government to identify all *Brady* material; and (4) a motion for a bill of particulars and an exhibit list.

## PRELIMINARY STATEMENT

The government's arguments do not change the obvious facts: the CPS Warrant was a facially deficient general warrant that led to the indiscriminate seizure of multiple terabytes of electronically stored information (ESI). Saddled with the immense task of reviewing this mountain of data, the government appears to have conducted a haphazard and incomplete offsite review of the seized ESI to determine what is actually responsive to the CPS Warrant. Its representations about the review process have suspiciously emerged in bits and pieces and evolved over time. The latest government representation, on March 6, 2018, is that only 1,830 documents out of literally millions of documents have been identified as "responsive" in what is represented to have been an 18-month "painstaking" review that concluded in April 2017. This fact alone tells us that the volume of ESI seized had no reasonable relationship to any articulated theory of criminality.

The government's convoluted, largely incomprehensible explanation of its ESI search procedures only serves to increase the suspicion level. An evidentiary hearing is necessary to sort out what actually happened rather than accepting at face value the government's assertions ("based on personal knowledge") that its review process was "entirely appropriate." A hearing remains necessary despite the government's illusory offer to stipulate that only the set of 1,830 would be relied upon by the government.

1

Moreover, the government fails to squarely address its continued resistance to identifying the exculpatory needles in the *Brady* haystack of the discovery production or to accept the defense's modest request to produce exhibit and witness lists sixty (60) days in advance of trial in lieu of providing a bill of particulars. But its boilerplate responses of its awareness of *Brady* or its standard office procedures remain woefully insufficient. The government must do more.

## ARGUMENT

## I. THE CPS WARRANT, SEARCH EXECUTION, AND OFF-SITE ESI REVIEW VIOLATED THE FOURTH AMENDMENT

### A. Mr. Mendlowitz Had A Reasonable Expectation of Privacy in the CPS Desktops and the CPS Servers

The government questions Mr. Mendlowitz's standing to even challenge the government's search and seizure of CPS desktops and CPS servers.[1] But Mr. Mendlowitz, as a co-owner, president and CEO who was actively involved in the day-to-day operations at the CPS Premises, and who had possession of the CPS Premises as a matter of both legal right and practical access, had a reasonable expectation of privacy within the entire CPS Premises and the ESI located on CPS computers.

#### 1. *Mr. Mendlowitz Has Standing as the Co-Owner, President and CEO*

The government's argument that Mr. Mendlowitz, conveniently recast from criminal mastermind to mere employee subject to a "CPS Employee Handbook," is contradicted by the government's own Indictment. The government cannot allege that as president and CEO he "supervised and oversaw all CPS departments and operations" (Indictment ¶ 12) but now argue

---

[1] The government, in *Wey*, apparently did not challenge the defendant CEO's standing to challenge the search of both his apartment and his office. *United States v. Wey*, 256 F. Supp. 3d 355, 379 n.4 (S.D.N.Y. 2017) ("the parties do not appear to dispute that Wey has standing to challenge the Search of his residence or the Search of the offices"). Now, post-*Wey*, the government apparently has taken a different position.

that he "had no conceivable expectation of privacy." (Govt. Mem. in Opp. at 11). The government's reliance on the CPS Employee Handbook and cited authority addressing the application of handbooks to employee privacy is misplaced. The CPS Employee Handbook includes a welcome letter from Mr. Mendlowitz, ***the president of the company***. The government turns the Handbook on its head claiming that the disclaimers, including the electronic communication policy, also apply to Mr. Mendlowitz, the co-owner, president and CEO. Meanwhile, Mr. Mendlowitz had the right "to retrieve and read any message or file" of any CPS employee. (Declaration of David Raymond Lewis, Dated March 8, 2018 ("Lewis Decl.") Ex. E at 26)). Mr. Mendlowitz, as the Indictment makes clear, was no mere employee.[2]

