UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------- X

                             :

UNITED STATES OF AMERICA,

                             :    Case No. S2 17 Cr. 248 (VSB)

      v.

                             :

MICHAEL MENDLOWITZ,
      a/k/a "Moshe Mendlowitz,"

                             :

           Defendant.

                             :

-------------------------------------- X

### DEFENDANT MICHAEL MENDLOWITZ'S SENTENCING MEMORANDUM

<br>

**SMITH VILLAZOR LLP**

Patrick J. Smith
Rodney Villazor
Sarah Zimmer
Nicholas J. Karasimas
250 West 55th Street, 30th Floor
New York, New York, 10019
(212) 582-4400

*Attorneys for Defendant*
*Michael Mendlowitz*

Dated: October 21, 2019

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................... 1

I.    PROCEDURAL HISTORY ...................................................................... 4

II.   MICHAEL MENDLOWITZ'S PERSONAL HISTORY AND
CIRCUMSTANCES .............................................................................. 5

    A.    Early Life and Upbringing .......................................................... 5

    B.    Education ...................................................................................... 7

    C.    Marriage and Family .................................................................... 9

    D.    Career ......................................................................................... 15

         i.    Founding Commerce Payment Systems .................................. 15

         ii.    CPS's Partnership with EVO and Resulting Growth .............................. 16

         iii.    Michael as an Employer ........................................................ 18

    E.    Character & Charitable Activities .............................................. 20

III.   THE OFFENSE CONDUCT .................................................................. 26

    A.    The Government's Allegations as Reflected in the PSR's Offense Conduct ...... 26

    B.    Contextualizing the Offense Conduct Based on Objective Evidence ................ 27

    C.    Michael's Role in the Offense Conduct .................................... 35

         i.    Sales Conduct ........................................................................ 35

         ii.    Billing Issues ......................................................................... 36

         iii.    Statement Messaging ............................................................. 36

         iv.    Terms and Conditions ........................................................... 37

    D.    Evidence of Self-Correction ...................................................... 37

IV.   A NON-CUSTODIAL SENTENCE IS SUFFICIENT BUT NOT GREATER
THAN NECESSARY IN THIS CASE .................................................. 39

    A.    Federal Sentencing Framework ................................................. 39

    B.    The PSR's Advisory Guideline Calculation is Unsupported .............. 40

         i.    The PSR's Guidelines Calculation ......................................... 40

         ii.    Loss Amount is Greatly Overstated ...................................... 41

         iii.    The Four-Level "Organizer or Leader" Enhancement is
Unwarranted .......................................................................... 46

      iv.    Appropriate Guidelines Calculation ...................................................... 46

C.    The Probation Department's Recommendation .................................................. 47

D.    A Downward Departure Is Appropriate ............................................................ 47

      i.    Lack of Personal Gain ............................................................................ 48

      ii.    Michael's Family Circumstances Warrant a Downward Departure ........ 49

E.    A Downward Variance from the PSR's Guidelines Calculation is Warranted Under Title 18, United States Code, Section 3553(a) ...................... 50

      i.    Michael's Personal History and Characteristics Weigh Heavily in Favor of a Downward Variance ............................................................ 50

      ii.    The Nature and Circumstances of the Offense Merits a Downward Variance ................................................................................................ 54

      iii.    The Disproportionate Impact of the Loss Amount in the Offense Level Calculation Merits a Downward Variance ..................................... 57

      iv.    The Need to Avoid Unwarranted Sentencing Disparities and Promote Consistency in Sentencing Merits a Downward Variance ........ 62

      v.    Sentencing Objectives Under 18 U.S.C. Section 3553(a)(2) .................. 70

V.    **A FORFEITURE ORDER IS NOT WARRANTED** .................................................. 72

**CONCLUSION** ............................................................................................................ 74

# **TABLE OF AUTHORITIES**

Page(s)

## **Cases**

*Gall v. United States,*
    552 U.S. 38 (2007) ........................................................................................... 39, 40

*Kimbrough v. United States,*
    552 U.S. 85 (2007) ..................................................................................... 39, 40, 62

*Nelson v. United States,*
    555 U.S. 350 (2009) ............................................................................................... 39

*Pepper v. United States,*
    562 U.S. 476 (2011) ............................................................................................... 40

*Rita v. United States*
    551 U.S. 388 (2007) ............................................................................................... 40

*United States v. Adelson,*
    441 F. Supp. 2d 506 (S.D.N.Y. 2006) ................................................................... 20

*United States v. Algahaim,*
    842 F.3d 796 (2d Cir. 2016) .................................................................................. 58

*United States v. Butler,*
    2011 WL 4073672 (E.D.N.Y. Sept. 13, 2011) ...................................................... 50

*United States v. Cavera,*
    550 F.3d 180 (2d Cir. 2008) ............................................................................ 39, 40

*United States v. Costello,*
    16 F. Supp. 2d 36 (D. Mass. 1998) ....................................................................... 48

*United States v. De La Cruz,*
    397 Fed. App'x. 676 (2d Cir. 2010) ...................................................................... 62

*United States v. DiMattina,*
    885 F. Supp. 2d 572 (E.D.N.Y. 2012) ................................................................... 50

*United States v. Dorvee,*
    616 F.3d 174 (2d Cir. 2010) .................................................................................. 40

*United States v. Faiella,*
    No. 06-CR-335 (JBW), 2008 WL 4862455 (E.D.N.Y. Sept. 8, 2008) .............. 70, 71

*United States v. Gupta,*
    904 F. Supp. 2d 349 (S.D.N.Y. 2012) ................................................................... 40

*United States v. Jones,*
  460 F.3d 191 (2d Cir. 2006) ................................................................. 40

*United States v. Nesbeth,*
  188 F. Supp. 3d 179 (E.D.N.Y. 2016) .................................................. 72

*United States v. Oakford Corp.,*
  79 F. Supp. 2d 357 (S.D.N.Y. 1999) .................................................... 48

*United States v. Redemann,*
  295 F. Supp. 2d 887 (E.D. Wis. 2003) ................................................. 48

*United States v. Stewart,*
  590 F.3d 93 (2d Cir. 2009) ................................................................... 72

*United States v. Stuart,*
  22 F.3d 76 (3d Cir. 1994) ..................................................................... 48

*United States v. Tighe,*
  No. 15-cr-62, 2018 WL 1307949 (E.D.N.Y. Mar. 13, 2018) ............... 70

*United States v. Walters,*
  87 F.3d 663 (5th Cir. 1996) .................................................................. 48

**Statutes**

18 U.S.C. § 981(a)(1)(C) ............................................................................. 73

18 U.S.C. § 1028A ......................................................................................... 5

18 U.S.C. § 1341 ............................................................................................ 4

18 U.S.C. § 1343 ............................................................................................ 4

18 U.S.C. § 1349 ............................................................................................ 4

18 U.S.C. § 3553(a) ............................................................................... passim

28 U.S.C. § 2461(c) ...................................................................................... 73

**Rules**

Fed. R. Crim. P. 32.2(b) ......................................................................... 74, 75

We respectfully submit this sentencing memorandum on behalf of Michael Mendlowitz, who is scheduled to be sentenced on November 4, 2019.

## PRELIMINARY STATEMENT

For a man who has dedicated his life to the service of others, is described universally as honest and trustworthy, and embodies the ideal of what a husband and father should be, a criminal conviction for fraud has been devastating.  Michael Mendlowitz has devoted his life to helping people, often anonymously, with no expectation of anything in return.  He is not driven by greed or a desire for material possessions.  And his conviction does not reflect the character of a man who is so widely respected and revered.

Michael, along with his wife of 22 years, Shira, and their seven children, have suffered continuously in the more than four years since this crisis began to unfold.  Yet through it all, Michael has not lost the tremendous support of his friends and family, and the community at large, who have attested to his extraordinary character in the nearly 200 letters of support[1] and the video testimonials[2] submitted on his behalf.  It is our hope that these materials along with this memorandum will provide the Court with a more complete picture of the man who awaits sentencing before Your Honor.  It is also our hope that this memorandum will put into context the offense conduct, which is not as simplistic or systematic as the government argues.  While Michael well acknowledges the significance of the jury's verdict regarding the offenses of conviction, it is important to take into account a more complete picture of CPS's business practices and the role that Michael played in the day-to-day management of the company, including the serious failures for which he takes full responsibility.

---

[1] The letters in support are attached as Exhibit B to this submission.  Michael Mendlowitz's letter to the Court is attached as Exhibit A.

[2] The video containing testimonials from Michael's friends and family is attached as Exhibit C.

Michael Mendlowitz is a 44-year-old father of seven wonderful children ranging from five to 20 years old.  Being a husband and father is his most cherished role in life—one that he began to envision for himself as a frightened young boy growing up in an abusive home.  Michael realized very early on that he wanted to be nothing like his angry, destructive father and instead vowed to bring joy and happiness into the world by seeing only the good in people.  Michael has given countless people second chances when no one else would.  He has provided employment, and a dignified source of income, to people from all walks of life who could not otherwise support themselves.  He has opened his home to troubled teenagers so that they can get a glimpse of what a loving family looks like while escaping their problems for a weekend.  Instead of resting with his family on the Sabbath, Michael hosts a program in his home for children with autism and other disabilities so that their caretakers can enjoy a break.  Perhaps the most amazing aspect of Michael's charitable and giving spirit is the effect it has had on his children.  His children have watched their whole lives as Michael has performed countless good acts and taught them always to be honest and kind.  And it is truly inspiring to see how the older children have followed in his footsteps, maturing into thoughtful citizens who contribute to charitable causes of their own.  Even the youngest children strive to emulate their father's warmth and giving nature, in the simplest of ways, like carefully choosing a dress to gift to a child who has even less than they do.

Michael's upbringing has caused him to retreat in the face of confrontation and to have gaps in his judgment when it comes to relying on and trusting people.  This seemingly benign personality flaw crept into and wreaked havoc on Michael's business.  He put people in charge that had no business being there.  He permitted people who begged for mercy to keep their jobs when they should have been fired on the spot for misconduct.  He trusted people who did not deserve to be trusted.  These were all grave mistakes.  He also made mistakes that were purely his

2

own—failing to take appropriate steps to ensure that merchants were billed correctly, and committing other lapses of judgment in an industry that routinely deployed aggressive tactics. And he has paid for these mistakes dearly. He has lost his career and his family's finances are in ruin. Michael has lived with the anxiety of how this case will turn out since the criminal investigation began more than four years ago. Uncertainty, deep sadness, and shame have eaten away at him every single day. Most importantly, this has brought immeasurable pain and fear to Michael's family, and the many dear friends that he considers family.

Michael is deeply remorseful for his failures and shortcomings at Commerce Payment Systems ("CPS"). But it simply is not the case that he sat on his hands and did nothing to fix the problems at CPS. The record contains a number of significant examples of Michael instituting remedial action. This evidence, which we discuss in detail below, is highly relevant to the Court's consideration of the severity of the offense conduct.

The Sentencing Guidelines, intended to aid the Court as it gauges the severity of the offense conduct, are a tool ill-suited to determining an appropriate sentence in this case. The driving force behind Michael's Guidelines calculation is the government's exaggerated loss calculation, which urges a view of loss that is unsupported by the record and does not withstand scrutiny. It sweeps in revenue for fees that were charged on notice and approved by EVO, CPS's parent company, and that were within the scope of written disclosures to merchants. The government also approaches loss here as if it were loss of principal suffered in a Ponzi scheme or boiler room operation. The government ignores that the severity of the victim impact here is quite low. None of CPS's merchants were forced out of business because they were charged a $99 PCI fee, or paid processing fees in the aggregate of 100 to 150 basis points higher than what might have been available elsewhere. The merchants received the processing services for which they paid.

3

Accepting the Guidelines and the government's outsized loss figure would suggest sentencing Michael to a term of imprisonment equal to those received by the worst white-collar offenders in recent history.  In the absence of a rational approach to calculating loss that is based on objective evidence, no direct personal gain to Michael, and minimal victim impact, we submit that the PSR's advisory sentencing range is unreasonable.

Our hope is that the Court will see that a Guidelines sentence in this case, as calculated in the PSR, fits neither the offense nor the offender.  Recent fraud sentences in this and neighboring districts suggest that anything approaching such a sentence would be extreme in its severity, given the nature of the offense conduct here.  Michael's remarkable life, which was blemish-free until this case, and the collateral consequences for his family, particularly his children, weigh heavily against *any* period of incarceration.  We respectfully request that the Court, after considering all of the Section 3553(a) factors, impose a non-custodial sentence.  We realize the magnitude of this request, but this is a rare situation and a unique defendant deserving of this just and fair result.

## I.   <u>PROCEDURAL HISTORY</u>

On May 2, 2017, a federal grand jury in the Southern District of New York indicted Michael Mendlowitz on one count of conspiracy to commit mail and wire fraud, in violation of 18 U.S.C. § 1349 (Count One); one count of mail fraud, in violation of 18 U.S.C. § 1341 (Count Two); and one count of wire fraud, in violation of 18 U.S.C. § 1343 (Count Three).

The original Indictment alleged, in sum and substance, that Michael made false statements and misrepresentations to customers and fraudulently overcharged customers for credit card processing services.  Dkt. 2.  The government superseded the Indictment on March 27, 2019, approximately one month before trial.  Dkt. 98.  The superseding Indictment added a charge of aggravated identity theft, in violation of 18 U.S.C. § 1028A (Count Three), removed the mail fraud

charge, and stripped out most of the detail in the original Indictment.  *Id.*  The crimes charged in Counts One and Two of the superseding Indictment are Conspiracy to Commit Wire Fraud and Wire Fraud, respectively.

Trial began on April 29, 2019.  The government rested on May 20, 2019.  Michael moved for judgment of acquittal under Rule 29(a) as to Count Three of the Superseding Indictment, which the Court denied.  Michael did not put on a defense case-in-chief, and closing arguments took place on May 21, 2019.  On May 23, 2019, the jury returned a verdict of guilty as to Counts One and Two (conspiracy to commit wire fraud, and wire fraud), and not guilty as to Count Three (aggravated identity theft).

Count Two, the substantive wire fraud count, carries a statutory maximum sentence of 20 years and a statutory maximum fine of $250,000.  Count One, the conspiracy charge, is subject to the same penalties as those prescribed for the commission of Count Two.

## II.   MICHAEL MENDLOWITZ'S PERSONAL HISTORY AND CIRCUMSTANCES

### A.  Early Life and Upbringing

Michael was born in New York City in 1974.  PSR ¶ 95.  His mother was a homemaker and his father was involved in various businesses including textiles, diamond sales, and credit card processing.  PSR ¶ 97.  Michael lived in Brooklyn with his parents and his older sister, Mindy, until he was five years old.  At that time, Michael's father relocated his family to Los Angeles in order to pursue a new business opportunity.  *Id.*  When Michael was seven, his younger sister, Perri, was born, making Michael the middle child and his parents' only son.

Because Michael is an extraordinary father to his seven children, and a supportive and loving spouse to his wife of 22 years, it is difficult to imagine that his own childhood was marred by abuse and neglect at the hands of parents whose marriage was toxic.  Michael's father, who ███████████████████████, *see* S. Mendlowitz-Belgrade Letter, Ex. B at 25, had a volatile

temper, and was both verbally and physically abusive to Michael's mother, and their three children. Michael's mother, who experienced the brunt of her husband's abuse, was emotionally unavailable and unable to protect or comfort her children when they so desperately needed her.  *Id.*  When Michael's father was in the ███████████████████████████████████. *Id*.  In fact, Michael's father was ███████████████████████. "This had a deleterious effect on Michael's emotional well-being during his childhood as he has always been an extremely sensitive and gentle child."  *Id.*  Michael was forced to walk on eggshells at home because of his father's temper and learned to avoid "inciting his father's ire by not standing up for himself in order to avoid conflict."  *Id.*; *see also* P. Mendlowitz Letter, Ex. B at 21 ("I believe that my intimidation may have contributed to Michael's avoidance of confrontation in exchange for his desire to be a peace-maker.").

Although their marriage was volatile, Michael's parents did not separate until he was 18. Michael's father lost most of the family's life's savings in a failed business venture, which caused the Mendlowitz family to lose their home.  P. Mendlowitz Letter, Ex. B at 21.  At that time, Michael's parents each moved into their own apartments.  *Id.*  Michael, always the family's peacemaker, was forced to mediate his parents' bitter divorce and shield his sisters, especially Perri who was just eight years old, from the infighting as best he could.  Perri credits Michael with being the father figure she so desperately needed during her early childhood and adolescence.  P. Unger Letter, Ex. B at 32.

Michael was in therapy for five years in order to manage the pain of his childhood and the everlasting effects of the abuse his father inflicted on him as a child and young adult.  *See* PSR ¶ 116.  To this day, it is hard for Michael to talk about his childhood trauma, especially because he does not wish to disparage or hurt his parents.  Michael is a deeply religious man who tries to live

his life according to the teachings of the Torah, one of which demands that children preserve their parents' dignity and treat them with respect and reverence.