Nor can the government allege that Mr. Mendlowitz was "closely involved in preparing false and fraudulent marketing materials and websites, causing sales staff to be provided with false and fraudulent written scripts . . . [or] directing employees on how to handle complaints from merchant-customers," (Indictment ¶ 12), on one hand, and, on the other, convincingly claim that he had no possessory interest in the very aspects of the business he is alleged to have closely controlled. Such allegations in the Indictment preclude a challenge to his standing. *See United States v. Burke,* 718 F. Supp. 1130, 1135 (S.D.N.Y. 1989) (finding principals had standing to challenge search of three separate offices based on indictment allegations and attorney affirmation); *United States v. Dupree*, 781 F. Supp. 2d 115, 147–48 (E.D.N.Y. 2011) (finding

---

[2] The CPS Employee Handbook (Lewis Decl. Ex. E) together with additional documents attached to the government's opposition (Lewis Decl. Exs. I and J) bear the legend "confidential; produced in response to grand jury subpoena" but none of these documents were in the discovery previously provided. It seems that the government has improperly used the grand jury to gather evidence to oppose Mr. Mendlowitz's motion. *See United States v. Leung,* 40 F.3d 577, 581 (2d Cir. 1994) (noting that it is "improper for the Government to use the grand jury for the sole or dominat[ing] purpose of preparing for trial under a pending indictment") (citation omitted). The remedy here should be to strike these materials from the government's opposition. *Cf. In re Grand Jury Subpoena Duces Tecum, Dated January 2, 1985*, 767 F.2d 26, 29-30 (2d Cir. 1985) (remanding to district court to quash grand jury subpoena because AUSA improperly utilized grand jury). We also note that this copy of the handbook was never produced in discovery and the other two items were first produced on March 6, 2018.

president and CEO and CFO had standing based on allegations of roles and day-to-day operation). Here, the government cannot deny the co-owner, president and CEO the benefit of having a reasonable expectation of privacy and possessory interest in the CPS Premises for standing but still impose the burden of being omniscient in every facet of the CPS operation in the Indictment.[3] *See United States v. Chuang*, 897 F.2d 646, 649 (2d Cir. 1990) ("[W]hether a corporate officer has a reasonable expectation of privacy to challenge a search of business premises focuses principally on whether he has made a sufficient showing of a possessory or proprietary interest in the area searched.").

The government argues that *Chuang* should be dispositive here, selectively discussing facts about that defendant's ownership interest in a bank, his executive position, and his operational control over the bank. (Govt. Mem. in Opp. at 19). But the government leaves out the key circumstance that crushed Chuang's attempt to show he had a reasonable expectation of privacy: Banking is a highly regulated industry and the materials were subject to inspection by the OCC, the bank's principal regulator. *Chuang*, 897 F.2d at 650. The Second Circuit found that, not only did Chuang fail persuasively to demonstrate that he had a subjective expectation of privacy in such bank documents, it was also objectively unreasonable for someone in a highly regulated industry in a commercial space to hold such an expectation. *Id.* at 650-51. None of these factors is present with respect to the business of credit-card processing, a private business with no dedicated regulatory oversight.

Meanwhile, the government is all too quick to spurn the cogent holdings in *United States v. Schwimmer,* 692 F. Supp. 119 (E.D.N.Y. 1988), and *United States v. Zemlyansky,* 945 F. Supp.

---

[3] For these same reasons, the government's cited authority pertaining to employees' reasonable expectation of privacy in the workplace is inapposite. (*See* Govt. Mem. in Opp. at 16-17).

2d 438 (S.D.N.Y. 2013). In *Schwimmer*, the government only points to the judge's assumption of standing to ultimately deny the motion to suppress. (Govt. Mem. in Opp. at 21). A closer reading, however, shows that the district court declined to hold an evidentiary hearing to conclusively address standing, but for purposes of deciding the motion to suppress, found that there was sufficient evidence—"ownership and control of First United, his participation in the company's affairs, and his office at the company's suite of First United's offices . . . for the court to find that [the defendant] had a legitimate expectation of privacy ***in the entire suite of First United's offices***." *Schwimmer*, 692 F. Supp. at 125 (emphasis added). Given Mr. Mendlowitz's historical possession and sole control over the premises, including the leasehold interests, the facts here are even stronger.