Michael's most remarkable character trait—and arguably also his weakest one, especially in the workplace—is his endless ability to forgive those who have wronged him or others. After everything his parents put him and his sisters through, he simply forgave them. *See* Mindy Futersak Letter, Ex. B at 29 ("[M]y sister and I are still dealing with the anger over the trauma [our parents] put us through, but Michael was always the forgiving one, forgiving of our parents' many flaws, forgiving of their harmful actions and forgiving of the childhood he was never afforded."). Michael's forgiving nature and desire to avoid conflict at (almost) all costs, which can be baffling to his wife, *see* S. Mendlowitz Letter, Ex. B at 1-2, is paramount to Michael's character and is a major factor that led him to where he is today.

Growing up, Michael had a very close relationship to his 93-year-old grandmother, Rosa Gross, who was the only member of her family to survive the Holocaust. R. Gross Letter, Ex. B at 36. Michael and Rosa are still very close and Rosa cherishes the summers she spends with Michael and his family. *Id.* When he was a young boy, Rosa recalled how Michael would sit with her for hours while all the other grandchildren were playing in the yard:

> My oldest grandson Michael was always unique to all the rest of my grandchildren. Since he was a child, he always had this intense need to connect with me and the trauma I experienced. He was always a very sensitive soul and I never wanted him to feel my pain so deeply, yet, it was almost as if he felt better just hugging me and sharing the burden of my pain. He would sit with me a young child tracing the outline of the numbers on my arm memorizing those numbers so he would never forget what I had been through.

*Id.* According to Rosa, "[a]s Michael grew and matured he remained the same compassionate person who was always looking to lift [her] spirits." *Id.* at 37.

### B. Education

When he was just 14 years old, Michael's parents sent him across the country to a religious,

all-boys boarding school in Pikesville, Maryland called Ner Israel Rabbinical College.   S. Belgrade-Mendlowitz Letter, Ex. B at 25.  There, Michael excelled not only at his studies, but in making new friends, and he emerged as a role model and mentor to many of his fellow classmates. "Michael is the type of person that everyone considers their best friend."  J. Paneth Letter, Ex. B at 71.  His cousin, who later attended the same boarding school only because Michael was entrusted to look after him, recalled how Michael was admired by the faculty and students alike.  *Id.* at 72; *see also* E. Paneth Letter, Ex. B at 69 ("When we discussed with Michael the idea of sending Jack to the same school, Michael immediately assured us that he would take care of Jack as if he was his own brother.").  This is undoubtedly due to Michael's innate ability to make everyone feel valued and important, no matter where they come from.

> Michael Gottlieb, Michael's friend for more than 30 years wrote:
>
> Even as [a] teenager[], you could see that Michael was unique in his ability to care for and look out for others.  Michael mentored younger students and took them under his wing.  As we got older he tutored younger students, free of charge to help them with their studies.  Michael would also visit area nursing homes [] keeping elderly, lonely people company, especially around the holidays."

M. Gottlieb Letter, Ex. B at 110.  Michael's mother recalled how he would give his allowance and clothing away to students that came from less fortunate families.  S. Belgrade-Mendlowitz Letter, Ex. B at 25.  Many of Michael's former classmates described how Michael mentored them and positively contributed to their high school experiences.  *See* J. Semel Letter, Ex. B at 96 ("[Michael] educated me, guided me and most of all, was a most special and caring friend."); R. Rosen Letter, Ex. B at 128 ("[Michael] was patient and took a genuine interest in helping me gain confidence"); A. Eisenberg Letter, Ex. B at 76 ("Michael quickly befriended me . . . without any agenda.  He did it solely to make sure I was comfortable.").

Michael continued his post-high school studies at Ner Israel and earned a bachelor's degree

in Talmudic Law from the rabbinical college in 1998.  Upon graduating from Ner Israel, Michael went on to earn his MBA from Johns Hopkins University in 2000.  One of Michael's former classmates at both Ner Isreal and Johns Hopkins recalled how Michael was a "very generous classmate always looking to help those who lacked in certain material necessities and would not sit down to relax until he knew that others who may have been less fortunate ha[d] been taken care of."  D. Rosenberg Letter, Ex. B at 81.  Michael's philanthropic spirt and relentless desire to help others continued into adulthood as he married and started a family of his own.

### C.  Marriage and Family

While Michael is many things to many people, be it community leader or beloved cantor at his synagogue, his most important role in life is that of devoted father to his seven children.  "[Michael] lives for his family."  P. Unger Letter, Ex. B at 34.  From the day his first child was born, Michael was determined to build a home that was the exact opposite of what he and his sisters experienced growing up.  Michael and Shira have provided their children with a loving, stable environment in which each child feels loved and protected.  While Shira ensures that the children's physical needs are met, it is Michael who gives them what they need emotionally.  S. Mendlowitz Letter, Ex. B at 25.  "It is [Michael's] patience, calmness and tolerance that has made our home so stable and loving."  *Id.*  According to Michael's mother-in-law, Michael is the "warmest, most involved and loving parent [she has] ever seen."  K. Davidson Letter, Ex. B at 44. This sentiment is echoed in dozens of letters from friends and family who have been inspired by Michael to become better parents and spouses.

Michael and Shira were married in 1997 and lived in an apartment in Baltimore while Michael finished his MBA program at Johns Hopkins.  According to Shira:

> Although many girls would have been wary to get involved with a boy who was raised with such dysfunction and whose life was full of trauma and strife, I had heard much about what a special person he was and I wanted to meet him.  The

more I got to know Michael, the more I saw what a sweet, patient, caring and giving person he was.  He saw the good in every person regardless of how much pain they caused him.

S. Mendlowitz Letter, Ex. B at 1.  Michael and Shira are just as in love with each other today as they were on their wedding day.  They have an incredibly strong bond that has remained intact despite the many challenges they have faced in their 22 years together.  This bond was tested when they experienced their first tragedy as a married couple in 1998, when their first child, a daughter, was stillborn one week before Shira's due date.  The young couple was crushed.  According to Shira, "it was only because of Michael's strong emotional support that [she] didn't fall apart and had the strength to start again and build a family." *Id.* at 2.  Their eldest daughter, Chaya, was born soon after this tragedy, in 1999.  After the birth of their second child, Avraham ("Avi"), in 2001, Michael and Shira relocated to Long Island to be closer to Shira's family.  Michael and Shira went on to have five more daughters: R████ ("R████"), 16, M███, 14, A███, 11, S██████, 9, and A███, 5.

Before A████ was born, the unthinkable happened:  in November 2012, Michael and Shira lost another full-term baby, this time a long-awaited boy and younger brother to their only son, Avi.  During a routine medical visit one week before her due date, Shira discovered that her baby boy's heart had simply stopped beating.  This time, as Shira put it, "the stakes were much higher." *Id.*  Michael and Shira had six heartbroken children who needed their parents to be strong during this unfathomable occurrence.  Understandably, Shira fell into a profound depression and although she knew her children needed her to guide them through their grief, she was overcome by her own pain and was unable to do so.  *Id.* at 3; M. Mendlowitz Letter, Ex. A at 9.  It was Michael who emotionally supported Shira and his children during this time.  He spent countless hours at home— at the expense of running and supervising his business (CPS)—coaxing Shira out of bed,

10

counseling his children, and performing all of the household duties that Shira was unable to manage due to her depression.  *Id.*  "The only person [Shira] could talk to about her grief and share her pain with was [Michael]."  H. Greenfield Letter, Ex. B at 50.

Shira and Michael put their trust in god, and decided to try for another baby.  After a difficult pregnancy that required regular monitoring by high-risk specialists, their seventh child and sixth daughter, A████, was ████████████ in 2013.  K. Davidson Letter, Ex. B at 43.



A████, now ████████, is an ████████████████████ ████████████████████████████. S. Mendlowitz Letter, Ex. B at 5; D. Brazil Letter, Ex. B at 82.  Her significant ██████████████████████ ████████████████ *See* Y. Oppen Letter. Ex. B at 136.  A████ ████████ ████████████████████████████████████ ██████. *See* T. Rubin Letter, Ex. B at 134. ████████████████████████████ ████████████████████████████████ *Id.* ████████████████████████ *Id.* A██████████████████ ████████████████████ *Id.* A████ is very attached to Michael and ████████████████████████. *Id.* Michael puts A████ to sleep almost every night and she cannot fall asleep without her father.  If Michael happens to be out, A████ will wait for him, in his bed, until he returns and only then is she able to fall asleep.  S. Mendlowitz Letter, Ex. B at 5.  A████ also experiences ████████████████████ ████████████████████████████████. *Id.*

S██████, age █, is a ██████████████████ who frequently exhibits ████████████████. *Id.*  Shira, who is admittedly impatient, relies on Michael to handle the

brunt of S███████'s ███████████████, as he is the one person who is truly able to help her

███████████████. *Id.*; D. Kurland Letter, Ex. B at 84.  Michael and Shira have taken S███████



███████████████. S██████'s ████████████████████████████████

████████████████████████████████████████████████████████████

█████████ Dr. Reichman Letter, Ex. B at 89.  S███████'s Principal at B'nos Bais Yaakov

School for Girls ("BBY") noted that:

> Although S██████ has tremendous potential, the last couple of years have been



D. Kurland Letter, Ex. B at 84; *see also* P. Neuberg Letter, Ex. B at 118.  While S████████



██████████████ *Id.*

A███, age ███, will soon celebrate her Bat Mitzvah, an important life milestone that occurs

at age 12 for girls in Orthodox Judaism.  A███ is a shy, quiet girl, who is sometimes overlooked

due to the needs of her sisters, which are often more pressing.  *Id.*  Michael, however, always looks

out for A███ and ensures that he spends special one-on-one time with her.  *Id.*  Although A███

does not have any formally diagnosed disorders, adults in her life, including her current teacher,

Leah Weinstein, have noticed that this former "happy go lucky, carefree and friendly girl" is now

"weighed down by worry, aloof, and has closed in on herself."  L. Weinstein Letter, Ex. B at 102.

Because of her tendency to "bottle up" her emotions, Michael and Shira are terribly worried about

how Aliza will cope with the possible incarceration of her father.

M███, age ██, like A███, is an ███████████████. She also ███████████████

███████████████████████████████████████████████████

███████████████████ S. Mendlowitz Letter, Ex. B at 4. Dr. Renov, M██'s

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████ Dr. Renov Letter, Ex. B at 100. M███ recently ███████████

███████████████████████████████████████████████████

███████████ *Id.* Michael and Shira have taken M███ █████████████

███████████████████████████████████████████████████

███████████████ S. Mendlowitz Letter, Ex. B at 4; M███ Mendlowitz Letter, Ex. B at

19. M███ attends ███████████████████████████████████████

███████████████████████████. *Id.* M███'s former teacher at

BBY, Leah Weinstein, described M███'s ███████████████████████████

███████████████████████████. L. Weinstein Letter, Ex. B at 103.

M██ described ███████████████████████████████████:



M███ Mendlowitz Letter, Ex. B at 19. M███ cannot fathom even one day without her father and

is "terrified what will happen to [her] life and to [her] sisters and brother and [] mother" if Michael

is taken away from them. *Id.* at 20.

R████, age ██, has ███████████████████. S. Mendlowitz Letter, Ex. B at 4.

Her ███████████████████████████████████████████████

L. Weinstein Letter, Ex. B at 103.  R███ has a ███████████████████████████

████████████████████████████████████████████████████████████████████████████

*Id.*  Because of ██████████████████████████████████████████████████████████████

███████████████████████████████████  Michael was relentless in helping R███ ██████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

█████████████████████████████  J. Schonbrun Letter, Ex. B at 97.  Michael found

████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████.  *Id.* at 98.  By the time she

was █████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████  *Id.*

     Michael worked tirelessly to ensure that R████  ████████████████████████████

████████████████████████████████████████████████████████████████████████████

██████████████████████  *Id.*  R████  is currently a ██████████████  and still relies

heavily on Michael, ███████████████████████████████.  *Id.*  Michael is R████'s

hero and "the person who [she] aspire[s] to be like most."  R. Mendlowitz Letter, Ex. B at 17.  In

her letter to the Court, R███ recounts a teaching that Michael has ingrained in his children: "be

a giver not a taker."  *Id.*  Michael is living this refrain despite his legal troubles.  *Id.*  No matter

how little they have, their father has taught them that they can always find something to give to

others who have even less.  *Id.*

     Avi, Shira and Michael's only son, now 18, just graduated high school and is entering a

critical time in his young adult life.  He is a quiet, introverted boy who relies on his father for

advice and direction.  Avi and Michael are extremely close, as one may expect since they are the

14

only men in a house full of women and girls.  But this is not the sole source of their bond.  Michael has been an incredible mentor, confidante, and loving father to Avi.  As a close family friend and clinical psychologist observed:  "Michael's relationship with his only son . . . is something to behold.  They are best friends and mean the world to each other."  S. Lawrence Letter, Ex. B at 133.  Avi's letter echoes this sentiment and tells of important life lessons Michael has instilled in Avi and his sisters.  A. Mendlowitz Letter, Ex. B at 12.

Chaya, the eldest, now 20, hopes to marry in the near future.  Getting married and raising a family is a major focus and goal in the Jewish community in which they live.  S. Lawrence Letter, Ex. B at 133.  While the rest of her friends are dating and starting to marry, Chaya has not had a single person ask her out on a date.  J. Davidson Letter, Ex. B at 56.  This is due to her father's legal predicament and the family's uncertain future.  S. Mendlowitz Letter, Ex. B at 4.  If Michael is incarcerated, it will impact her ability to get married and start a family and life of her own.  The same is true for Michael's other children and will soon be realized as they too enter young adulthood.  This is an unfortunate reality of their community.  J. Davidson Letter, Ex. B at 56.  Chaya, who is giving and selfless just like Michael, has so much to offer.  S. Mendlowitz Letter, Ex. B at 4.  "She has a heart of gold and lives her life to help others."  *Id.*  Although she is suffering so much because of her family's situation, she often tells her mother that she would give up anything to keep Michael home.  *Id.*

**D.  Career**

i.  <u>Founding Commerce Payment Systems</u>

While in Baltimore, Michael and Shira founded a small wholesale business distributing health and beauty products to local retail stores and pharmacies.  PSR ¶ 128.  They achieved some success, but when the family decided the time was right to return to the New York area, Michael had two children, mounting bills, and a need to find a true career.  M. Mendlowitz Letter, Ex. A at

15

3.  Michael's father had started a small credit card company, and Michael began to work for his father as a commission-based sales representative.  *Id.*  This primarily involved going door to door, selling processing services to new merchants.  *Id.*  He built a small customer base and made a modest living.  *Id.*

Unfortunately, Michael's father let him down again, eventually refusing to pay Michael for his work and effectively terminating the relationship.  *Id.* at 3-4.  With an entrepreneurial spirit and a determination to create something of his own, Michael founded CPS in 2005.  PSR ¶ 126; M. Mendlowitz Letter, Ex. A at 4.  He maintained a small office first in Cedarhurst, New York and then in Hewlett, New York.  *Id.*  CPS was an independent sales office, marketing and selling processing services on behalf of large processing companies.  Initially Michael worked alone, but over the next three to four years, assembled a team of approximately six employees, and signed up a few thousand merchant accounts.  *Id.*  Michael personally trained his sales team and worked with them closely.  *Id.*  CPS offered free or low-cost hardware, and unlike many processors, did not charge cancellation fees.  *Id.*  Michael was proud of the success his small company achieved, and proud that he had forged his own path.  *Id.* at 5.

ii.  CPS's Partnership with EVO and Resulting Growth

In 2009, Michael met several EVO executives, including its Chief Executive Officer Jeff Rosenblatt, and its Chief Operating Officer, Kevin Lambrix.  At the time, EVO was one of the largest and most experienced credit card processors.  Part of EVO's business model was to partner with independent sales offices ("ISOs") that would sell and market credit card processing services, while EVO did the actual processing and billing.  EVO would invest in the ISO and maintain an ownership interest in it.  EVO was interested in such an arrangement with CPS, and in April 2009, Michael agreed to partner with EVO to form a new LLC, Commerce Payment Group, that carried the business forward while continuing to use the "Commerce Payment Systems" name.

16

Michael was excited to partner with EVO, hoping to benefit from their operational, compliance, and risk infrastructure, and grow the business. *Id.* at 5. As an EVO ISO, CPS was primarily responsible for marketing, signing up merchants and onboarding them, and customer service. All operational aspects of the business were run through EVO. In other words, merchant transactions were processed, and funds were deposited to merchant accounts after assessing fees, through EVO's software and systems. CPS did not have its own risk, compliance, legal, and human resources functions—it relied on EVO's framework in these respects.

From the time CPS became an EVO ISO until EVO shut CPS down, Michael served as CEO of the company and was responsible for all aspects of the business. Because Michael's expertise was in marketing, he focused much of his time there—ensuring that CPS had a pipeline of potential customers. Michael had managers in place underneath him to help handle the day to day aspects of the business, like sales and operations.