*Zemlyansky* likewise provides sound reasoning despite the government's dismissal of its standing conclusion, arguing that the court found standing "without any explanation of its analysis, nor citation to any precedent supporting its conclusion." (Govt. Mem. in Opp. at 21). This mischaracterizes the opinion. The Hon. Paul Oetken, citing *Chuang* as well as *United States v. Kazarian*, 2012 WL 1810214 (S.D.N.Y. May 18, 2012), noted that one defendant was a sole shareholder and president and the other co-defendants submitted sworn declarations "that they both 'participated in managing and running the operations . . . and shared [Zaretskiy's] interest in the company." 945 F. Supp. 2d at 452. Judge Oetken appropriately found that the defendants had demonstrated the possessory or proprietary interest in the subject premises.

The government's heavy reliance on *United States v. Nagle*, 803 F.3d 167 (3d. Cir. 2015), in which the co-owner was found to not have standing to challenge the search, still does not undermine Mr. Mendlowitz's reasonable expectation of privacy in the CPS Premises. In *Nagle*, the Third Circuit recognized that a shareholder who demonstrates a

'"personal connection to the places searched and the materials seized"' could have a reasonable expectation of privacy. *Id.* at 178 (citation omitted). After an evidentiary hearing—one which the government asks this Court to avoid—the appellate court affirmed the district court's fact-specific holding that the defendant did not demonstrate a personal connection to the subject premises. *Id.* at 178-79. The facts present here satisfy the *Nagle* rule.

### 2. Mr. Mendlowitz Signed Leases for the CPS Premises

Another factor weighing in favor of Mr. Mendlowitz's reasonable expectation of privacy is the nature of the leasehold interest in the CPS Premises, through Route 340 Corp., and later through Commerce Payment Systems. The government calls these lease agreements "nonsense" and a "detour." (Govt. Mem. in Opp. at 13). But the sublease agreement nevertheless remains further proof evincing Mr. Mendlowitz's personal and possessory interest in the CPS Premises.

Mr. Mendlowitz first leased the CPS Premises in his individual capacity in May 2006. (*See* Declaration of Rodney Villazor, dated March 29, 2018 ("Villazor Decl."), Ex. 14 at ¶ 2). On March 1, 2009, Mr. Mendlowitz and Mr. Davidson, through their Route 340 Corp., entered into a sublease agreement with Commerce Payment Systems for 4,000 square feet at $9,000 per month. (*Id.* at ¶ 3). Commerce Payment Group, LLC did not exist until April 2009. (*Id.* at ¶¶ 5-6). That March 2009 sublease between Route 340 Corp. (overtenant) and Commerce Payment Systems (subtenant) for $9,000 monthly rent was signed by Mr. Mendlowitz on behalf of Commerce Payment Systems. (Villazor Decl. Ex. 15).

On April 23, 2009, Route 340 Corp. signed a new five-year lease for the CPS Premises with escalating rent between $13,151.67 and $14,802.33 through the first five years.[4] (*See*

---

[4] Among Route 340's duties under this lease agreement, Route 340 Corp., not Commerce Payment Group, LLC, paid a proportionate share of real estate taxes, operating expenses and maintained an insurance policy. (Villazor Decl. Ex. 14 at ¶ 9).

Declaration of Patrick J. Smith, dated Jan. 22, 2018 ("Smith Decl.") Ex. 1 at 39). On January 1, 2012, a new sublease between Route 340 Corp. (overtenant) and Commerce Payment Systems (subtenant) for $11,500 monthly rent for 5,110 square feet was again signed by Mr. Mendlowitz on behalf of Commerce Payment Systems and Mr. Davidson on behalf of Route 340 Corp. (Smith Decl. Ex. 2). The government's cited evidence corroborates Mr. Mendlowitz's possessory interest in the CPS Premises. The rent receipts show that Commerce Payment Group, LLC (co-owned by EVO and Mr. Mendlowitz) paid that monthly $11,500.00 rent in compliance with the sublease signed by Mr. Mendlowitz. (Lewis Decl. Ex. J).