Michael's role in the offense conduct is described in Section III of this submission. Michael takes responsibility for much of what went wrong at CPS, and deeply regrets not being focused or forceful enough to identify and rectify issues that arose in a timely manner. In hindsight, this managerial failure occurred in part because Michael was stretched far too thin. As described in this submission, not only is Michael a husband and father of seven children, but he spends an incredible amount of time and energy assisting those around him. Sometimes, Michael got himself involved with projects that—while worthwhile and important—distracted him from the everyday operations of CPS (such as his herculean efforts to guide a local school through a financial and leadership crisis in 2013-2014). Michael and his family also faced immeasurable loss when he and Shira lost a second full-term baby in November 2012. As described, this tragedy understandably left Shira in a state of paralyzing grief, and even more family responsibilities fell

17

to Michael, who was dealing with his own grief.  While none of this serves as an excuse for Michael's failures at CPS, we do believe it should be considered when evaluating his mistakes as these distractions and other priorities coincided with some of the more significant issues at CPS.

Michael was a salaried employee of EVO.  From 2009 through 2011, his salary was $165,000.  *See* PSR ¶ 125.  In 2012, it was raised to $225,000, and from 2013 until his termination in 2015, it was $300,000.  *See id*.  He also received performance bonuses (approximately $35,000 in early years, and $100,000 in later years), *see id.*, subject to EVO's sole determination.  Because Michael was salaried, his compensation was not tied to the amount of money that CPS charged for its services.  There was no direct link between the amount of money the portfolio made and the amount of compensation Michael received; even his bonus was based on EVO's more nebulous determination that CPS was "on plan."

Under this agreement with EVO, Michael owned 20% of the business, and EVO owned the other 80%.  *Id.*  EVO also controls, entirely and unilaterally, the right to distribute any proceeds from the business.  Early in the partnership, EVO invested CPS's residual income back into the business.  Later on, anticipating an initial public offering, EVO stopped investing residuals back into the business to show more favorable financial metrics.  In any case, EVO has never declared a distribution, Michael has never seen a dollar of profit distribution from EVO, and there is no reason to believe that he ever will.

       iii.  <u>Michael as an Employer</u>

One aspect of Michael's time at CPS that is not in dispute is the kindness and generosity with which he treated his employees.  This was readily confirmed by the government's cooperating witnesses.  Mendy Greenblatt testified that Michael "[a]bsolutely" treated him well while he was at CPS, including by giving him extra money when commission revenue was down, additional bonuses, a new laptop as a birthday gift, and a loan of $7,000 to help Greenblatt deal with the

ramifications of an erroneous tax withholding.[3]  Tr. at 1556:12-1558:25.  Similarly, Benny Caban testified that Michael approved cash advances to him for personal expenses when Caban had bills to pay, and gave him concert tickets as a thank you.  Tr. 2352:20-2353:24.

Michael also provided employment opportunities to individuals who were down on their luck and provided others with their first real-world employment.  A close friend described Michael as a "sponge" for people from "all walks of life," and people that had "nowhere to turn," explaining that Michael employed many people facing difficult circumstances and "never turned anyone away."  Meyer Futersak Letter, Ex. B at 74.

Other letters in support come from individuals who were given their first career opportunity at CPS.  Ms. Levy describes her difficult upbringing and lack of direction when she was introduced to Michael and became employed at CPS.  R. Levy Letter, Ex. B at 122.  Ms. Levy describes Michael as "the first male figure in [her] life to treat [her] with respect and be a proper role model of how men should act."  *Id.*  Ms. Levy explains in detail her career at CPS, first as a sales representative and later as a manager responsible for underwriting and risk.  *Id* at 122-123.  Her letter provides a great deal of insight into the issues that arose at CPS, including the "cat and mouse" game that Michael was forced into with the sales representatives, interactions with EVO, and her view on the role of employees like David Devers, Rick Hart, and Greenblatt.  *Id.* at 123.  Ms. Levy believes that Michael was too trusting and lenient but emphasizes that Michael never sanctioned sales representatives lying to customers, or changing prices without permission.  *Id.*  Ms. Levy's letter also describes the many times Michael acted selflessly and with incredible kindness toward her and other employees.  As one example, Ms. Levy met former employee Bridgette Velez at a local café near the office, and saw that her "boss was mistreating her" and that

---

[3] Greenblatt apparently understood and even expected that this loan was a gift from Michael, free and clear, which says quite a lot about how Greenblatt conceived of their relationship.  Tr. at 1058:18-21.

Velez was often upset.  *Id* at 126.  Ms. Levy told Michael about Velez's situation, and Michael offered her a data entry job so that she could quit her abusive restaurant job and start fresh.  *Id.*

Ahuva Eisen explains that she was unable to find employment after high school and desperately needed a job; it was Michael that gave her a chance.  A. Eisen Letter, Ex. B at 79.  Ms. Eisen describes Michael as a "boss [] that you can call a friend" to her and many other employees, and describes him as "honest, kind, patient, giving and understanding."  *Id.*  She recounts an occasion on which, after she mistakenly promised the wrong (more expensive) terminal to a customer for free, Michael told her to give the customer what was promised.  *Id.; see also* M. Reich Letter, Ex. B at 113, A. Solomon Letter, Ex. B at 75.

### E.  Character & Charitable Activities

To assist the Court in imposing a fair sentence, we have submitted nearly 200 letters in support of Michael Mendlowitz written by friends, family, community members, and those who have benefitted from or witnessed Michael's incredible generosity.  Ex. B.  Also available for the Court's consideration is a video containing testimonials from some of these individuals, along with remarks from Michael himself.  Ex. C.  We could not possibly recount here all of the good deeds that Michael has performed throughout the course of his 44 years, beginning as early as elementary school and continuing to the present day, even during and after his trial.  As the court in *United States v. Adelson* aptly remarked:

> [I]f ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance.  This elementary principle of weighing the good with the bad, which is basic to all great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, the history and characteristics of the defendant.

441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006) (internal quotations omitted).  Michael is a pillar of his community and has worked with more than 30 organizations[4] over the last 20 years from his children's schools to organizations that provide support and counseling to children who have experienced grave traumas.  "There is almost no charitable cause in our area that has not benefitted from Michael's assistance."  M. Hellman Letter, Ex. B at 114.  It is remarkable that Michael manages to be a hardworking professional, loving husband, and doting father to *seven* children, while still finding time to help anyone and everyone who knocks on his door.  But Michael goes beyond helping only those that reach out to him; he actively seeks out opportunities to make a difference—often quietly—in the lives of others.  Michael has helped so many people—some of whom have been close family members, while many have been strangers or minor acquaintances who were downtrodden when Michael stepped in to change their lives for the better, often doing so anonymously to preserve the recipient's dignity.  He is not driven by ego.  He seeks no praise or acknowledgement.  "He is the ultimate giver and he never expects anything in return."  S. Mendlowitz Letter, Ex. B at 1.

Michael is a crusader for children, their education, and their emotional well-being.  "He is someone who cares deeply for every child and will give of himself unconditionally to help them succeed."  A. Mandel Letter, Ex. B at 77.  The General Studies Principal at BBY recalled an occasion where Michael was very concerned about the plight of a student who was extremely introverted and not succeeding in her current school.  Michael took it upon himself to work with BBY, on behalf of this student, to see that she was admitted to BBY and given the tools she needed to thrive.  "Michael spent hours advocating for this child who incidentally he did not know simply because the pain of that child became his pain."  *Id.*

---

[4] Attached as Exhibit D is a chart that lists many of these organizations.

Michael has been an involved parent in all aspects of student life at BBY since his eldest daughter began attending the school in 2002.  L. Keilson Letter, Ex. B at 108.  The Judaic Studies Principal who has known Michael for more than a decade, expressed her observations of Michael as a parent:

> [Michael] has always shown himself to be an integral part of each daughter's social, academic and emotional development.  He is an active parent who is in tune with each of his children's unique qualities.  The extent of his participation in his daughters' daily lives is remarkable.  He is one of the few fathers who are known to personally drop off snacks with encouraging notes for his daughters during the day.

P. Neuberg Letter, Ex. B at 118.  Since 2002, Michael has been involved in countless fundraising and educational projects for the school, all for the sole purpose of making it a better place for the hundreds of girls who attend.  *Id.*  In 2007, he became a member of the Board of Directors, and was elevated to the chairmanship in 2014.  *Id.*  His greatest achievement as a member of the BBY community is well-documented in dozens of letters submitted to the Court.  That is, Michael's heroic effort throughout 2013 and 2014 to save the school from the brink of extinction.  BBY's closing would have left approximately 1,200 girls without a school and 300 faculty members without a paycheck just one week before the start of the school year.  J. Edelstein Letter, Ex. B at 93; S. Koenig Letter, Ex. B at 129 ("Most of our teachers live paycheck to paycheck and rely on this income to put food on the table.").  Without hesitation, Michael took the reins, holding the inaugural board meeting in his dining room, and led an effort to raise more than $2.5 million for employee back pay and school-related expenses.  J. Edelstein Letter, Ex. B at 94.

> Michael stood in front of the parent-body during a townhall meeting and poured his heart out beseeching the crowd to donate large sums for the sake of the community's children.  The requisite money was raised [] and we were able to open the doors for the next school year.  Thereafter, Michael oversaw the reorganization of the school's fiscal and operational offices, implementing policies for granting scholarships for underprivileged children . . . and he also streamlined expenses to realize savings so that the school could run on a balanced budget.

22

*Id.*  Another parent recalled how Michael "taught by selfless example . . . put[ting] his entire personal and professional life on hold while dedicating all of his time, resources and expertise toward the future of [] 1,000 children."  L. Schuss Letter, Ex. B at 106.

Michael is a deeply religious man and a prominent member of his synagogue, Aish Kodesh, where he shares a special relationship with Rabbi Moshe Weinberger, a world-renowned leader. G. Klein Letter, Ex. B at 91.  For many years, Michael served as cantor for the high holidays, leading the congregation's prayers with his "extraordinary melodious voice."  Rabbi Weinberger Letter, Ex. B at 119.  Jewish Law requires that the cantor must be "scrupulous in his personal behavior, and an upstanding, respected member of the community."  *Id.*  Cantors are typically paid significant sums of money for their services.  *Id.*  Michael, however, refused to accept even one penny from his beloved congregation.  *Id.*  As a result of his legal predicament, Michael made the painful decision to relinquish his cherished role as cantor.  Many members of Michael's synagogue have mourned the loss of Michael's role in leading their prayer services as he is "dearly loved and respected for his humility, kindness, and authentic gentle spirituality."  *Id.*

Rabbi Weinberger, who has known Michael for 17 years, has witnessed Michael help countless people in their community find employment when they were out of a job and in desperate straits.  *Id* at 2. Rabbi Weinberger has also seen their community benefit from Michael's organized and regular charitable work:

> Each week we celebrate the Sabbath and enjoy the day of rest after the long hectic week.  Most use their Sabbath to relax and unwind.  Michael and his children saw that families in our community with children who are autistic, disabled or have any type of special need don't ever get that luxury of resting on the Sabbath. . . .  He spearheaded a program for these children, which was held in the Mendlowitz home for a few hours each Sabbath to give the parents a much-needed break.  He recruited his own children and their friends to help run this program teaching them by example how to be a selfless and giving person.

*Id.*

Michael has supported and counseled many friends and family members through personal tragedies.  Following an almost fatal car accident that left him and his wife in the hospital and later a rehab facility for many months, unable to care for their six children, ranging in age from one-year-old to 14, Michael Rapaport, Michael's friend of 20 years, describes how Michael was his "rock" following his accident:

> Michael spearheaded an emergency meeting, mobilizing our friends and taking charge of our six children.  Michael and Shira together planned, managed and implemented a detailed plan to stabilize all aspects of our children's lives and their myriad needs: daily meal preparation, transportation for hospital visits, arranging day-camp carpools, food shopping, organizing play dates and activities, arranging trauma therapists for our kids [who witnessed the accident]. . . . Thanks to Michael's selflessness, care and kindness, the traumatic impact on my family's life was considerably mitigated.

M. Rapaport Letter, Ex. B at 233.  Throughout the year that Michael supported his friend's dramatic recovery, Mr. Rapaport had no clue that Michael was going through a very painful situation of his own—namely, the loss of his business as a result of the FBI raid in July 2015 and ensuing criminal investigation.  According to Mr. Rapaport, "[Michael] didn't want me to worry about him and cause any extra stress on my weak and fragile mind and body.  He wanted the focus to be on my health and well-being."  *Id.* at 234 (emphasis in original).

One of Michael's greatest virtues is his ability to put others before himself, no matter what personal turmoil he may be experiencing.  Michael's brother-in-law recalls how Michael and Shira attended his wedding the day after the tragic loss of their first baby:

> Not only did Michael come and celebrate – he came and elevated our joy by dancing with me so that there shouldn't be even a minute pall of sadness on what should be our most joyous day.  This ritual dancing engenders feelings of unity, love and joy for the newly married couple and comes from a place deep in the soul.  I don't know how Michael was capable of doing this but he somehow found the strength to put his own grief aside in that moment of devotion to us and he uplifted us in a way that is hard to describe.

S. Reich Letter, Ex. B at 59.   Michael is described in many letters as a person who brings immeasurable joy to people's lives.   He also mitigates their pain and suffering in the most delicate manner.   For instance, Michael paid for a week-long hotel stay in Boston when his friend's son was ███████████████████████████.   M. Gottlieb Letter, Ex. B at 111.   The medical bills were mounting and Michael knew his friend could hardly afford to pay for the hotel while his son was in the hospital, so he picked up the tab without telling his dear friend, who later found out about Michael's generosity from a third party.   *Id.*

Michael has performed innumerable acts of kindness for people he has crossed paths with, whether he knows them or not.   An administrator at BBY recounts a compelling example in her letter that occurred this past June at Michael's daughter's graduation ceremony, during a time when Michael was recovering from the pain and shock of his trial and resulting guilty conviction:

> [Michael] thank[ed] me for all I contributed to [his daughter's] education; but not before asking me who a particular graduate he noticed during the ceremony was. His keen eye and golden heart noticed a girl who didn't smile because she was in desperate need of orthodontic treatment. Her mother, a single mom, couldn't dream of this 'luxury' and as a result she had [sic] extremely noticeable teeth deformity. In his swift and discrete manner, he didn't rest, until all the details were attended to, changing this girl's life forever, ensuring this sad girl the ability to smile with confidence!

S. Koenig Letter, Ex. B at 130.   Michael changed this girl's life forever without her even knowing he had done so.

Michael has encouraged his own children to follow in his charitable footsteps.   Recently, Michael discovered that a local man with two young daughters could not make his monthly rent payment.   J. Zoldan Letter, Ex. B at 138.   Michael urgently mobilized his contacts to ensure that the man was able to pay his rent and then find new employment so that he could pay his bills on his own, with dignity.   *Id.*   Michael then sourced food vouchers from the local supermarket and collected clothing for the man's daughters.   *Id.*   His friends "watched in awe as he asked his young

25

girls to go through their closets and each find a nice dress that they would like to give to [this man's] girls who have less than them." *Id.*  Michael's children did not protest having to part with their clothes.  Instead, they felt proud to emulate their father's giving spirit.  *Id.*

## III.   THE OFFENSE CONDUCT

The offense conduct set forth in the PSR does not accurately reflect the objective evidence established at trial (or otherwise available).  Nor does it accurately reflect Michael's role.  Rather, the offense conduct is largely a recitation of the original Indictment.  We recognize that this case was tried to verdict and that Michael was found guilty, but the general verdict is not an endorsement of each allegation the government has made, or of each theory of the offense that the government presented at trial.  The government's continued presentation of the offense conduct as a monolithic, six-year scheme in which Michael directed his employees to cheat CPS's customers is overbroad, unreasonable, and most importantly, not supported by the weight of the evidence.

We set forth below relevant objective facts regarding the offense conduct and Michael's role that place the verdict into context.

### A.  The Government's Allegations as Reflected in the PSR's Offense Conduct

The PSR outlines a systematic fraud scheme, in place from 2009 through 2015, with two major components: (1) sales misconduct through misstatements and omissions made during the marketing and signing up of new merchants, PSR ¶ 25, and (2) fraudulent overcharging of merchants, based on variance between the rates and fees on merchant applications and those charged, PSR ¶ 26.

With respect to sales misconduct the PSR finds that prospective merchants were routinely lied to during the initial sales pitch, to induce merchants to sign up with CPS.  PSR ¶¶ 22, 25.  The PSR references a sales pitch used at CPS and argued that it was misleading primarily because it contained language stating that rates were guaranteed for life, and that other than a monthly

statement fee, merchants were only charged when they processed transactions.  PSR ¶ 37.  The government has argued that these statements were misleading because rates and fees were sometimes raised, and there were rates and fees imposed that were not tied to processing transactions.  The PSR also finds that CPS's sales force told customers there were "no hidden fees" (though this is not contained in the sales script) where in fact there were hidden fees.  PSR ¶ 22. The PSR finds that Hart developed the sales script and that Michael approved it, PSR ¶¶ 20, 37, and further, that Michael directed employees to make false statements to merchant customers, lie during sales calls and otherwise about rates and fees that CPS charged.  PSR ¶ 25.