### 3. Mr. Mendlowitz Had De Facto Control Over the CPS Premises

Additional circumstances further reinforce the conclusion that Mr. Mendlowitz had a sufficient possessory interest in the CPS Premises. Mr. Mendlowitz alone had the power to admit or exclude any individual from the CPS Premises, even EVO employees who had to be admitted into the CPS Premises by a CPS employee. (Villazor Decl. Ex. 14 at ¶¶ 10-11, 13). He had the master keys to access his office and the locked computer server room with the ultimate authority to grant or deny access. (*Id.* at ¶¶ 10, 15). He alone had the primary authority to grant, revoke or deauthorize electronic security cards to enter the CPS Premises. (*Id.* at ¶ 12). Mr. Mendlowitz also had the power, and at times exercised that prerogative, to access any CPS computer and the archived calls on the CPS servers. (*Id.* at ¶¶ 14-15). Only Mr. Mendlowitz, and no other EVO or Commerce Payment Group employee or manager, exercised such possessory authority over the CPS Premises. These facts place this case squarely within the standards set forth in *Chuang*, *Schwimmer*, and *Zemlyansky* and even the Third Circuit's "personal connection to the places searched and the materials seized" test in *Nagle*.

*4. Mr. Mendlowitz, as a Person Aggrieved, Has Rule 41 Standing to Seek Return of ESI*

According to the government, Mr. Mendlowitz has no standing to make such a motion as a "person aggrieved," and besides, the government argues, "portions of the seized material" were returned to Mr. Davidson and Commerce Payment Group. (Govt. Mem. in Opp. at 33). However, as co-owner, president, CEO and leasehold interest holder, together with the other powerful facts demonstrating Mr. Mendlowitz's interest in the CPS Premises, he sufficiently alleges "a colorable ownership, possessory or security interest in at least a portion of the defendant property." *United States v. $515,060.42 in U.S. Currency,* 152 F.3d 491, 497 (6th Cir. 1998); *Mathews v. United States,* 917 F. Supp. 1090, 1104 (E.D. Va. 1996) (noting the "comparatively low standing threshold"); *see also United States v. Ganias*, 824 F.3d 199, 218 (2d Cir. 2016) (*en banc*) (*Ganias II*) (criticizing defendant for never seeking return of any seized material). The seized ESI from the CPS Premises that the government unreasonably continues to retain remains subject to return or destruction at the Court's direction.

**B. The CPS Warrant Remains a General Warrant**

*1. The CPS Warrant Lacks Particularity*

The government contends that its warrant was "sufficiently particular." (Govt. Mem. in Opp. at 28). "[E]very subparagraph of the list of evidence to be seized is modified by introductory language limiting the Search to 'evidence, fruits, and instrumentalities of ***the operation of a fraudulent credit-card and debit-card processing scheme*** in violation of Title 18, United States Code, Sections 1343 and 1349." *Id.* at 29 (emphasis in original). But the government misses the point.

The crux of Mr. Mendlowitz's argument is that the enumerated Target Offenses in the Warrant were for a generic "fraudulent credit-card and debit-card processing scheme" to be

executed at a credit-card processing business.  Without a description of how that fraud allegedly operated, the executing agents had no ability to distinguish between evidence that relates to the alleged fraud and what was part of an otherwise legitimate business.  (It is worth noting that the government does not allege that CPS merchant-customers did not receive the credit-card processing services they bargained for).  In other words, it was unremarkable to find the enumerated types of evidence, (Govt. Mem. in Opp. at 5-6), such as "business and financial reports and records, bank and credit card records" or "checks (personal and certified), customer contracts and agreements, customer bills" and the like, that would exist at any card processing company.  If the government had obtained a similar type of general warrant for a "bank fraud" to search a bank for records of financial transactions, the same indiscriminate seizure would occur.

To save this facially defective warrant, the government relies heavily on the details of the alleged fraud in the McCaw Affidavit.  (Govt. Mem. in Opp. at 30 ("Each of the enumerated categories are . . . closely tethered to the probable cause described in the search warrant affidavit. . . . The Search Warrant Affidavit makes clear that virtually every aspect of Commerce's operation was permeated by fraud.")).  But the government is asking the Court to overlook a singular but decisive error previously highlighted by Mr. Mendlowitz and noticeably unaddressed by the government.[5]  The McCaw Affidavit is not incorporated by reference in the warrant.  Thus, any detail contained therein bears no relevance whatsoever in assessing the lack of particularity in the CPS Warrant.  *See United States v. Rosa*, 626 F.3d 56, 64 (2d Cir. 2010) ("[W]e may no longer rely on unincorporated, unattached supporting documents to cure an otherwise defective search warrant.").