Relatedly, the PSR finds that CPS concealed this deception by sending merchant-customers applications that omitted the "terms and conditions."  PSR ¶ 42.  Important terms that were omitted through failure to send the terms and conditions included language that authorized CPS to charge an annual "PCI fee," to increase rates and fees, and that changes would be provided through a notice on the merchant's monthly statement.  *Id.*

With respect to overcharging and variance, the PSR finds that CPS employees, at Michael's direction, caused rates and fees to vary from the rates and fees listed on merchant applications as part of a plan to defraud merchants.  PSR ¶ 50.  The government has also argued that it was fraudulent to inform merchants about newly imposed fees, such as IRS compliance fees or PCI fees, or to raise existing fees, via statement message, and to subsequently impose such fees.

## B.  Contextualizing the Offense Conduct Based on Objective Evidence

The objective and credible evidence at trial did not prove a systematic fraud scheme engineered by Michael.  The government sought to make the case simple, but the facts are anything but.  Different issues arose at different times and impacted merchants in different ways.  Some problems were caused by self-interested sales personnel, or by incompetent employees.  Many of the core practices were rubber-stamped by EVO.  While there were major issues and operational

27

deficiencies at CPS that resulted in merchants being overcharged (and which, as described below, Michael takes the ultimate blame for), the portrayal of the facts as an intentional, monolithic, and systematic fraud scheme does not hold up to scrutiny.  Important aspects of the government's version of the offense conduct, which is incorporated into the PSR, are discussed below, with reference to evidence in the record, to provide further context.

*Frequency of sales misconduct and use of the sales script.*  The government claims that merchants were routinely lied to during initial sales calls, but has never undertaken any meaningful review of any significant number of those calls.  Servers containing hundreds of thousands of calls were seized during the execution of the search warrant.  The government reviewed a tiny fraction of those calls, and just a handful of sales calls were played at trial.  Since the government cannot plausibly assert what was actually said on the calls, it pivots to the sales script.  But the sales script was not drafted by Michael, was only used by some members of the sales team, and was not in use for the entirety of the relevant period.  In fact, the government played two recorded sales calls during its direct examination of Guy Samuel, neither of which contained the phrase "guaranteed for life," Tr. at 422:21-24, and Samuel confirmed that his sales pitch varied, and that he did not follow the script to a tee.  Tr. at 422:17-423:3.  Greenblatt testified that he did not use a script at all, Tr. at 848:25-849:1, and agreed that it was his job to answer merchant's questions about rates accurately.  Tr. at 865:11-18.  While we do not dispute that sales representatives may have said misleading things to merchants on sales calls, the government has not attempted to prove, other than pointing to the sales script and a handful of calls, that this happened with regularity.[5]

---

[5] The government's contention regarding the frequency of sales misrepresentations is particularly important given that, as discussed below, their loss calculation inherently assumes that all merchants were lied to, and lied to the same way, on sales calls.

***Michael's knowledge and direction of sales misconduct.***   The government argues that Michael directed employees to lie during sales calls about the rates and fees that CPS charged, but there is no evidence, other than the uncorroborated statements of self-interested cooperators, to support that contention.   Moreover, there was limited evidence at trial that Michael knew of and approved a sales script that contained allegedly misleading statements; instead, the evidence showed Michael circulating scripts to sales manager Hart that contained general information, without the language that the government has focused on.   *See, e.g.*, DX 5214.   Michael was aware that sales representatives might not proactively disclose each and every rate that a merchant could be charged during the initial sales call, and he knew that sales representatives were quoting base or "teaser" rates on sales calls.   He felt that this was not problematic because it was industry standard, and because the sales call would be followed up by a merchant application and other written disclosures.   But Michael did not direct the sales staff to lie, and he expected them to answer honestly if asked about a rate or fee.

The best evidence of this is the contemporaneous conversation between Devers and then-sales manager Stephan Mahabir, in which Mahabir says, in sum and substance, that sales representatives cannot lie, and if asked about a rate or fee, they must tell the truth.   *See* DX 5311/5311T; Tr. 2028:4-2029:2-18.   But Michael's intent is also reflected elsewhere.   For example, in an email to Devers, Michael said that a merchant should be given full refund because the sales "rep mislead [sic] him."   Ex. E at 1 (CPS_04235556).

***Statements made on sales calls must be considered in connection with the merchant application and statement messages.***   The government's version of the offense conduct divorces the statements allegedly made on sales calls from the merchant application sent to prospective customers near-contemporaneously, and from subsequent written disclosures.   But government

witnesses agreed that if a rate was listed on a merchant application, it was not "hidden," Tr. 868:13-16; Tr. 878:5-8 (Greenblatt), Tr. 617:6-8 (Meador), and numerous witnesses agreed that e-statement notifications to customers about fees ensured that merchants were informed about new or increased fees and that those fees likewise were not hidden. *See, e.g.*, Tr. 2301:14-18 (Caban); Tr. 878:5-8 (Greenblatt). Lambrix also agreed that a statement message was an appropriate way to tell merchants that there was going to be a change in the fee structure, Tr. at 2449:2-6, and there are a number of examples in the record of "suggested" statement messages prepared by EVO for its ISOs. *See, e.g.*, DX 5189, DX 5749.

There are many examples of Michael specifically instructing Devers to prepare and implement a statement notification. *See, e.g.*, DX 5189. Sometimes, Devers failed to ensure that Michael's instructions were carried out. Tr. at 1791:15-1793:11. While Michael did not specifically instruct Devers to send a statement message every time a rate or fee was changed, Michael's understanding was that Devers knew this was his responsibility. Michael's position on the need to notify merchants of changes to rates and fees was made clear by his statement, while Devers is wearing a recording device and trying to goad Michael into raising dues and assessments: "You have to do a statement notification. You can't just raise it." DX 5326/5326T.

**Evidence of overcharging was cherry-picked, not systematic.** The government argues that mismatch between the rates and fees listed on applications and the rates and fees charged was part of a scheme to fraudulently overbill customers. We do not dispute that variance (and thus, overcharging) happened far more often than it should have at CPS. But while the government did present certain instances of variance at trial, it did not present a systematic analysis comparing

30

rates and fees listed on applications with rates and fees charged, despite having access to all of the source material that would be needed to do so.[6]

***A core reason for variance was a failure to keep applications consistent with the onboarding template.***  Merchants that signed up with CPS were "onboarded" into the billing system using billing templates.  Where those templates did not match up with the rates and fees listed on a customer's application, there was a possibility for a variance.  The government argued that Michael instructed his employees to use the rates and fees on the "boarding template" rather than using the rates and fees on applications.  *See, e.g.*, Tr. 3093:9-13.  It is true that Michael wanted employees to use the boarding templates—this automated the process rather than requiring employees to input dozens of rates and fees for each new merchant, and ironically, was intended to solve for human error in the onboarding process.  But it was also Michael's intention for the applications to match the boarding system.  In this regard, he failed.  As Michael describes in his letter to the Court—his failure to keep the applications current vis-à-vis the boarding template was a major issue, and for that he takes full responsibility.

This failure on Michael's part was exacerbated by the fact that salespeople would alter applications so that rates and fees would appear lower.  Michael's efforts (which were not sufficient) to make sure that applications in use reflected the right rates were at times thwarted by salespeople.  Greenblatt, an experienced sales manager who knew exactly what he was doing, was one of the worst offenders, consistently making unauthorized changes to applications to secure sales and commission dollars.  *See, e.g.*, Tr. 1114:17-1115:18 (questioned about GX 701 and GX

---

[6] Despite not undertaking any systematic analysis, during summation, the government asked, rhetorically, why billing discrepancies "always seem to come out in a way the hurts the customer and helps CPS?"  Tr. at 3257:6-9.  The fact is that there *were* billing variances that led to undercharging.  As one readily accessible example, the application for a merchant reviewed as part of EVO's audit report, Jones Tax, lists dues and assessments at .95.  Ex. E at 3 (EMS_004238).  But this merchant was charged a discount rate of .13 for "Visa assessments."  DX 4606.

752, Greenblatt testified that his failure to include network access fees on an application after being directed to by Michael was a "mistake," and agreed that such a mistake could cause a problem at the onboarding stage); Tr. 1131:16-1138:3 (questioned about DX 4474, Greenblatt ultimately admitted that an application containing .095 for dues and assessments a few months after he directed the sales staff to use .95 obviously contradicted his own instruction); Tr. 1138:9-22 (after questioning on why rates and fees on applications that Greenblatt prepared did not match rates and fees that were authorized per emails, Greenblatt testified that he was "interested in closing deals and at the directive of Michael," admitted that he "made more commissions" and offered his (mis)impression that Michael also "made more profit").

*EVO's awareness of the practices at issue.* The government has continually attempted to put daylight between CPS and EVO, and the PSR contains the broad factual finding that Michael made "false and misleading statements to EVO with the intention of concealing aspects of the fraud scheme." PSR ¶ 54. The notion that EVO was kept in the dark is not supported by objective evidence. To the contrary, EVO was plainly aware of many of the practices at issue, of CPS's pricing, and of specific challenges that Michael was trying to address. These points are not made to shift blame; they are relevant because Michael relied heavily on EVO for guidance.

The evidence shows that EVO executives were aware of the contents of CPS's online marketing. *See, e.g.*, GX 1418 (EVO CFO Kevin Hodges sends EVO financial analyst Michael Gleason a CPS web advertisement and asks how the "pricing work[s]," Gleason says it is a "teaser rate" and describes aspects of CPS's pricing strategy including "95 basis point" assessment fees, and charging PCI fees). The evidence also shows that Michael elevated specific sales issues to executives such as Lambrix. *See* DX 5712 (email chain between Michael and Lambrix in which Michael says that BBB complaints have been an "ongoing issue . . . in our telesales model" that

CPS sales representatives "promise the world to customers and don't disclose MIDS/NONS, fees etc.," explains that CPS "tr[ies] to manage this as best [it] can" by for example recording sales calls "for training and QC" and by clawing back commissions where merchants cancel within six months, and offering that CPS "needs to police this better"). Lambrix responds with a general suggestion that CPS "adjust the sales comp programs" to claw back commissions where there was a BBB complaint. [7] *Id.* EVO also received and had the opportunity to review and comment on scripts in use at CPS. *See* DX 5743 (reflects EVO receiving, reviewing and commenting on call center script); Ex. E at 5 (CPS_01756724) (reflects EVO receiving various CPS policy documents and other materials including the Hart sales script).

More importantly, there is no dispute that EVO had access to information that would allow it to review the rates and fees CPS was charging, as well as the rates and fees on applications. Lambrix confirmed that CPS sent EVO signed applications for every new merchant and that this was an "available source" of information that would allow EVO to analyze CPS's pricing.[8] Tr. at 2602:10-18. Lambrix confirmed that financial analysts at EVO had access to the billing systems and thus the rates and fees that CPS was charging. Tr. at 2597:12-17. He also confirmed that the "financial performance of Commerce" was analyzed on a regular basis at least in the later years of

---

[7] Lambrix testified that these issues "raise[d] concerns," Tr. 2621:10-13, and seemed to acknowledge that this email put him on notice as to issues with the sales force, Tr. 2613:16-18, but other than "making some suggestions and trying to be helpful," Lambrix could not recall taking any other action, because, in his view, "this part of the business was [Michael's] responsibility, not [his]." Tr. 2619:14-2620:20.

[8] That EVO received and had access to thousands of completed applications is one basis for EVO's knowledge that, for a long period of time, CPS applications did not attach terms and conditions. Despite this, Lambrix testified that his understanding was that merchants were receiving terms and conditions. Tr. 2555:24-2556:3. That CPS sent every application to EVO certainly provided Michael with reasonable assurance that EVO understood what was contained or not contained in the applications. Michael recognizes that it was a mistake not to include terms and conditions in the merchant application, M. Mendlowitz Letter, Ex. A at 5, but it is worth noting this, as well the fact that (a) the terms and conditions largely contained information that was not relevant to the merchant, (b) important disclosures, like the fact that statements would be provided through an online portal, were made in other ways, such as CPS's welcome kit, and (c) the application itself contained language reserving the right to amend the agreement without notice.

the relevant period, Tr. at 2598:11-14, and confirmed that the finance team could analyze how many basis points were being charged to merchants, portfolio wide.  Tr. 2743:6-9.

One component of EVO's analysis of CPS's business was the regular "Financial Friday" conference calls that EVO would host and Michael would join.  According to Lambrix, these calls were a "touch base . . . on the performance of [EVO's] various investments."  Tr. 2693:15-18. Materials prepared by EVO in advance of these calls show that EVO was fully aware of various pricing strategies, rates, and fees including surcharging (GX 1453 at EMS_000659, "Revenue favorable to Plan and prior year due to merchant growth and significant increase in surcharge pricing"), PCI fees (*id.* at EMS_000686, "Revenue favorable to Plan largely due to billing PCI fees earlier than expected"), and membership fees (*id.* at EMS_000707, "Membership fee billed in July vs. a planned August").

EVO was also fully aware of a number of the specific rates and fees that the government argues were fraudulently imposed.  EVO knew that CPS was charging 95 basis points for "dues and assessments," and that this was intended as a profit generator rather than reflecting pass through costs, *see* GX 1418, but noticed in July 2013 that certain applications said ".095" rather than .95.  GX 1462.  Ultimately, Ken Rubin recommended to Lambrix that CPS leave assessments at .95 for existing merchants "unless of course they call to complain."  GX 1403.  Lambrix considered this issue a "mistake" that needed to be fixed, Tr. 2681:23-2682:5, but EVO did not recommend or require that impacted merchants be refunded, with Lambrix explaining that it was a "complicated exercise," Tr. 2550:23-2551:13, and that he was "not aware" of others in the industry "offering refunds to merchants for mistakes[.]"  Tr. 2682:18-2683:3.  While the government apparently credits EVO's explanations on various fronts, the government views the dues and assessments issue as an instance of intentional fraud, not a mistake.  As another example,

it was EVO that created surcharge table E, Tr. 1684:11-14, and EVO employees appeared to understand that the surcharge table was "active for all card and charge types."  DX 5165.  Lambrix did not have any concerns about the language of the statement message that alerted merchants to the new surcharge pricing, and although that statement message should have gone out a month earlier, Lambrix testified that he did not recall any "internal conversation" about what if anything should be done about the fact that the disclosure was a month late.  Tr. 2700:14-2703:22; GX 1403.

### C.  Michael's Role in the Offense Conduct

Michael's letter to the Court addresses in significant detail the mistakes and lapses in judgment that played a role in the offense conduct.  There are four basic issues:

> i.    Sales Conduct

When CPS was smaller and there were only a handful of sales representatives, Michael had a good handle on how they were pitching the service.  M. Mendlowitz Letter, Ex. A at 4.  He would train them himself, and the pitch—which was not committed to a script—was simple and straightforward.  *Id.* at 4-5. Sales representatives tried to focus on certain benefits that CPS provided over the competition, like free or low-cost hardware and no cancellation fees.  *Id.*

But as CPS and the sales staff grew, Michael lost touch with the culture and conduct of the sales staff.  He did not ensure that managers he put in place were faithful to the cardinal rule that Michael expected the sales team would follow—which was not to lie—and did not do enough to put policies and procedures in place to make sure that this did not happen.  *Id.* at 6.  He also did not focus closely enough on the script that Hart drafted and instructed his sales team to use. *Id.* Michael knew that there were sales misconduct issues at the time but did not know the extent of the issues, *id.*; he was not actively monitoring or reviewing sales calls like Hart was.  Relatedly, Michael knew that some employees were modifying applications without authorization.  *Id.* at 7. He describes a game of "cat and mouse" with the sales staff as he sought to make sure that they

would not change rates and fees on applications without approval. *Id.* at 7-8. Ultimately, Michael was not forceful enough in curtailing this conduct; too often willing to give people second and third chances, not willing enough to come down hard and take definitive corrective measures. While Michael did not instruct his employees to lie to merchants, he did not do enough to put a stop to problematic sales conduct.

### ii. Billing Issues

Michael also takes responsibility for the application and onboarding issues that led to billing variance. As he explains in his letter, applications needed to match onboarding templates to ensure that merchants were being billed pursuant to the rates and fees in their agreements. *Id.* at 6. Michael failed to keep applications current with the onboarding templates, which led to variance. *Id.* Michael explains how this happened specifically with respect to two types of fees— dues and assessments and network access fees—which led to the most significant variance issues. *Id.* at 7. While Michael eventually got this under control, especially by taking significant corrective action around August 2014, he recognizes that his failure to keep the applications consistent with the onboarding template at all times led to variance issues, which then led to inexcusable overcharges. *Id.* at 6-7.

### iii. Statement Messaging

Michael believed that it was acceptable to notify merchants of changes in fees, or new fees, via statement message. *Id.* at 8. And he believed that his managers knew that statement messages needed to go out when pricing changed. *Id.* But he also knows that the process was not perfect and that there were times where statement messages were not sent or were sent late. *Id.* He recognizes that he should have done more to make sure that the process was executed consistently. *Id.*

iv.   Terms and Conditions

Finally, Michael describes the mistake he made when he decided to omit the "Terms and Conditions" from the merchant application. *Id.* at 5. He explains that he justified that decision to himself in a number of ways, but that it was motivated largely to make the sales process less complicated. *Id.* at 5-6. He knows that this was a shortcut he should not have taken. *Id.* at 6.