---

[5] The government seems to acknowledge its failure to incorporate the McCaw Affidavit in its good faith argument acknowledging that the "facial validity of the warrant must be assessed independent of the unattached affidavit." (Govt. Mem. in Opp. at 32 n.7).

Accordingly, *United States v. Zemlyansky,* 945 F. Supp. 2d 438 (S.D.N.Y. 2013), and *United States v. Vilar*, No. 05-CR-621, 2007 WL 1075041 (S.D.N.Y. Apr. 4, 2007), remain directly on point. Nothing on the face of the CPS Warrant sufficiently advised the executing agents what it was about CPS's business that was allegedly fraudulent. Viewed through this lens of an undefined "fraudulent credit-card and debit-card processing scheme," coupled with the catch-all provisions, the CPS Warrant lacks the necessary particularity rendering it a prohibitive general warrant.

### 2. *Agents Could Not Have Relied on a Facially Deficient CPS Warrant in Good Faith*

As a last resort, the government retreats to the agents' purported good faith to save its CPS Warrant. That burden falls on the government. *See United States v. Voustianiouk*, 685 F.3d 206, 215 (2d Cir. 2012) ("[t]he burden is on the government to demonstrate the objective reasonableness of the officers' good faith reliance.") (citation omitted). Here, the government contends that there was no widespread seizure of items and no evidence of bad faith. (Govt. Mem. in Opp. at 32 (citing *United States v. Shi Yan Liu*, 239 F.3d 138, 140 (2d Cir. 2000) (finding wholesale suppression appropriate only when (1) government agents "effect a widespread seizure of items that were not within the scope of the warrant," and (2) "do not act in good faith."))). The record evidence belies that assertion.

The government oddly contends that the search executed was not a "widespread seizure of items not within the scope of the warrant" but, at the same time, concedes that most of the produced discovery, the whopping 8 terabytes that consists of duplicate sets, is "irrelevant to what needs to be reviewed in preparation for trial." (Govt. Mem. in Opp. at 32, 34 n.11). That concession alone firmly establishes the widespread nature of the seizure despite the government's desperate attempt to focus the Court on the "modest" number of desktops or

servers seized. More to the point, the 1,830 "responsive" documents culled from the terabytes of data seized further demonstrate the widespread seizure of non-responsive evidence.

The good-faith inquiry instead should turn on the agents' good faith, specifically the facial deficiencies of the CPS Warrant that rendered any reliance upon it unreasonable.[6] The government correctly points out that the Court may evaluate the McCaw Affidavit here in assessing whether the agents acted in good faith. (Govt. Mem. in Opp. at 32 n.7 (citing *Rosa*, 626 F.3d at 64)). *But see Wey*, 256 F. Supp. 3d at 396-97 (noting the "highly unusual facts" of *Rosa* and repeated appellate signals to weigh objective reasonableness and deterrence value) (citation omitted). The McCaw Affidavit alone, however, is woefully inadequate to conclusively establish the agents' good faith. This is best left for an evidentiary hearing.

*Wey* again illustrates the need for an evidentiary hearing. At the *Wey* hearing, the case agent could not recall any instructions or guidance provided to the search team, only made the supporting affidavits "available" to the other agents, did not actually hand out copies of the supporting affidavits, and did not ensure that the search team actually read the affidavits. *Wey*, 256 F. Supp. 3d at 368. In finding no good faith, the *Wey* court also thoroughly weighed exigency, whether the case agent meaningfully discharged his duties, and whether the search team actually reviewed the supporting affidavits, overseizure, and the government's continuing search of ESI. *Id.* at 399-409.

Here, the facial invalidity of the warrant, the tortured procedural history of producing discovery and belated "responsive" documents, the "duplicate" productions that cannot be accounted for with precision, and the continued possession of non-responsive ESI that the

---

[6] There is no contention that the magistrate judge was knowingly misled, that the judge wholly abandoned his role or that the warrant application was so lacking in probable cause. *Wey*, 256 F. Supp. 3d at 395.

government may later seek additional warrants to continue to search all raise troubling issues. The government cannot point to the McCaw Affidavit alone to meet its burden of establishing good faith. An evidentiary hearing will bear out whether the lackadasical agent approach to the execution of search warrants shown in *Wey* is endemic. The present record certainly points to alarming practices by the government.