## D. Evidence of Self-Correction

As reflected in his letter to the Court and in Section III.C, above, Michael recognizes that he failed to correct issues that arose and failed to adequately supervise his employees. However, the record contains a number of significant examples of Michael trying to take remedial, self-correcting action. We believe this evidence is relevant to the Court's consideration and summarize key items below.

Michael took steps to police the sales force and thwart sales misconduct. For example, he reprimanded Samuel for improper use of "double accounts," and referring back to a discussion he had with Samuel, reiterated that "there needs to be an 'honor and trust' system [at CPS.]" DX 4963. Michael learned that some self-interested sales representatives were taking the extreme step of editing or adding rates and fees *after* a merchant signed the application, so he asked IRIS about ways to make the application "un-editable" after it was signed. DX 5005.

A number of emails reflect Michael, or employees acting at Michael's direction, instructing salespeople not to change applications or templates, to make sure that their applications were updated to reflect pricing changes (so that the applications would then match the template), or to otherwise ensure that applications were filled out properly. *See* DX 4465 (email from a CPS employee telling salespeople that they "are not to make any modifications to these templates per Michael's strict instructions."); GX 701 (Greenblatt emails sales representatives, at Michael's direction, Tr. 1111:20-22, with rate and fee adjustments to be made to applications); GX 702

37

(Greenblatt emails sales representatives, sent with Michael's approval, Tr. 1126:11-13, with instructions for filling out applications properly including with respect to insurance fees and monthly minimums, and directing that rates and fees on the application needed to match the "cover page" which Greenblatt agreed was to ensure that accounts could be onboarded correctly, Tr. at 1124:9-20); GX 705 (Greenblatt emails sales representatives to instruct them that "[u]nder no circumstances should [they] change the MID or NON fields on a merchant application from the 2.95% set in the templates" and that "[i]f this happens again Michael will personally be dealing with this.").

While it should have happened sooner, Michael realized around August 2014 that he needed to take significant action to get variance issues rectified. This was prior to EVO's audit, and well before the government's investigation began, and is reflected by documents in the record. Importantly, on August 14, 2014, Devers circulates an email to the customer service staff, which, among other things, says that "[a]s of today, all new merchants will be boarded with network access fee as .0195%+$.10 and the dues and assessments as 0.0195+$0.10, [t]he account will be boarded as is." DX 5103. Devers confirmed that this email reflected the new boarding policy. Tr. at 1979:20-1980:6. Devers would not agree that boarding an account "as is" meant that what was on the application should go into the system, Tr. 1981:6-8, but the statement speaks for itself. This email from Devers was a day after Michael emailed his software developers at IRIS, telling them that he "need[ed] to make some changes to the merchant app both in the fine print and rate section" and asking how to go about doing that. DX 5038.

The results of these remedial efforts are apparent from applications dated post-August 2014; two such applications were introduced through Mahabir to illustrate this point. DX 4716; DX 4717; DX 4718; Tr. 2861:4-2865:21. Michael also told EVO, contemporaneously, that he was

in the midst of making "a ton of QC changes" in August 2014, and that he expected to "see the positive effect" in the coming months.  Ex. E at 6 (CPS_02511381).

## IV.  A NON-CUSTODIAL SENTENCE IS SUFFICIENT BUT NOT GREATER THAN NECESSARY IN THIS CASE

### A. Federal Sentencing Framework

The "overarching" command of 18 U.S.C. § 3553(a) instructs district courts to "impose a sentence sufficient, but not greater than necessary" to accomplish the goals of sentencing." *Kimbrough v. United States*, 552 U.S. 85, 89 (2007).  As this Court is well aware, the Guidelines are advisory and are merely one factor to consider in determining an appropriate sentence.  *Gall v. United States,* 552 U.S. 38, 45 (2007).  In fact, courts "may not presume that the Guidelines range is reasonable" at all or that only "extraordinary circumstances . . . justify a sentence outside the Guidelines range."  *United States v. Cavera*, 550 F.3d 180, 189, 199 (2d Cir. 2008) (quoting *Gall*, 552 U.S. at 47); *see Nelson v. United States*, 555 U.S. 350, 350 (2009) ("The Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable.").

While the Court is instructed to use the Guidelines as an initial benchmark, they can and should play no role in the sentencing decision when doing so would undermine Federal sentencing objectives.  *Kimbrough*, 552 U.S. at 90.  As the Second Circuit has explained:

> the district court must form its own view of the "nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). The sentencing judge is directed, moreover, to consider: a) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for that offense; b) the need to afford adequate deterrence to criminal conduct; c) the need to protect the public from further crimes by the defendant; and d) the need for rehabilitation. *Id.* § 3553(a)(2). Additionally, district courts must take into account: the kinds of sentences available, *id.* § 3553(a)(3); any pertinent Sentencing Commission policy statement, *id.* § 3553(a)(5); the need to avoid unwarranted sentence disparities among similarly situated defendants, *id.* § 3553(a)(6); and, where applicable, the need to provide restitution to any victims of the offense, *id.* § 3553(a)(7).

*Cavera*, 550 F.3d at 188-89.  It follows that courts may consider whether a sentence based on the

Guidelines does not reflect the considerations outlined in § 3553(a), reflects an unsound judgment, does not treat defendant characteristics in the proper way, or that a different sentence is otherwise appropriate. *Rita v. United States*, 551 U.S. 338, 350-51; *see also United States v. Gupta*, 904 F. Supp. 2d 349, 350 (S.D.N.Y. 2012), *aff'd*, 747 F.3d 111 (2d Cir. 2014) (the "irrationality" of the Guideline's focus on loss amount was clear where 20 of the defendant's 30 offense level points were due solely to the loss calculation).  Judges also "may vary [from Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines."  *Kimbrough*, 552 U.S. at 101; *see also Pepper v. United States*, 562 U.S. 476, 501 (2011).

In fashioning a just sentence, the Court must conduct its own "independent review of the sentencing factors, aided by the arguments of the prosecution and the defense" and exercise discretion in fitting the sentence in this case to Michael's individual circumstances, giving "consideration [to its] own sense of what is a fair and just sentence under all the circumstances." *See Cavera*, 550 F.3d at 189; *United States v. Jones,* 460 F.3d 191, 195 (2d Cir. 2006).  It is not the amount by which a sentence deviates from the applicable Guidelines range that is the measure of how "reasonable" a sentence is.  *United States v. Dorvee*, 616 F.3d 174, 184 (2d Cir. 2010) (citing *Gall,* 552 U.S. at 46-47).  Rather, "[r]easonableness is determined instead by the district court's individualized application of the statutory sentencing factors."  *Id.*  Application of these factors here strongly supports a non-custodial sentence.  If the Court deems a custodial sentence necessary, it should be no greater than the sentence Your Honor imposed on co-defendant Richard Hart—which was one year and a day—for the reasons discussed below.

### B.  The PSR's Advisory Guideline Calculation is Unsupported

#### i.  The PSR's Guidelines Calculation

The government's loss calculation, adopted by the PSR, is approximately $23.2 million, which purports to be the difference between the amounts paid by merchant customers and the "true

market value" of the processing services.  PSR ¶¶ 60-63.  To do this calculation, the government compared CPS's profit margins with a "fair market value" of 3%, which was, "[a]ccording to EVO," the expected profit margin of an ISO with a portfolio "similar to CPS."  PSR ¶ 60.  The government multiplied CPS's processing volume from 2009 through July 2015 (after backing out revenue derived from American Express transactions) by its profit margins in each year, and considered anything over and above 3% to be fraud loss.  PSR ¶¶ 60-63.  At the same time, the PSR states that "[a]ccording to the Government, they do not intend to seek restitution because the number of identifiable victims makes restitution impractical and determining each victim's loss amount would unduly complicate and prolong the sentencing process."  PSR ¶ 69.

Applying this loss figure to the Guidelines, the government (and PSR) calculated Michael's offense level as follows:

| | |
|---|---|
| 2B1.1(a) - Base Offense Level: | 7 |
| 2B1.1(b)(1) - Amount of Loss over $9.5 million: | 20 |
| 2B1.1(b)(1)(A) - More than 10 victims, mass marketing | 2 |
| 3B1.1(a) – Organizer or leader, 5 or more participants | 4 |
| TOTAL OFFENSE LEVEL = | 33 |

Michael has no prior criminal convictions, and as a result has a criminal history score of zero and a criminal history category of I.  PSR ¶¶ 89-90.  This results in a Guidelines range of 135 to 168 months' incarceration.  PSR ¶ 137.

## ii.  Loss Amount is Greatly Overstated

The Court is aware from our prior submission in connection with Hart's sentencing that we believe that the loss methodology proposed by the government and adopted by the PSR lacks an evidentiary basis, is wrong in its basic approach, and is entirely unfair and overly punitive.  We note at the outset that the government did not seek to prove any specific loss amount at trial, and

41

the evidentiary record presents an insufficient basis upon which to draw any conclusion about loss. Among other defects, the PSR's approach assumes a uniformity in how CPS merchants were affected that is inconsistent with what we know about how CPS operated.  Because the loss amount is such a huge driver of Michael's Guidelines range, we are compelled to address the issue in some detail here.

*Treating all processing revenue, from all customers, over the entire period, as fraud loss.* The loss methodology inappropriately and without an evidentiary basis treats all processing revenue (other than AMEX revenue), from all customers, as tainted by fraud and part of the "pool" from which to capture loss.  This is entirely unsound and unsupported.

The loss methodology cannot rely on the alleged sales misconduct to support this assumption.  As described above, the government has not presented any evidence (or done any work to try and prove) that the sales conduct it alleges was fraudulent was deployed with any frequency, much less, as the loss methodology assumes, on **every call with every customer for nearly six years.**

Nor is it reasonable to treat all revenue above a 3.0% profit margin (or any particular number) as the result of fraud.  This criminalizes high prices because it entirely ignores written disclosures.  Under the loss methodology, profits from processing revenue above 3.0% are treated as fraud **even if the customer agreed to higher rates and fees in a merchant application.**[9]  The government takes this shortcut because it has not done any systematic or statistically significant analysis to determine whether and which customers were billed rates and fees higher than what

---

[9] Similarly, the loss methodology totally disregards the effect of statement messages that advised of a change in pricing.  For example, a PCI fee imposed on a merchant (after a statement message) in Year 1 is included in the revenue figure, and not only that, subsequent PCI fees, in subsequent years, are also included despite ongoing notice through statement messages and through the actual imposition of the fee, year after year.  There is no basis to say that a fee imposed under those circumstances is fraudulent.

was disclosed.  This is not appropriate and not supported by the record, where there was near unanimous agreement for the unremarkable proposition that a rate or fee was valid if disclosed on the application.  Tr. at 868:13-16 (Greenblatt); 1966:1-8 (Devers); 606:23-607:3 (Meador).

The loss methodology treats all non-AMEX revenue from 2009 through July 2015 the same, and in that way assumes that the conduct was identical and consistent throughout the entire period.  That is consistent with the government's portrayal of the offense conduct as a monolithic fraud scheme, but not supported by the record.  For example, and as discussed above, sales conduct varied considerably, and varied in part based on CPS personnel.  The government argued in connection with Hart's sentencing that Hart trained and monitored his sales team closely, "pushed his subordinates relentlessly, listening to recordings of their sales calls and emailing his often-harsh critiques of their sales prowess to his entire team," and that he "demanded his sales staff employ aggressive and fraudulent sales tactics" and "helped concoct new ways to defraud victims."  *See* Govt's Sentencing Mem., No. 17-cr-248-VSB-2, Dkt. 199 at 2.  Hart was only hired in December 2011, promoted to manager thereafter, and was fired in February 2015.  *Id*. at 2, 4.  But the loss methodology simply assumes that the sales conduct was similar throughout, with or without Hart.  As another example, the government argues that various rates and fees—dues and assessments, network access fees, surcharges, and PCI fees—were imposed fraudulently.  But CPS did not charge certain of these fees throughout the relevant period, and the amounts charged varied over time.  But again, the loss methodology paints the simplest possible picture with the broadest possible brush, and assumes that these rates and fees were applied the entire time, in the same way.  As discussed in Section III.D, Michael took major remedial actions particularly in and around August 2014—before the EVO audit, and well before the government investigation—which significantly decreased variance issues.  But, again, the loss methodology simply sweeps revenue

from that point forward into the loss calculation.

It is also profoundly unreasonable to proceed under the assumption that all merchants were defrauded, and that all processing revenue is tainted by fraud, where EVO has been permitted to continue to manage, and generate revenue from, CPS's portfolio.  It is difficult to reconcile this position with the notion that all of CPS's merchants were defrauded.

Finally, the government explicitly argued at trial that "friends and family" merchants were not defrauded.  *See, e.g.*, Tr. 84:23-84:5, Tr. 3108:4-7, Tr. 3114:4-6 ("How else do we know the defendant intended to defraud his customers?  Because when the customers were his friends and family members, he didn't defraud them.").  Yet, like all other revenue, revenue from "friends and family" merchants is included in the loss methodology.  This point, while relatively minor in comparison to the others, is indicative of the loss methodology's complete lack of rigor.[10]

A "reasonable" estimate does not mean an estimate that is most simple for the government, or one that provides the most possible exposure for a defendant, at the expense of any meaningful consideration of the evidence.

**The "fair value" amount is arbitrary.**  There is no basis for the 3.0% "fair value" figure utilized in the loss methodology.  The PSR simply states that it comes from EVO.[11]  PSR ¶ 60.  No further detail is provided regarding the source for that number, and no context is provided that

---

[10] The loss methodology also entirely ignores the hundreds of thousands of dollars that CPS refunded to merchants during the relevant period.

[11] It is interesting to learn that EVO now considers 3% the "fair value" of processing services for an ISO like CPS. There is no dispute that EVO knew (or at the very least, had access to information that would allow them to determine) what CPS's profit margins were.  This is precisely the type of data that was reviewed, for example, on weekly "Financial Friday" calls between EVO and CPS.  GX 1453 (consistently lists as a "key metric" the "Total Revenue / Volume" expressed in basis points).  EVO did not raise concerns about these margins until it conducted an audit in late 2014, which resulted in a "marginal satisfactory" grade for CPS.  It strikes us as self-serving and not credible for EVO to now apparently report that 3.0% is an appropriate "fair value" figure and raises further questions about why Michael has been prosecuted, while EVO and its executives have, to date, not faced any consequence.

would allow the Court to consider whether it provides an appropriate comparison for CPS, which the government knows serviced a large percentage of small, sometimes risky, startup businesses.

***The impact of low-processing or non-processing merchants.*** The loss methodology fails to take into consideration the fact that low processing or non-processing merchants, if charged fixed fees (like an annual PCI or IRS fee), would skew profit margins significantly higher. Many of CPS's merchants were low processing or non-processing. Consider as an example a merchant that did not process in a given month but was charged a monthly minimum fee (which was typically disclosed on the merchant agreement) of $15. The "profit margin" percentage on that merchant, for that month, would be skewed significantly upward. This skewing effect is demonstrated, for example, by an analysis prepared by EVO at the government's request. EVO calculated that the total income as a percentage of revenue in 2009 was 4.73%, but this is well before many of the issues that the government claims were fraudulent even arose, including surcharges, high assessment fees, and a number of the large fixed fees (in fact, the income percentage for 2009 is higher than a number of subsequent years). Ex. E at 8 (EMS_030043). This shows that there are other factors that drive the income percentage, one of which is the fact that low volume or non-processing merchants will necessarily generate a higher income percentage or profit margin.

The only way to determine a reasonable estimation of loss would be to review and analyze the actual rates and fees customers agreed to pay or were otherwise fairly advised of versus the rates and fees they were charged.[12] The government implicitly recognizes that this is how one would determine each victim's loss, PSR ¶ 69, and that the government is unwilling or unable to do so in that context does not mean that it can employ an extraordinarily unfair and unreasonable methodology in calculating a loss amount for the purpose of sentencing.

---

[12] It is our position that it would then be necessary to determine what variances, if any, were caused by intentional misconduct attributable to Michael, rather than mistake, or the conduct of others.

### iii.   The Four-Level "Organizer or Leader" Enhancement is Unwarranted

The fact that Michael was the CEO of CPS does not automatically mean that he should receive a four-level enhancement of criminal activity pursuant to U.S.S.G. § 3B1.1(a).   When considering enhancements under this provision of the Sentencing Guidelines, titles are "not controlling," U.S.S.G. §3B1.1, comment. (n.4), and courts often consider the factors listed in Application Note 4 of this Section to determine whether treatment as an "organizer or leader" is appropriate: the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.  *Id.* There is a lack of evidence of Michael directing or approving the sales conduct, no evidence that he recruited accomplices, and as discussed, Michael did not personally benefit from the offense. In addition, Michael was essentially a middle manager in the overall EVO structure.  For these reasons, he is more accurately described as a manager or supervisor.