### C. The Off-Site ESI Review Was Unreasonable Under the Fourth Amendment

The government's assertion that "the Government painstakingly reviewed the evidence for some 18 months, and the Government then carefully provided the defense with discovery indices and letters that separated a mere 1,830 responsive documents" obscures the government's inadequate and tardy disclosures. (Govt. Mem. in Opp. at 38). These are not "unfounded imaginings." (*Id.* at 33). The summary of the review process the government now describes was suspiciously not provided when defense counsel made a straightforward request in September 2017. (Smith Decl. Ex. 7 at 2) ("We request specific details of the search and review process of the seized ESI."). Furthermore, the government's discovery production, while tortured, bears summarizing because it raises significant concerns pertaining to the competency and adequacy of the ESI review.

On June 12, 2017, the government produced 8 terabytes of ESI, some of which was "duplicative." (Smith Decl. Ex. 6). The explanation as to what precisely was duplicative was left wanting. "Emails and other documents were selected from [seized computers] at different stages of the investigation, and so are often duplicative." (*Id.* at 3). Describing email extracted from CPS servers in PST and MBOX format, the government advised that "[m]ost of these emailboxes are duplicated" from documents taken from the seized CPS computers. (*Id.*).

After months of reviewing largely irrelevant and duplicative documents, in September 2017, defense counsel sought to understand exactly what was not duplicative between the extractions from the computers and the extractions from the servers and what ESI had been deemed responsive to the search warrant. (Smith Decl. Ex. 7). The government ignored the requests for information. (Smith Decl. Ex. 8). Finally, on November 15, 2017, the government provided defense counsel with the assurance that the ESI review commenced two months after the execution of the warrant and completed some unspecified time prior to the return of the Indictment in April 2017. (Smith Decl. Ex. 9). And for some inexplicable reason, the government *in November 2017* advised that it was just starting to prepare copies of the documents it had allegedly deemed "responsive" before April 2017. (*Id.*).

On November 30, 2017, the government designated less than 8,000 documents as "responsive." (Smith Decl. Ex. 11). Shortly thereafter, defense counsel again encountered non-responsive spam and sought clarification from the government. (Smith Decl. Ex. 13). The government again unconditionally represented that the documents produced on November 30, 2017 "are the responsive documents we have identified to date." (Smith Decl. Ex. 13). Defense counsel renewed its focus on these "responsive" documents only to encounter more and more non-responsive material.

This motion highlighted, among other things, the spam within the November 30, 2017 production that the government had repeatedly assured us was the subset of responsive material. Now, in its opposition and a recent discovery letter, the government has changed its previous representation. On March 6, 2018, the government advised that only 1,830 documents of the production were actually individually reviewed and deemed as "responsive" while the rest of the

November 30, 2017 production, namely two large .pst files, consisted only of *potentially* responsive material.  (Lewis Decl. Ex. C).

This labored process to extract clarity and precision from the government raises fundamental concerns over its ESI review and process. The government evidently has no clear understanding of what was seized, what was searched, and what is responsive.  This lack of fluency in the materials that are supposedly responsive to the warrant after a "painstaking" review is troubling.  *United States v. Payne*, 63 F.3d 1200, 1208 (2d. Cir. 1995) ("The individual prosecutor is presumed to have knowledge of all information gathered in connection with the government's investigation."); *see also Kyles v. Whitley*, 514 U.S. 419, 436-37 (1995) ("prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police").

The government's evolving, confusing explanations heighten the suspicion level.  For example, the two .pst files that were subjected to electronic searches only and resulted in "potentially responsive material" contribute to the doubt on the adequacy of the ESI review.  The government concedes that these two .pst files, containing approximately 8,000 documents, were not actually individually reviewed but still attempts to describe a robust, "painstaking" ESI review that it claims warrants no scrutiny.  Put succinctly, if the November 30, 2017 production of less than 8,000 documents is the entire universe of potentially responsive documents identified by the government to review, there should be no reason why the agents could not have reviewed each of these documents within the 18-month "painstaking" review.  There should be no reason why the government should have withheld its 1,830 responsive designations until March 6, 2018.