### iv.   Appropriate Guidelines Calculation

As stated in our PSR Objections, we calculate Michael's Guidelines offense level as 12, based on a Guidelines offense level of 7, *see* U.S.S.G. § 2B1.1(a)(1); a two-level increase because the offense involved at least 10 victims and was committed through mass marketing, see *id*. § 2B1.1(b)(2)(A); a three-level increase because Michael was a manager or supervisor and the criminal activity involved five or more participants, *see id*. § 3B1.1(a).

Michael has zero criminal history points and is in Criminal History Category I. Accordingly, the offense level of 12 yields a Guidelines range of 10-16 months' imprisonment.

### C.  The Probation Department's Recommendation

The PSR recommends a sentence of 48 months, which reflects a downward variance of 87-120 months from the Guidelines range, and a period of supervised release of two years.  PSR at 32.  The PSR does not recommend a fine and does not take a position on the amount of any forfeiture.  *Id.*  In justifying the recommended variance, the PSR explains that "without minimizing the seriousness of this case, given the non-violent nature [of the] offense, the defendant's lack of criminal history, his family ties and responsibilities, his charitable deeds, and his compliance with his bail conditions," the recommended sentence was "sufficient but not greater than necessary" to satisfy sentencing objectives.  *Id.* at 34.

We appreciate the Probation Department's careful weighing of the relevant factors that led it to its recommendation of a substantial downward variance.  We observe that the PSR's starting point was a Guidelines range that was driven largely by an outsized loss figure.  We understand that the Probation Department was not in a position to resolve the parties' dispute over loss, PSR at 30, and given that fact, the PSR's ultimate recommendation must be considered in part the by-product of the government's flawed, unfounded thinking about the extent of the loss in this case.  We submit that the Court should, however, consider the very steep variance that the PSR recommends as it considers Michael's sentence, especially given the significant amount of work the Probation Department did to consider Michael's family dynamic, including a home visit and in-person and telephonic interviews with Michael, Shira, a number of their children, and Michael's sisters,  PSR ¶¶ 103-111, as well as Michael's impact on the community through charitable work.  PSR ¶ 129.

### D.  A Downward Departure Is Appropriate

If the Court accepts the PSR's loss calculation, the Court should, for the reasons that follow, grant a downward departure from the resulting offense level under the Guidelines.

47

i.   Lack of Personal Gain

Courts have found downward departures appropriate where the defendant received little or no personal benefit from the offense.  *United States v. Walters*, 87 F.3d 663, 671-72, n.8 (5th Cir. 1996) (affirming downward departure where loss calculation "overstates the seriousness of the particular defendant's conduct" as defendant "fail[ed] to receive a personal benefit" from the scheme); *United States v. Oakford Corp.*, 79 F. Supp. 2d 357, 368 (S.D.N.Y. 1999) (finding that Guidelines overstated seriousness of offense where "each of the defendants personally realized only a small portion of the overall gain or profits" from scheme); *United States v. Stuart*, 22 F.3d 76, 82-83 (3d Cir. 1994) (finding that a nine-level loss enhancement may overstate defendant's criminality because he only personally received a maximum of 1.6% of the government's loss figure).  The facts here present a substantial basis for a downward departure on these grounds.

The government offered no credible evidence that Michael received any incremental personal gain through the commission of the offense.[13]  This is because, as described in Section II.D, Michael was a salaried employee, EVO controlled the "upside" residual income that CPS generated, and EVO has never declared a profit distribution.  That Michael held a 20% stake in potential, eventual profit distributions is highly attenuated.  This is not a case where "loss and gain are roughly coincident."  *See United States v. Costello*, 16 F. Supp. 2d 36, 40-41 (D. Mass. 1998) (downward departure from level 24 to 15 was "appropriate" where, among other things, the loss enhancement generated offense level seriously overstated the offense as defendants' personal gain was not nearly commensurate with loss); *United States v. Redemann*, 295 F. Supp. 2d 887, 899-

---

[13] That there was no evidence that Michael's compensation was tied to the rates and fees that CPS charged did not stop the government from attempting to give the jury that impression, suggesting in its opening statement and through its witnesses that Michael tied the imposition of one fees to the need to pay tuition for his children.  Tr. at 81:17-22, Tr.1267:17-23.  The government knew, having full access to EVO and receiving from EVO specific documents that set forth Michael's compensation, that the inference they were hoping the jury would draw was inaccurate.

900 (E.D. Wis. 2003) (granting downward departure where "defendant may have improperly gained nothing from his crime; at most he received $500,000, yet the loss amount attributed to him was five times that").

The Court should decline to apply a 20-level loss enhancement under these circumstances.

ii.   <u>Michael's Family Circumstances Warrant a Downward Departure</u>

Michael is entitled to a downward departure for Family Ties and Responsibilities pursuant to U.S.S.G. § 5H1.6.  Michael has seven children between the ages of five and 20, all of whom live in the Mendlowitz family home and are dependent on Michael and Shira for all of their basic needs.  PSR ¶ 106; D. Brazil Letter, Ex. B at 83 ("His children are dependent on him and truly would not survive without him.").  Michael has always been the main source of income for his family and is pursuing new business opportunities in order to get back on his feet so that he can financially support his family.  Since EVO shut down Michael's business in July 2015, Michael and Shira have had to take out a large home equity loan and rely on assistance from family and friends to get by, as Shira's income alone is not enough to support their large family. Understandably, these outside sources of support have all but dried up.  *See, e.g.*, K. Davidson Letter, Ex. B at 44 ("I am 64 years old, have worked my entire life and have mortgaged or sold everything I own to help [the Mendlowitz family] survive these past 4 years.").

Michael is the rock of his family and the parent to whom his children turn when they need help, no matter what they may be going through.  As Shira explains:

> [Michael] is the one they go to when they're feeling down about something or are having issues with friends.  It is he who they go to when they struggle to understand their schoolwork.  He is the one who patiently lies with our youngest daughter and tells her endless stories until she falls asleep.

S. Mendlowitz Letter, Ex. B at 2.  Shira also relies heavily on Michael for her emotional and psychological well-being, and will not be able to cope if Michael receives a custodial sentence.

*Id.*  Any period of incarceration, which will physically take their father and emotionally take their mother, will have a devastating effect on each one of the Mendlowitz children.

### E.  A Downward Variance from the PSR's Guidelines Calculation is Warranted Under Title 18, United States Code, Section 3553(a)

#### i.  Michael's Personal History and Characteristics Weigh Heavily in Favor of a Downward Variance

Michael has led an extraordinary life premised on helping anyone who has had the good fortune of crossing his path, from the beggar who knocks on his door for pocket change and is invited inside for a bite to eat, *see* C. Mendlowitz Letter, Ex. B at 9, to the more than 1,200 girls whose school he saved from financial and operational ruin, *see* L. Kielson Letter, Ex. B at 108. Michael has changed countless lives and given people second chances because he sees the best in everyone, no matter their ethnic background, religion, or position in society.  The nearly 200 letters submitted on his behalf represent a fraction of the people who have been touched by Michael's generosity and rely on him in endless ways.  These people have described to the Court the effect Michael has had on their lives, and they have uniformly attested to his good moral character and invaluable contributions to the community.  *See United States v. Butler*, 2011 WL 4073672, at *4 (E.D.N.Y. Sept. 13, 2011) (imposing non-Guidelines sentence "in large part because defendant was 'supported by a large community of family and friends, and a wife and child, who have attested to his good character in written submissions to the court'").

Any prison time will create a severe hardship for Michael's immediate and extended family, along with the dozens of organizations to which he graciously lends his time and energy. *See United States v. DiMattina*, 885 F. Supp. 2d 572, 582 (E.D.N.Y. 2012) (justifying variance from Guidelines range and imposing a sentence of a year and a day based, in part, on the fact that the defendant's "family will suffer emotionally and financially from his absence during his long incarceration").  Michael's younger children will be irreversibly damaged by his absence, which

50

comes at a time when ████████████████████████ (A███, S██████, and R██ ), and ██████████████████████ (M███ ).  Shira would be lost without Michael and unable to provide the stable and loving home their children so desperately need.  *See* S. Mendlowitz Letter, Ex. B at 5.  Shira's mother stated:

> I know it will be too much for my daughter to bear, she has had to be so strong for her children and for her gentle sweet husband and she is now so brittle and fragile. I believe if Michael is separated from his family, that what is left of Shira's strength will crack and she will sink back into a depression, which she will not be able to get free of. What will happen to their family? What will happen to our entire family?

K. Davidson Letter, Ex. B at 44.

Several of the Mendlowitz children ████████████████████████ that require ██████████████████████████████.  Michael, given his tremendous patience and strength, has always overseen these efforts, which Shira is unable to handle on her own given each child's unique situation and needs.  While each child's ████████ have been addressed in Section II.C, we will briefly address the impact Michael has on the emotional and physical well-being of each of his children here.

Michael's ██████████████, A███ , now █, requires ██████████████████ ████████████████████████████████████████████████████ ████ Since a ████████████████████████████ both Michael and Shira have worked diligently to provide A███ with a ██████████████████████ ██████████████ T. Rubin Letter, Ex. B at 135.  A███ has made ██████████ ████████████████████████████████████████████████████ ████████████████████████████████████████ *Id.* Because Michael and Shira are unable to afford to pay for ██████████████, they both work tirelessly with A███'s teachers to ████████████████████████.  One of A███'s ████████████

expressed the importance of Michael's presence in A████'s daily routine:

> Being that A███ is very attached emotionally to her father, Michael, it is of utmost concern to us that his absence from her day-to-day life would negatively impact her to a great extent.  A████'s father plays a very significant role in her life.  Her face lights up whenever she talks about her father, such as when she describes to me how her father puts her to sleep at night after reading bedtime stories and hide-and-seek with her.  Every Sunday, A████ and her father plan a special activity together – whether it's going to the park, bike-riding, or painting pottery.

*Id.*  A████'s ████████ teacher, who is also a social worker, stated that much of A████'s ████ ████████████████████████████████████████████████.  D. Brazil Letter, Ex. B at 82. "Taking away the most cherished person in A████'s life would wreak havoc on this innocent, sweet child and would undoubtedly lead to irreparable damage."  *Id.*

Michael's ███-year-old daughter, S███████, ████████████████████████████████████ ████████████████████████████████████████████████.  Dr. Reichman Letter, Ex. B at 89.  Dr. Reichman believes that any period of incarceration of her father will have ████████████████████████ on S██████'s ████████████████████████████████████████ *Id.*  Devorah Kurland, the principal for grades ███ at BBY, expressed a similar sentiment: "Undoubtedly, Michael's day to day involvement with S██████ is imperative to her ████ ████████████████████████ and I fear that any absence of her father would have devastating repercussions to S██████'s well-being."  D. Kurland Letter, Ex. B at 84.  She also noted that the ████████████████████████████ ████████████████████████████████████ ████████████████████████████████████████████████████████ ████  *Id.*  "Sentencing [Michael] with incarceration and removing him from being an active participant in her life, would undoubtedly put S██████'s ████████████████████████████ ████████  P. Neuberg Letter, Ex. B at 118.

M████, ██, ████████████████████████████████████████████████



██████████████████████████████. For the last year, she has ████████████████

████████████████████████████████████████████████ M██ has recently

started a new school, which has ███████████████████████████████████████

S. Mendlowitz Letter, Ex. B at 4.  Shira "can't imagine what would happen to [M██] if she were

to suffer the trauma of losing her father ███████████████." *Id.*  M██ and Michael share a deep

bond.  "They are both sensitive souls and he really understands and helps her ██████████████

more than anyone." *Id.*  M██ needs Michael to get through adolescence and high school, █████

██████████████████████████████████████████████████████████████████████

████████████ if Michael is taken from her. *Id.*

R████, age █, has ████████████████████████████████████████████████

████████████████████████ due to the unwavering dedication of her father.  "Michael will often

sit with her for hours a night ████████████████████████████████████████

███████████████  S. Mendlowitz Letter, Ex. B at 4.  █████████████████████████

██████████████████████████████████████████  Without her father's ████████████,

R████ will ████████████████████████████████████████████████████████

███████████████████████████████████

A██, ██, Avi, 18, and Chaya, 20, also deeply depend on their father even though they do

not present with any ████████████████████████████████████████.  Each

child is, ████████████████████████████████████████.  A██ is shy and bottles up her

emotions.  Michael is the one who looks after her and ensures that she feels important.  *See* S.

Mendlowitz Letter, Ex. B at 5.  Avi recently graduated high school and is attempting to manage

life as a young adult.  Michael is the one who supports Avi through every challenge in his life.  A.

Mendlowitz Letter, Ex. B at 13; Rabbi Weinberger Letter, Ex. B at 120 ("I fear for his wellbeing

at this critical time in [Avi's] life should he be separated from [Michael]").  Chaya is hoping to marry, but given the uncertainty of her father's legal situation, no one has been willing to even ask her out on a date.  S. Mendlowitz Letter, Ex. B at 4.

Michael's 93-year-old grandmother is at risk of ███████████████████, should she experience any trauma at this stage in her life.  R. Gross Letter, Ex. B at 38.  Her doctors ███

████████████████████████████████████████████████████████

██████████████████████████████████ *Id.* ████████████████████

██████████████████████████████████████████

Michael's community would also suffer greatly if we were given a custodial sentence.  The charitable and community organizations listed in Exhibit D are just some of the groups Michael regularly assists.  "Whenever there is a need in the community, Michael is always willing to help." Rabbi Bender Letter, Ex. B at 140.  "He refuses to accept any honor or public appreciation for his work even though he has spent countless hours helping so many struggling community members in need." *Id.*

ii.  <u>The Nature and Circumstances of the Offense Merits a Downward Variance</u>

As described in Section III.C, Michael is responsible for a number of serious problems that arose at CPS—he made a number of poor decisions, failed to properly manage his staff, and failed to ensure that there were processes in place to prevent variance, and thus, overcharges.  Michael owns, and is tortured by, these failures.  But there is a large gap between what Michael is responsible for, and the broad, years-long scheme that the government alleges Michael orchestrated.  Because the government's version of events is, in many respects, not supported by the weight of the evidence, we urge the Court to sentence Michael based on the conduct that has been demonstrated by objective evidence, interpreted fairly.  This leaves Michael culpable for very serious failings but does not support a sentence anywhere close to what the Guidelines suggest.

While the offense conduct (especially the government's iteration) is undoubtedly serious, it lies outside the heartland of classic, serious fraud cases.  This is not a Ponzi scheme or an investment fraud, where victims lost their principal or had their savings wiped out.  CPS's customers received legitimate processing services.  These services often came with benefits like quick access to funds and free hardware.  Some merchants were overcharged, but the number of overcharged merchants has not been determined in any remotely reliable way.  Individual merchants that were overcharged were generally overcharged in relatively small absolute amounts. The government can say what it will about the impact on CPS's customers, but it has also explicitly taken the position that "the number of identifiable victims makes restitution impractical and determining each victim's loss amount would unduly complicate and prolong the sentencing process."  PSR ¶ 69.  EVO took a similar position when it determined that it was not necessary to refund merchants that were overcharged on dues and assessments because determining what merchants would be owed was "a very complicated exercise to complete," Tr. 2550:23-2551:9, and because, according to Lambrix, it was not necessary to refund merchants for mistakes.  Tr. 2682:18-2683:3.

The government also views the conduct as benign enough not to warrant, to date, any prosecution of EVO.[14]  As discussed in Section III.B, EVO had open access to the rates and fees that CPS was charging and was fully aware of many of the contested practices.  That the loss calculation is based on a "fair value" amount provided by EVO, while at the same time giving EVO a free pass when EVO knew—the entire time—what CPS's profit margins were, is deeply puzzling.  But the result is that EVO executives like Lambrix wound up with millions of dollars'

---

[14] While the government has continued to urge that it has not offered EVO an "assurance," the S-1 EVO filed in connection with its IPO states: "We are not named in the indictment and *are not suspected of wrongdoing.*"  Form S-1 at 42, April 25, 2018, available on EDGAR (emphasis added).

worth of stock after a successful IPO, Tr. 2760:10-2761:12, whereas Michael, according to the Guidelines range advanced by the government, should be imprisoned for approximately 12 to 14 years.   Not only that, EVO has been permitted to continue servicing, charging fees to, and generating revenue from, the CPS merchant portfolio.  Tr. at 2571:11-2572:15.  There is no way to square this circle.