Against this background, the Court should reject the government's explanations about the regularity of its ESI review process as well as its attempt to avoid fact-finding on this issue

through an evidentiary hearing. The Court should further disregard the government's meaningless offer to stipulate as set forth in its opposition. (Govt. Mem. in Opp. at 37, 41 n.16). This offer is a misleading effort to placate the Court and the defense and avoid scrutiny of the mess the government has made of the ESI review in this case. The offer to stipulate is meaningless because the government wants to carve out the right to seek additional search warrants so that it can go back and search the data it did not review properly within the reasonable time frame allotted by the Fourth Amendment. In view of what has been represented, on personal knowledge, to be a "painstaking" and thorough search of the seized ESI that resulted in the identification of 1,830 responsive documents—a search that required a full 18 months and was completed by April 2017—there should be no necessity for an additional search warrant to review again that which has been so carefully reviewed already.[7]

### D. The Government Unreasonably Continues to Retain Seized ESI

Another alarming position from the government related to the reasonableness of its ESI review is its steadfast view that "the Government is not required to return the electronic devices that remain in its possession or divest itself of electronically stored information." (Govt. Mem. in Opp. at 41). Its sole justification is "for purposes of introducing data thereon at trial." But that explanation is disingenuous. On September 26, 2017, defense counsel agreed to stipulate authenticity and continues to agree to do so. (Smith Decl. Ex. 7, at 3 n.4).

The government's position also disregards the cautions embodied in the *Ganias* opinions. The panel in *Ganias I*—cited for the express purpose of showing binding precedent at the time of

---

[7] We tried to accept the government's offer to stipulate that only the 1,830 documents identified as responsive could be used by the government at trial and have this motion terminated as moot. The government refused to agree that it would forego the use of additional search warrants to go back through the ESI. A copy of our email exchange is attached as Exhibit 16 to the Villazor Declaration.

the execution of the warrant and the ESI review—expressly found that "the government's retention of copies of Ganias's personal computer records for two-and-a-half years deprived him of exclusive control over those files for an unreasonable amount of time." *United States v. Ganias*, 755 F.3d 125, 137 (2d Cir. 2014), *rehearing en banc*, *Ganias II*, 824 F.3d at 220-21.[8] The *en banc* panel, in addressing particularity, remarked that the government could potentially hold a "vast trove of personal information" that is entirely irrelevant to the criminal investigation. *Ganias II*, 824 F.3d at 217.[9]

In sum, the government should not retain the prerogative to obtain additional search warrants for ESI seized in July 2016 that it has either designated as non-responsive or never examined. (Govt. Mem. in Opp. at 37) (government is "prepared to stipulate that the only documents so far identified as 'responsive'—*assuming no additional search warrant is obtained*—are those 1,830 [documents identified on March 6, 2018].") (emphasis added). This flouts any semblance of reasonableness under the Fourth Amendment.

### E. Blanket Suppression of Seized ESI Is an Appropriate Remedy

Contrary to the government's assertion, one available remedy that remains is the blanket suppression of ESI. *See United States v. Matias*, 836 F.2d 744, 747 (2d Cir. 1988) (noting blanket suppression available when there is a "flagrant disregard" of the warrant). Nothing proffered by the government precludes this remedy at this stage. The benefits of deterrence remain great—compelling the government to impose constitutional and reasonable restraints on

---

[8] The *Ganias II en banc* panel "did not resolve the ultimate question whether the Government's retention of forensic copies of Ganias's hard drives during the pendency of its investigation violated the Fourth Amendment." *Ganias II*, 824 F.3d at 220-21.

[9] Justice Sotomayor, in a concurring opinion, expressed a similar concern, that is, the government's indefinite retention of ESI would allow the government to store and "efficiently mine them for information years into the future." *See United States v. Jones*, 132 S. Ct. 945, 955-56 (2012) (Sotomayor, J., concurring).

its ESI seizures, review and retention and discovery productions to comport with the Fourth Amendment in this digital age—will serve the administration of justice. Meanwhile, nothing will undermine the minimal costs of blanket suppression. The case will not move beyond allegations of a non-violent alleged fraud, and Mr. Mendlowitz is a non-violent person with no criminal history whatsoever.