It also bears noting that the credit-card processing industry is notoriously sharp-elbowed, and commonly criticized, among other things, for a lack of transparency and for price confusion.[15] Given the complexity and lack of transparency, there is an entire cottage industry devoted to assisting merchants in navigating the payment processing landscape, comparing payment processing options, and helping merchants understand their processing bills.  A number of credit card processors have been sued civilly, and the allegations overlap in many respects with the conduct alleged in this case.  *See, e.g.*, *Patti's Pitas et al. v. Wells Fargo Merch. Serv.*, *Inc. et al.*, 1:17-cv-04583-GRB, Dkt. 1 at ¶7, 8, 14 (complaint alleging that Wells Fargo Merchant Services engaged in an "overbilling scheme," after "inducing small, 'mom and pop' merchants" to execute applications "with the promise of straightforward pricing" but then buried certain fees in a 63-page "Program Guide," and charged other fees that were not disclosed or explained even in that document); *Choi's Beer Shop, LLC et al. v. PNC Merch. Serv. Co., L.P.*, 1:18-cv-05906-NGG-CLP Dkt. 1 at ¶1 (complaint alleging that PNC Merchant Services engaged in an overbilling scheme, by assessing "unanticipated and excessive fees and deliberately obscure[ing] and hid[ing] the upcharges" so that merchants cannot detect them).  Despite all of this, we are not aware of

---

[15] *See, e.g.*, *I Spent a Year Working for Merchant Services – Here's How They Screwed Small Businesses, and Here's How to Avoid It,* Paste Magazine (Aug. 15, 2016), https://www.pastemagazine.com/articles/2016/08/i-spent-a-year-working-for-merchant-servicesheres.html; *My Search for Reasonable and Understandable Credit Card Processing,* New York Times (March 26, 2013), https://boss.blogs.nytimes.com/2013/03/26/my-search-for-reasonable-and-understandable-credit-card-processing/; *Credit   Card   Processor   Scams,* CardFellow (May 17, 2019), https://www.cardfellow.com/blog/credit-card-processing-scams-lies/

another criminal case brought against a credit card processing company, or an individual employee of a credit card processing company, for the conduct at issue here.

      iii.   The Disproportionate Impact of the Loss Amount in the Offense Level Calculation Merits a Downward Variance

In Section IV.B.ii., we addressed the significant issues with the loss methodology that underly the loss calculation.  This loss amount, which leads to a 20-point enhancement, is the largest driver of the Guidelines range.  The flaws in the loss methodology aside, courts and commenters have raised significant concerns regarding the impact that a loss enhancement has on the Guidelines.  These concerns are especially poignant where the loss amount is completely divorced from any personal gain based on the offense conduct.

*a. The Offense Conduct Resulted in No Personal Gain to Michael*

For the same reasons that compel a departure from the Guidelines based on the fact that Michael did not personally profit from the offense, *see* Section IV.D(i), if the Court adopts the PSR's Guidelines range, it should apply a downward variance.

*b. Judicial Critiques and Reform Efforts Reinforce the Loss Enhancement's Inapplicability*

The Federal Sentencing Guidelines applicable to fraud cases are "widely acknowledged as broken and dysfunctional, particularly in cases where the loss amount is high."[16]  The Second Circuit recently addressed the disproportionate impact that monetary loss amounts have in fraud cases and openly questioned the fairness of allowing the loss amount to drive the calculation of the offense level.  It noted that:

> the Commission could have approached monetary offenses quite differently. For example, it could have started the Guidelines calculation for fraud offenses by selecting a base level that realistically reflected the seriousness of a typical fraud offense and then permitted adjustments up or down to reflect especially large or

---

[16] Robert J. Anello & Richard Albert, *Rise of ABA Task Force's 'Shadow Sentencing Guidelines'*, N.Y.L.J. Vol. 255, No. 64, Apr. 5, 2016.

> small amounts of loss. Instead the Commission valued fraud (and theft and embezzlement) at level six, which translates in criminal history category I to a sentence as low as probation, and then let the amount of loss, finely calibrated into sixteen categories, become the principal determinant of the adjusted offense level and hence the corresponding sentencing range. This approach, unknown to other sentencing systems, was one the Commission was entitled to take, but its unusualness is a circumstance that a sentencing court is entitled to consider.

*United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016). The Second Circuit instructed that, where, as here, "the Commission has assigned a rather low base offense level to a crime and then increased it significantly by a loss enhancement, that combination of circumstances entitles a sentencing judge to consider a non-Guidelines sentence." *Id.* The Second Circuit's reasoning applies with particular force to Michael, who is charged with a relatively low base-level offense and is subject to a disproportionate increase in the offense level based on a loss amount that has no evidentiary basis.

### c. November 2015 Amendments to the Sentencing Guidelines

Recent amendments to the Sentencing Guidelines that went into effect on November 1, 2015 are also instructive here. The amendment to Section 2B1.1, which revised the commentary at Section 2B1.1, Application Note 3(A)(ii), redefined "intended loss" as pecuniary harm that "the defendant purposely sought to inflict." As indicated in the Official Commentary to the amendments, the amendment reflects the Commission's belief that "sentencing enhancements predicated on intended loss, rather than losses that have actually accrued, should focus more specifically on the defendant's culpability."[17] In other words, the Commission adopted an approach that focuses upon the subjective intent of the specific defendant, that is the "pecuniary harm that the defendant purposely sought to inflict" when evaluating a defendant's intent to inflict

---

[17] Amendments to the Sentencing Guidelines dated Nov. 1, 2015, *available at* https://www.ussc.gov/sites/default/files/pdf/amendment-process/official-text-amendments/20150430_Amendments_0.pdf.

loss.  U.S.S.G. §2B1.1, Application Note 3(A)(ii).  The Commission's subjective approach to intended loss makes it unreasonable to attribute a loss figure in the realm of $23 million to Michael when there is no evidence that he intentionally sought to cheat anyone out of money, and the evidentiary record presents no basis upon which to draw any conclusion about loss.

### d. American Bar Association's "Shadow Guidelines"

Equally instructive is a 2014 report published by a special task force of the American Bar Association ("Task Force"), comprised of, among others, judges from within this Circuit, that proposed to the Commission substantial amendments to the Guidelines for economic crimes.[18] The result of the Task Force's work offers a fundamental alteration of the Guidelines, substantially decreasing the focus on loss amount while properly increasing the importance of a defendant's culpability in guiding the sentencing determination.  The Task Force proposal reduces the loss table from 15 tiers to six tiers and decreases the enhancement for the highest loss amount from 30 offense levels to 14.  The proposal also changes the definition of loss from the "greater of the actual or intended loss" to actual loss.

The report begins with a base offense level and requires a sentencing court to make specific calculations relating to: (1) actual loss; (2) culpability; and (3) victim impact.  *See* ABA Report at Economic Offense § (b).  Applying the reasoning in the PSR solely for argument's sake, the loss would result in an increase of 12 offense levels rather than the 20 levels under the Guidelines.  It is, as explained in great detail above, the defense's position that no increase in the offense level for loss is warranted here.

---

[18] *See* American Bar Association, *A Report on Behalf of the American Bar Association Criminal Justice Section Task Force on the Reform of Federal Sentencing for Economic Crimes*, Final Draft (Nov. 10, 2014), *available at* https://www.americanbar.org/content/dam/aba/publications/criminaljustice/economic_crimes.auth checkdam.pdf ("ABA Report").

The Task Force's proposal would require judges to make explicit findings for "culpability" on a five-level scale from "lowest" to "highest," with corresponding offense level adjustments, ranging from 6 to 10 offense levels down and up, based on various factors. *Id.* Many of these factors, including, but not limited to, the general nature of the offense, lack of personal gain, lack of sophistication, and the fact that Michael took steps to mitigate the harm from the offense, all weigh in favor of assigning Michael a low culpability level. *See* ABA Report at 1-5.

The proposal includes four levels of "victim impact" with increases of zero to six levels. *See* ABA Report at Economic Offense § (b)(3). Similar to its multifactor analysis of the culpability levels, the proposal suggests that courts consider a variety of factors to arrive at the appropriate level including vulnerability of victims and significance of loss. *See* ABA Report at 5-6. To date, the government has not proffered a reasonable estimate of the number of victims. It is impossible to determine whether a customer was a "victim" (by virtue of being overcharged) without reviewing that customer's merchant agreement, the rates and fees charged, and other relevant disclosures like statement messages. The government is unwilling to engage in any type of meaningful analysis on this front. The defense submits that the number of victims involved is at least 10 per Section 2B1.1(b)(2)(A) of the sentencing guidelines. We also submit that the majority of "victims" were business owners, not wholly unsophisticated parties, and the loss amounts, if any, were unimpactful.

Finally, the Task Force proposes that first-time offenders who have committed offenses that are not "otherwise serious" have a cap of level 10 in their offense level. *See* ABA Report at 6-7. The proposal sets forth a long list of factors in determining whether an offense is "otherwise serious" including, but not limited to, the following: the amount of loss; whether loss was intended

at the outset of the offense conduct; whether the defendant's offense conduct lacked sophistication; the duration of the offense conduct; and the nature of the victim impact caused by the offense. *Id.*

According to the PSR's calculation, the offense level under the ABA proposal is at most 19, calculated as a base offense of level 7, combined with a loss enhancement of 12. *See* ABA Report at Economic Offense § (b). There is certainly nothing about the offense conduct that would elevate the associated culpability above the "moderate culpability" heartland, which is "presumptive and would account for the largest number of defendants sentenced under the guidelines." The loss enhancement accounts for any "victim impact" and should negate any further enhancement on that ground. Thus, even accounting for the PSR's alleged loss, and calculating an offense level of 19, results in a sentencing range of 30-37 months' imprisonment in contrast to the PSR's 135-168 month sentencing range. The defense's position is that because no increase for loss is warranted here and the victim impact is "minimal," the offense level under the ABA proposal is 7, which falls within Zone A and a sentencing range of 0-6 months' imprisonment. *See* ABA Report at Economic Offense § (b).

In March 2016, Eastern District of New York Judge Eric Vitaliano rejected the Guidelines' recommended 80-year sentence to impose a 63-month sentence on former Synergy Brands Inc. CEO Mair Faibish. In doing so, Judge Vitaliano concluded that "while the current guidelines system does not provide a reasonable way to . . . try to provide fair and just punishment . . . the ABA task force guidelines certainly significantly move in that direction." Sentencing Transcript, *United States v. Faibish*, 12-cr-265 (E.D.N.Y. March 10, 2016) at 23:2-7. Judge Vitaliano then conducted an alternative offense level analysis under the ABA Task Force guidelines, starting at level 7, adding 12 levels for loss, 3 levels for a victim enhancement and a 4-level increase for culpability, resulting in an offense level of 26, corresponding to a sentencing range of 63 to 78

months.  Judge Vitaliano concluded that such analysis was "fairly reflective of what a court is required to do under Section 3553(a)" and that to follow the shadow guidelines "is what is most reasonable here."  *Id.*

Other judges in this Circuit also have relied on the Task Force's proposal to reach a more rational sentence in white-collar cases.  U.S. District Court for the District of Connecticut Judge Robert Chatigny applied its methodology in *United States v. Rivernider*.  There, the defendant was convicted of 18 counts of wire fraud and conspiracy to commit wire fraud.  Judge Chatigny noted that the Task Force guideline calculation, which resulted in a sentence of 144 months, was "preferable to" the 324-405-month calculation under the sentencing Guidelines which "significantly overstate[d]" the defendant's culpability.  Sentencing Transcript, *United States v. Rivernider*, 3:10-cr-222 (D. Conn. Dec. 18, 2013) at 206:10-13, 212:5-14.  Similarly, in *United States v. Litvak*, a securities fraud case, District of Connecticut Chief Judge Janet Hall stated that she had studied the Task Force guidelines and was in "complete agreement with the drafters of this proposal, some of whom are very highly regarded judges in this circuit, in which the drafters urge the courts not to focus on things that are easily quantifiable."  Sentencing Transcript, *United States v. Litvak*, 3:13-cr-19 (D. Conn. July 23, 2014) at 135-36.  Judge Hall sentenced the defendant to 24 months in prison where the Guideline recommendation contained in the PSR was 108-135 months.

    iv.   <u>The Need to Avoid Unwarranted Sentencing Disparities and Promote Consistency in Sentencing Merits a Downward Variance</u>

    *a. A sentence far below the guidelines range is consistent with the evolving treatment of fraud sentencings in this circuit*

It is well-established that Guidelines themselves "can create unwarranted disparity." *United States v. De La Cruz*, 397 Fed. App'x. 676, 678-79 (2d Cir. 2010) (citing *Kimbrough*, 552 U.S. at 91).  A recent study of fraud cases in the Southern District of New York revealed that "[i]n

recent years, roughly seventy percent of defendants in major white-collar cases received a downward departure from the Guidelines-calculated sentencing range, and those departures were, for the most part, quite large."  Jillian Hewitt, *Fifty Shades of Gray: Sentencing Trends in Major White-Collar Cases*, 125 Yale L.J. 1018, 1052-53 (2016).  Thus, "judges in S.D.N.Y. have not shied away from using the discretion afforded by *Booker* to impose sentences significantly shorter than those produced by the Guidelines."  *Id.*  Indeed, "when a below-range sentence is imposed, it is generally vastly shorter than the sentence recommended by the Guidelines.  The lengthy sentences produced under the Guidelines are rarely actually imposed, at least in S.D.N.Y."  *Id.* Recent statistics provided by the U.S. Sentencing Commission show that in 2017, courts in the Second Circuit imposed a below-Guidelines sentence for 70.7% of all fraud defendants.[19]

Courts have imposed significantly below-Guidelines sentences in circumstances far less compelling than this one.  Indeed, courts in this Circuit have imposed sentences substantially below the Guidelines range for defendants convicted at trial of fraudulent conduct that was either far more extensive or involved much greater sophistication than the conduct at issue here.  For instance:

- In *United States v. Cervino*, No. 15-cr-00171 (S.D.N.Y.), following his conviction at a three-week jury trial, Judge Carter sentenced Cervino in 2018 to one year and a day for his role in a complex scheme to profit from the manipulation of the price of securities, through which the defendant received cash payments and large commissions while clients lost their entire investment.  Judgment, No. 15-cr-00171, Dkt. 367 at 3.  Cervino also lied to the SEC during the course of its investigation.  Gov't Sentencing Mem.,

---

[19] *See* Federal Sentencing Statistics (2017), Tbl. 10, *available at* https://www.ussc.gov/sites/default/files/pdf/ research-and-publications/federal-sentencing-statistics/state-district-circuit/2017/2c17.pdf (hereinafter, "Federal Statistics").

No. 15-cr-00171, Dkt. 362 at 3-7.  Cervino's Guidelines range was 135-168 months (*id.* at 8), and his sentence represented a 91% reduction from the bottom end of the Guidelines;

- In *United States v. Block*, No. 16-cr-595 (S.D.N.Y.), the former CFO of a publicly traded real estate investment trust was convicted of being the mastermind of a fraud to manipulate the company's financial results by fraudulently inflating a key metric used by investors.[20]  The Court accepted the government's calculation of roughly $300 million in shareholder loss and stated that the defendant had brazenly falsified key accounting numbers, but rejected the government's proposed sentence of at least seven years imprisonment. Sentencing Tr., Nov. 8, 2017 at 68:15-20.  Noting, among other things, the defendant's clean criminal record prior to the offense and his "personal history" as a good father and friend, the court imposed a sentence of 18 months' imprisonment.  *Id.* at 69:14-20;

- In *United States v. Collins*, No. 07-cr-1170 (S.D.N.Y.), the defendant lawyer had prepared "legal documents over years for the transactions planned by company insiders to effect the fraud."  Sentencing Tr., July 15, 2013, Dkt. 244 at 21:8-14.  The government argued that there were thousands of victims, billions of dollars in losses, and that the defendant's participation in the scheme was longstanding.  *Id.* at 17:7-9, 20:6-12.  Although the Guidelines called for life imprisonment, *id.* at 20:23-21:1, Judge Preska imposed a sentence of one year and a day in prison, *id.* at 36:1-2;

---

[20] *Former Chief Financial Officer of American Realty Capital Partners Sentenced For Accounting Fraud*, Dep't of Justice Press Release (Nov. 8, 2017), https://www.justice.gov/usao-sdny/pr/former-chief-financial-officer-american-realty-capital-partners-sentenced-accounting.

- In *United States v. Lumiere*, No. 16-cr-483 (S.D.N.Y.), a former portfolio manager at Visium Asset Management was convicted of securities and wire fraud for orchestrating a complex scheme to overvalue securities to inflate the value of the fund.  Gov't Sentencing Mem., No. 16-cr-483, Dkt. 98 at 1-2.  The government argued that the scheme caused a $9.5 to $25 million in loss to investors, *id.* at 3, and the parties agreed that it resulted in millions of dollars in unlawful gain.  Sentencing Tr., June 14, 2017, Dkt. 117 at 2.  Referring to the Guidelines as "irrational," Judge Rakoff varied from the Guidelines range of 87-108 months, despite the defendant's "highly significant" role in the scheme for years and his "attempt at blackmail" to conceal his crimes, imposing a sentence of 18 months' imprisonment.  *Id.* at 29.

- In *United States v. Pierce*, No. 18-cr-388 (S.D.N.Y.), Judge Ramos sentenced the former CEO of Quintillion, a telecom company, to 36 months' imprisonment for wire fraud and two years for eight counts of identity theft, for forging contracts in order to trick funders into investing $270 million to build a fiber optic data network in Alaska. Sentencing Tr., June 19, 2019, Dkt. 46 at 37-38.  The Guidelines range was 210 to 262 months' imprisonment and the Probation Office recommended a term of 12 years' imprisonment.  Gov't Sentencing Mem., No. 18-cr-388, Dkt. 45 at 1.  To execute her scheme, Pierce created phony contracts to induce investors, which included two individual victims, to give hundreds of millions in funding by showing them fake deals. *Id.* at 1-4.  Pierce repeatedly lied to investors and forged the signatures of her customers' executives on fake revenue contracts.  *Id.*  Pierce also used some of the money she fraudulently raised for her own personal benefit, which included funding a

large retirement account for herself.  *Id.* at 5.  When her scheme began to unravel, Pierce attempted to cover it up by destroying evidence.  *Id.* at 5-6.