## II. THE GOVERNMENT CONTINUES TO HIDE BRADY MATERIAL IN A DISCOVERY HAYSTACK

The government conflates its newly minted 1,830 responsive production with its independent obligation under *Brady*. Due process requires the government to disclose favorable material evidence for effective use at trial and cannot hide such material in a "haystack of discovery materials." *United States v. Thomas*, 981 F. Supp. 2d 229, 239 (S.D.N.Y. 2013). Just because the government argues that "important discovery here has been dramatically pared down," that does not obviate the need to search for *Brady* within the materials in its possession. Moreover, the 18-month "painstaking" review for responsive documents presumably would have included identifying exculpatory material. Yet, the government has not changed its position that it is unaware of any *Brady* material despite the defense counsel's express reference to the recorded statements by the government's own cooperating defendant and the identification of "unambiguous disclosures of rates to merchant-customers."[10] (Def. Mem. at 28).

This again calls into question the thoroughness of the ESI review with the troubling prospect that *Brady* material was seen but not properly identified. This may be a product of the government's superficial understanding of its own evidence or a glib interpretation of its *Brady*

---

[10] Instead, the government has shifted the narrative from its Indictment and added in the background section of its Memorandum in Opposition that "[false rates] and other misstated rates were then partially reflected in written agreements with customers." (Govt. Mem. in Opp. at 2).

obligations. Accordingly, at an evidentiary hearing, the government should also be compelled to account for its process to recognize and identify exculpatory material as agents detail the search warrant and ESI review practice and procedures.

## III. EXHIBIT AND WITNESS LISTS OBVIATE THE NEED FOR A BILL OF PARTICULARS

The government erroneously contends that its 1,830-responsive document production is some sort of panacea to cure the need for a bill of particulars. However, the government's reservation of its right to obtain additional search warrants to search for additional responsive documents would create an untenable situation. As defense counsel prepares all viable defenses based on the 1,830 documents, the government could unilaterally augment the responsive set of documents thereby undermining any defense strategy. Such capabilities will allow the government to cure its evidentiary gaps or create new theories of liability.

The government also cannot credibly argue that it still must obtain a warrant from a magistrate judge. A probable cause finding is fait accompli given the 1,830 responsive documents already in the government's position. Staleness is not a concern either when the government continues to retain all seized ESI since July 2015. This is a fundamentally unfair advantage the government retains for itself. Unless the government is willing to stipulate that no additional search warrants will be sought, a need for a bill of particulars as previously detailed remains necessary.

As an added measure to cure the pleading deficiencies, Mr. Mendlowitz seeks an exhibit list and witness list sixty (60) days in advance of trial. The government appears resistant to this modest accommodation to moot, at least, the motion for a bill of particulars. However, the Court, in its discretion, may order the government to do so to cure the prejudice and provide

sufficient notice of the charges provided it is material to the preparation and reasonable. *See United States v. Cannone*, 528 F.2d 296, 300-01 (2d Cir. 1975) (recognizing discretion of district court to order government to provide witness list in advance); *see, e.g., United States v. Chalmers*, 474 F. Supp. 2d 555, 573 (S.D.N.Y. 2007) (ordering government to produce preliminary trial exhibit list 30 days in advance of trial). In light of the apparent woeful discovery and ESI review in this case, the advance witness and exhibit lists are proper.

## CONCLUSION

For the foregoing reasons, the Court should conduct an evidentiary hearing, order the government to identify *Brady* material and grant Mr. Mendlowitz's motions to suppress, to return property and for a bill of particulars.


Dated:  New York, New York
       March 29, 2018

SMITH VILLAZOR LLP

By: /s/ Patrick J. Smith
    Patrick J. Smith
    Rodney Villazor
    Sarah Zimmer
    1700 Broadway, Suite 2801
    New York, New York, 10019
    (212) 582-4400

*Attorneys for Defendant*
*Michael Mendlowitz*