As each of these cases makes clear, courts do not view the Guidelines as binding, and are willing to impose fair and just sentences—significantly below the Guidelines—upon consideration of all of the Section 3553 factors.  It is also noteworthy that Michael's offense conduct lacks virtually all of the aggravating factors present in the above examples, including breadth, abuse of trust, sophistication, quantifiable victim loss and personal gain, impact on and nature of the victims, and obstruction.

> *b. The Court should consider the co-defendant's sentence of one year and a day*

Perhaps the most significant sentence in terms of avoiding unwarranted sentencing disparities is the year-and-one-day sentence that the Court imposed on co-defendant Hart.  Under the government's view of the evidence, Hart was a manager who shared joint responsibility for the fraud at CPS.  We think there is no reasonable interpretation of the evidence that permits a conclusion that Michael is a *worse* offender than Hart.  The core of the problem that led to Michael's conviction was his failure to rein in the sales force and to ensure that the rates charged matched the contracts on a case by case basis.  The fraud scheme was rooted in the sales force's misconduct.  Michael's responsibility was to enforce compliance norms.

There is a very reasonable view of the evidence that Hart, who ran the sales force, is more culpable that Michael.  Hart drafted sales scripts and was the architect of the "guaranteed for life" pitch the government argued was so problematic.  The evidence linking Michael to the scripts is unpersuasive and often cuts the other way.  Michael removed problematic phrases from sales materials.  GX 411 is a January 9, 2013 email from Hart to Michael in which Hart sends a version of his script.  GX 411 does not contain a response from Michael.  DX 411A, and DX 5214, are

emails from Michael to Hart on January 24, 2013, attaching call-center scripts. As Devers confirmed on the stand, the scripts that Michael circulates do not contain the phrase "guaranteed for life," Tr. 2202:7-15, 2204:19-25, or other aggravating language. We submit that the scripts Michael circulated are a better indication of what he was comfortable with than GX 411, in which there is no response from Michael.[21]

The evidence that links Michael to the sales conduct more generally is weak. As the government argues, Hart trained his staff, pushed them relentlessly, and listened to and critiqued their sales calls. Gov't Sentencing Mem., No. 17-cr-248-VSB-2, Dkt. 199 at 2. There are hundreds of emails in the universe of discovery that reflect Hart berating his sales staff—criticizing them for not being aggressive enough, or for a lack of focus. We know of no emails of this type from Michael, and no credible, documentary evidence that demonstrates Michael listening to or commenting on sales calls.

Hart was partially compensated on the basis of number of deals closed and was motivated to push the envelope. There are audio tapes on which Hart personally misstates facts, with no corresponding proof that Michael knew of or condoned such conduct. Despite being too lenient with him for too long, Michael eventually fired Hart for misconduct in February 2015. Considering the sentencing factor of "offense conduct" in isolation, it just cannot be said that Michael is a more culpable actor.

---

[21] There are also documents in discovery that demonstrate that Michael was not comfortable with the phrase "rates guaranteed for life," which Hart favored. *Compare* Ex. E at 9-14 (CPS_03081580-81) (Hart sends Michael application packet which contains the phrase "Rates guaranteed for life, with no locked in contract") *with* Ex. E at 15-18 (CPS_04226576-77) (Michael sends Hart, four days later, an application packet that instead contains the phrase "Lowest rates in the entire industry – guaranteed").

To be sure, Hart presented compelling arguments in mitigation on personal history and family circumstances.[22] While we do not wish to diminish the seriousness of Hart's circumstances, we do wish to submit that Michael's circumstances are at least as compelling and, in many respects far more compelling. In particular, Michael's track record of personal giving and compassion, and his life of faith and devotion to family and community, together with the outpouring of support from nearly 200 friends, family members, former co-workers and former employees, is exceptionally powerful.

As we argue below, we respectfully submit that a non-custodial sentence is appropriate here and we urge the Court to consider it. If the Court deems a custodial sentence necessary, it should be no greater than the sentence Your Honor imposed on co-defendant Richard Hart.

        c.   *A non-custodial sentence is consistent with sentences imposed upon similarly situated defendants*

A non-custodial sentence, or minimal incarceration, is consistent with recent sentences imposed by other judges for similar conduct. The Second Circuit's sentencing statistics reveal that a substantial percentage of fraud defendants—15.9%—received non-custodial sentences. *See* Federal Statistics at Tbl. 5. The Sentencing Commission has acknowledged that fraud defendants are often well-suited to receive probation: "[o]ffenders convicted of fraud and other white collar offenses, while still primarily sentenced to prison, also more often are sentenced to alternatives; approximately one-third of fraud and white collar offenders are sentenced to prison alternatives."[23]

---

[22] Hart's claims about the credit card processing business he founded after being fired from CPS, however, were not accurate. Def.'s Sentencing Mem., No. 17-cr-248-VSB-2, Dkt. 196 at 7-8. In reality, Merchant Bank Card was the subject of extremely negative customer reviews online that suggest that Hart was engaging in some of the same overly aggressive and misleading tactics that he spearheaded at CPS.

[23] U.S. Sentencing Comm'n, Alternative Sentencing in the Federal Criminal Justice System (Jan. 2009), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/alternatives/20090206_Alternatives.pdf.

Less than two weeks ago, Judge Abrams sentenced a bottle collection company executive in a $1.5 million scheme, who was facing a Guidelines range of 33 to 41 months, to time served with three years of supervised release, with one year to be served in home confinement, and 120 hours of community service. Judgment, Dkt. 178, *United States v. Rakhamimov*, No. 18-cr-72 (S.D.N.Y.). There, in order to defraud Pepsi and Canada Dry Bottling Companies, and ultimately the State of New York, the defendant falsely overstated the number of empty beverage containers the company delivered for redemption (typically by about $1,000 worth of containers per truckload) and paid kickbacks to a worker at the redemption center for Pepsi and Canada Dry containers. Gov't Sentencing Mem., No. 18-cr-72, Dkt. 107 at 2-3. At sentencing, Judge Abrams noted that prosecutors failed to prove that the defendant profited from the scheme, other than earning a salary.[24] The same is true here. In another recent case, Judge Oetken sentenced a defendant who was facing a Guidelines sentence of 97-121 months to six months of home confinement, 1,000 hours of community service, and three years of probation. Sentencing Tr., Sept. 29, 2017, Dkt. 44 at 7:6, 29:3-17, *United States v. Kelley*, No. 16-cr-00837 (S.D.N.Y.). There, the defendant had conspired to bribe a New York pension fund official, which earned her $200,000 in commissions from the ill-gotten business. She also concealed the scheme by agreeing to testify falsely in an SEC investigation about the bribes. This conduct—bribing a state pension fund official, personally profiting from the scheme to the tune of hundreds of thousands of dollars, and committing perjury—is far more egregious than the conduct at issue here

---

[24] Stewart Bishop, *Bottle Co. Manager Dodges Prison For Recycling Scam*, Law360, Oct. 10, 2019, https://www.law360.com/whitecollar/articles/1208571/bottle-co-manager-dodges-prison-for-recycling-scam?nl_pk=5a1f01c5-55a0-4650-8c4e-dd8869a23ab1&utm_source=newsletter&utm_medium=email&utm_campaign=whitecollar

Other district courts have likewise imposed non-custodial sentences based on similar conduct after both guilty pleas and jury trials. *See, e.g.*, *United States v. Tighe*, No. 15-cr-62, 2018 WL 1307949, at *1 (E.D.N.Y. Mar. 13, 2018) (imposing sentences of four years' probation with six months' home confinement after defendants, officers of drug repackager, pled guilty to a years-long wire fraud conspiracy to falsely certify compliance with drug safety standards, when in fact the drugs were subject to unsanitary conditions that put patients at risk); *United States v. Schulman*, No. 16-cr-442 (E.D.N.Y.), Dkt. 155, at 26:22-27:5, 37:6-12, 40:1-16 (reducing a sentence from a Guidelines range of 41 to 51 months to three years' probation with 2,000 hours of community service and a $50,000 fine, after jury conviction for "textbook insider trading" in which a lawyer betrayed his clients' trust by providing inside information to his friend); *United States v. Faiella*, No. 06-CR-335 (JBW), 2008 WL 4862455 (E.D.N.Y. Sept. 8, 2008) (imposing a sentence of five years' probation, 500 hours of community service, and a $15,000 fine where defendant conspired with news company executives in a massive fraud exceeding $80 million[25] to inflate circulation numbers and defraud thousands of advertisers); *United States v. Harkonen*, No. 08-cr-164 (N.D. Ca.), Dkt. 373 at 60:2-5, 154:2-160:3 (imposing sentence of three years' probation, with six months of home confinement and 200 hours of community service, and a $20,000 fine, where defendant was convicted by jury of wire fraud for misrepresenting the results of a drug trial, and Government argued there was over $20 million in losses and over 250 vulnerable victims).

     v.   <u>Sentencing Objectives Under 18 U.S.C. Section 3553(a)(2)</u>

A non-custodial sentence satisfies the federal sentencing objectives, including those articulated by statute and reflected in the Guidelines. Courts have noted that specific deterrence is "not required" where the defendant has led a "law abiding lifestyle" and it is therefore "unlikely

---

[25] *In re Newsday Litigation*, Report and Recommendation, 1:06-cr-335, Dkt. 41, at 2.

that [the defendant] will engage in further criminal conduct." *United States v. Faiella*, No. 06-CR-335 (JBW), 2008 WL 4862455, at *2 (E.D.N.Y. Sept. 8, 2008).   Specific deterrence is unnecessary in this case.   Michael has otherwise led a law-abiding lifestyle premised on community service and helping those in need.   His upstanding community reputation has been damaged.   He has had no choice but to step down from several leadership positions at his beloved synagogue as well as his children's schools, organizations to which he has contributed significantly over the last 20 years.   He has spent many hours in therapy and with religious leaders trying to understand how he wound up here.   M. Mendlowitz Letter, Ex. A at 1.   He spends several hours every single day at his synagogue praying for mercy and forgiveness.   *Id.*   He lies awake at night thinking about all of the pain he has caused. Michael will spend the rest of his life trying to right his wrongs and repair the suffering he has caused his loved ones.

A custodial sentence is not necessary to "protect" the public from Michael, a first-time, non-violent offender.   To the contrary, a custodial sentence would be a significant detriment to the community given all the ways in which Michael dedicates himself to the service of those around him.   There is simply no basis to believe that Michael would re-offend.   As the Sentencing Commission has recognized, there is considerable research showing that first-time offenders like Michael are far less likely to commit another crime than other defendants.[26]

Regarding general deterrence, this prosecution, the first of its kind, sent shockwaves through the credit card processing industry, as well as through Michael's vast community. Michael's well-publicized arrest, indictment, and trial conviction sufficiently satisfies general deterrent interests.   Other industry participants are certainly on notice that engaging in the offense

---

[26] *See* Tracey Kyckelhahn & Trishia Cooper, U.S. Sentencing Comm'n, *The Past Predicts the Future: Criminal History and Recidivism of Federal Offenders*, at 6-9 (Mar. 2017), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20170309_Recidivism-CH.pdf.

conduct may subject them to criminal process and prison, and there is no evidence that a term of incarceration will have any greater deterrent effect than a non-custodial sentence.  The long-lasting impact of a federal felony conviction for fraud is enough of a deterrence factor on its own.

The Second Circuit has instructed that, in order to "properly calibrate a 'just punishment,'" a trial court must "consider the collateral effects of a particular sentence."  *United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009); *see also United States v. Nesbeth*, 188 F. Supp. 3d 179, 180 (E.D.N.Y. 2016) (imposing a below-Guidelines, non-custodial sentence "in part because of a number of statutory and regulatory collateral consequences she will face as a convicted felon").

Here, those consequences are dire.  Michael has suffered and will continue to suffer devastating professional, financial, and personal collateral consequences.  The collateral consequences for his children—including the likelihood that his eldest daughter will be unable to marry and start a family—are especially bleak.  His once-thriving business has failed—a failure for which he takes full responsibility.  Michael will do everything he can to support his wife and seven children, but a felony conviction will make it very difficult for him to find new employment or start a new business.  Michael's inability to find meaningful employment since his business was shut down more than four years ago, has rendered his family virtually penniless.  The family home is nearly under water due to a large home equity loan Michael and Shira took out to pay for basic living expenses and schooling, and resources from friends and family have all but dried up.  Michael and his family have suffered tremendously.  Just punishment may be imposed and proper respect for the law promoted in this unique circumstance with a non-custodial sentence.

## V.   A FORFEITURE ORDER IS NOT WARRANTED

The PSR calls for a forfeiture order "including but not limited to a sum of money representing the amount of proceeds traceable to the commission of the offenses."  PSR ¶ 150-151

(citing 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c)).  While the PSR does not specify an amount to be forfeited, the government intends to seek a forfeiture order in the amount of $617,115.79.  *See* Gov't. Resp. to PSR Obj. at 9, Oct. 11, 2019.  The government arrives at this number using the same half-baked approach it used when calculating loss.  Again, relying on an unidentified EVO representative, the government assumes that "an ISO with a portfolio similar to CPS would be expected to have margins of 3.0%."  The government claims—without specifying any date range—that CPS's profit margins were 5.28%, and thus "the difference between the actual and expected profit is 2.28% (the amount which represents the proceeds due to fraud), which is approximately 43% of total profit."  *Id.*  The government then argues that 43% of Michael's salary, or $617,115.79, earned between 2009 and 2015 is subject to forfeiture.  *Id.*  For the same reasons that the government's loss calculation is arbitrary and unfair, *see* Section IV.B, this methodology and the resulting calculation also should be rejected.

Michael's salary and performance bonuses were subject to EVO's sole determination, and his compensation was not in any way tied to the amount of money CPS charged for its services. There was no link between the amount of money CPS's portfolio made and the amount of money Michael earned from EVO, and thus Michael's compensation is not "traceable to the offenses of conviction" and subject to forfeiture.

Furthermore, at the conclusion of the trial, the appropriate procedures outlined in Federal Rule of Criminal Procedure 32.2 were not followed.  First, no determination was made as to whether either party wanted the jury to be retained to determine the forfeitability of specific property.  Fed. R. Crim. P. 32.2(b)(5)(A).  The government plans to seek forfeiture of specific property, that is, money that Michael earned in the form of compensation from EVO between 2009 and 2015.  According to Rule 32.2, "if the indictment or information states that the government is

73

seeking forfeiture, the court must determine *before the jury begins deliberating* whether either party requests that the jury be retained to determine the forfeitability of specific property if it returns a guilty verdict."  Fed. R. Crim. P. 32.2(b)(5)(A) (emphasis added).  Additionally, no preliminary order of forfeiture has been entered to date.  Fed. R. Crim. P. 32.2 (b)(2)(A) ("If the court finds that property is subject to forfeiture, it must promptly enter a preliminary order of forfeiture. . . ."); Fed. R. Crim. P. 32.2(b)(2)(B) ("Unless doing so is impractical, the court must enter the preliminary order sufficiently in advance of sentencing to allow the parties to suggest revisions or modifications before the order becomes final as to the defendant under Rule 32.2(b)(4).").  The lack of timely compliance with Rule 32.2 prevents the government from seeking a forfeiture order now.

<u>**CONCLUSION**</u>

Michael Mendlowitz understands fully that he stands convicted of federal crimes and that his conviction will have consequences, greater than those he has already suffered.  The arguments that we advance on his behalf do not in any way seek to diminish the seriousness of the crimes for which he has been convicted and we recognize that some form of punishment is necessary.  It is our hope, however, that the Court will take into account where Michael's offense conduct falls on the spectrum of white-collar crimes.  The lack of meaningful victim loss and the absence of personal gain to Michael are powerful mitigating factors that counsel moderation in the imposition of sentence.  Michael's unique personal circumstances and remarkable life bursting with selfless acts and charitable activities also suggest leniency.  Above all else, his seven children, some of whom ██████████████████████████████, will be irreparably damaged if he is taken away from them for any period of time.  For the foregoing reasons, we respectfully request that

the Court impose a non-custodial sentence, which we submit is sufficient, but not greater than necessary, to satisfy the objectives of sentencing.

Respectfully submitted,

Dated:  New York, New York
       October 21, 2019

**SMITH VILLAZOR LLP**

By:  /s/ Patrick J. Smith           
     Patrick J. Smith
     Rodney Villazor
     Sarah B. Zimmer
     Nicholas J. Karasimas
     250 West 55th Street, 30th Floor
     New York, New York, 10019
     (212) 582-4400

*Attorneys for Defendant Michael Mendlowitz*