UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------x
                               :

UNITED STATES OF AMERICA,          :
                               :

         - v. -            :              S2 17 Cr. 248 (VSB)
                               :

MICHAEL MENDLOWITZ,        :
a/k/a "Moshe Mendlowitz,"       :
                               :

         Defendant.     :
-----------------------------------------------------X


# GOVERNMENT'S SENTENCING MEMORANDUM


GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
Attorney for the United States of America


David Abramowicz
Jilan Kamal
Dina McLeod
Assistant United States Attorneys

    - Of Counsel -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------- x
                                        :
  UNITED STATES OF AMERICA,             :
                                        :
              - v. -                    :          S2 17 Cr. 248 (VSB)
                                        :
  MICHAEL MENDLOWITZ,                    :
  a/k/a "Moshe Mendlowitz,"             :
                                        :
              Defendant.                :
----------------------------------------------------- X

**GOVERNMENT'S  SENTENCING MEMORANDUM**

On May 23, 2019, a jury convicted defendant Michael Mendlowitz of conspiracy to

commit wire fraud and wire fraud arising from his involvement in a pervasive consumer fraud

that took place at his company, Commerce Payment Systems ("CPS").   For years, the defendant

systematically overcharged customers who signed up for his credit card payment processing

services.  As part of this fraud, the defendant deleted multiple pages of the contract that was sent

to customers, instructed his sales staff to lie to customers about rates and fees, and repeatedly

lied to CPS's parent company about CPS's illegal business practices.

To reflect the seriousness of the defendant's conduct, to promote just punishment and

respect for the law, and to deter the defendant and others like him, the Government respectfully

requests that the Court impose a sentence within the Guidelines range of 135 to 168 months'

imprisonment, which would be sufficient but not greater than necessary to serve the legitimate

purposes of sentencing.

**I.      RELEVANT FACTS**

The evidence at trial consisted of the testimony of multiple former employees of the

defendant's company, Commerce Payment Systems ("CPS"), including four cooperating

witnesses and one witness who had signed a non-prosecution agreement with the Government. Two victims of the fraud, as well as two employees of CPS's parent company, also testified.  The Government also introduced phone recordings of conversations between CPS sales staff and customers, customer agreements and billing statements, and email communications.

The evidence at trial demonstrated that Michael Mendlowitz presided over a systematic and long-standing fraud at CPS.  Among other things, the trial evidence demonstrated that CPS sales personnel systematically lied to customers about the rates they would be charged (Transcript of Trial Proceedings ("Tr.") 232 (testimony of Guy Samuel); 662 (testimony of Mendy Greenblatt); *see also* GX 1309 (company sales script)).  The defendant not only knew about those lies (*see* Tr. 245-46 (testimony of Samuel); 663 (testimony of Greenblatt); 2802 (testimony of Stephan Mahabir)), but directed his employees to tell lies to customers about the fees they would be charged (*see* Tr. 243 (Samuel testimony that Mendlowitz had instructed him to lie to customers about the PCI fee); 679 (Greenblatt testimony that Mendlowitz had instructed him to lie to customers about the PCI fee); 2821 (Mahabir testimony that Mendlowitz had instructed him to lie to customers about the PCI fee)).

The defendant played a key role in other aspects of the fraud.  Among other things, the defendant instructed an employee, David Devers, to charge customers the rates and fees in the CPS pricing template rather than the rates and fees on the customer agreement that the customer had actually agreed to.  (*See* Tr. 279 (Samuel testimony), 1237 (Devers testimony); GX 515 (email from the defendant stating that a particular fee "should be entered even if the app doesn't have this fee")).  The defendant also routinely asked Devers to add or increase fees to customer accounts after the customer had signed the merchant agreement.  (*See, e.g.*, GXs 550, 583). Finally, the defendant deleted three of the five pages of the customer contract (*see* GXs 901 and

902)—which contained key terms of the contract, including CPS's ability to raise rates via a statement on the customer's billing statement—and added them back in only when EVO discovered the deletion of those pages in 2015 (*see* GX-903).

## II.   A GUIDELINES SENTENCE IS FAIR AND APPROPRIATE

### A.   Background

The United States Sentencing Guidelines continue to provide strong guidance to the Court following *United States* v. *Booker*, 543 U.S. 220 (2005), and *United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005).  Although *Booker* held that the Guidelines are no longer mandatory, it also held that the Guidelines remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing.  *Booker*, 543 U.S. at 264.  As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range" — that "should be the starting point and the initial benchmark."  *Gall* v. *United States*, 128 S. Ct. 586, 596 (2007).

After that calculation, however, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1); the four legitimate purposes of sentencing, *see id.* § 3553(a)(2); "the kinds of sentences available," *id.* § 3553(a)(3); the Guidelines range itself, *see id.* § 3553(a)(4); any relevant policy statement by the Sentencing Commission, *see id.* § 3553(a)(5); "the need to avoid unwarranted sentence disparities among defendants," *id.* § 3553(a)(6); and "the need to provide restitution to any victims," *id.* § 3553(a)(7).  *See Gall*, 128 S. Ct. at 596 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)     to afford adequate deterrence to criminal conduct;

(C)     to protect the public from further crimes of the defendant; and

(D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

### B.     The Offense Conduct

The Court has before it a well-developed record that establishes the defendant's involvement in, and direction of, a fraud that victimized thousands of innocent consumers over several years.  The defendant's attempts to minimize his conduct and blame others for his actions are simply belied by the record and should be rejected by the Court.

### 1.   *The Defendant Knew of, and Directed, the Fraudulent Sales Conduct*

Michael Mendlowitz systematically cheated thousands of customers for years.  The record evidence before the Court is overwhelming as to this fact.  Nonetheless, the defendant—who was the *CEO* of CPS—continues to minimize his conduct, claiming that the defendant expected his sales team "not to lie," and was simply "out touch with the culture and conduct of the sales staff."  (Def. Mem. at 35).  This portrayal of the defendant's role is completely at odds with the evidence at trial.

The defendant claims that he "did not focus closely enough on the [sales] script."  (*Id.* at 35).  But the trial record established that the defendant knew, and approved of, the content of the sales script.  For example, Stephan Mahabir testified that, after he replaced Rick Hart as a supervisor, he made some design changes to the script, gave it to Michael Mendlowitz for approval.  The defendant approved the script, *with* the lie that the rates were "guaranteed for life" and the lie that the only fee that would be charged was a $4.95 monthly fee.  (Tr. at 2803-04).

4

That testimony was corroborated by emails that revealed Mendlowitz had been aware of the false promises in the sales scripts for years.  In 2012, for example, the defendant was emailed a "letter to customer," which contained the following fraudulent misrepresentation: "Important Note:  Each and every rate that is agreed on this application will be set in for the lifetime of the account, regardless of the fact that there is no long term agreement."  (GX-731).  Again, in 2013, Rick Hart sent the defendant an email in which he offered the defendant some suggestions on how to improve the sales scripts of the call center employees (*i.e.*, the outside employees who took the initial sales call and transferred the call to a CPS sales representative).  (GX-411).  In that email, Hart told the defendant, "they should stick to the following scripts *which we know work on our end*."  (*Id.* (emphasis added)).  And the language Hart proposed to the defendant contained the same lies as in the sales script that the defendant approved—that "the only time you are ever charged from my company other than a $4.95 monthly statement fee is when you accept a credit card" and that these rates are "guaranteed for life."  (*See id.*).

The defendant also contends that "Michael did not direct the sales staff to lie, and he expected them to answer honestly if asked about a rate or fee."  (Def. Mem. at 29).  That statement finds no support in the record.  To the contrary, every single salesperson who testified told the jury that Michael Mendlowitz had directed them explicitly to lie to customers about the PCI fee.  (Tr. at 243 (Samuel); 679 (Greenblatt); 2821 (Mahabir)).  The defendant's argument that he was just "out of touch" with the sales staff is wholly unconvincing.  His role in the fraud was significant and supported by the record.

### 2. *The Defendant Directed the Campaign to Overcharge Customers*

Overcharging customers, for as long as possible, was the heart of the defendant's scheme. The evidence at trial shows that this overcharging took many forms.  On the front end,

Mendlowitz directed his employees to add fees to customer accounts that were not disclosed on the merchant application or in the sales process. On the back end, Mendlowitz routinely tasked David Devers (his Head of Customer Service and, later, his Head of Operations) and the customer service team with "projects" to increase those fees that *were* listed on merchant applications, such as the dues assessments, transaction fees, and per item fees. Although Mendlowitz purports to "take full responsibility" for the systematic billing errors at CPS (Def. Mem. at 31), the defendant simultaneously blames "self-interested sales personnel" and "incompetent employees" (Def. Mem. at 27) for the overcharging of customers. These baseless assertions failed to persuade the jury and they should not be relied upon here to mitigate the defendant's sentence.

As discussed *supra*, the defendant's sales agents lured customers with false promises of low rates and fees. The record evidence reveals, however, that the defendant directed his employees to add additional fees *as soon as* a new customer account was created. At Mendlowitz's direction, CPS's onboarding systems automatically added a $99 PCI fee, a $99 IRS fee, and a $34.95 membership fee to each new customer account. (Tr. 1237-38). These fees were never listed on the CPS merchant application. (Tr. at 1233-34; 1257; 1283). David Devers testified that these additional, undisclosed (or outright disclaimed) fees were automatically added regardless of what was listed on a new customer's contract. (Tr. 1235-38).

Devers also testified that Mendlowitz instructed him "[t]o put on the rates and fees as on the template" regardless of whether those rates and fees conflicted with the rates that customers had actually agreed to on the application. Guy Samuel testified about a particular episode in which he was present when Mendlowitz directed an onboarding employee to apply the rates and

fees in the onboarding pricing template instead of inputting the rates and fees set forth on the customer's application. (Tr. 279-280).

The defendant's own emails corroborate Devers's and Samuels's testimony. In one such email, Mendlowitz instructs Devers that a particular rate "should be defaulted in OnBoard to .25 cents...please ask the girls what's going on with this. *It should be entered even if the app doesn't have this fee*..." (GX 515, emphasis added). In another email chain, Devers points out to Mendlowitz that 125 merchants were not charged a "monthly minimum" fee, which was consistent with their contracts. In his reply, Mendlowitz treats this—the omission of a fee, *consistent with the customer's contract*—as an error and tells Devers "thanks for catching that. Please find out why Brig and Crystal did that.  I am very concerned about this *mistake*." (GX 521 (emphasis added)). On this record, the defendant's self-serving assertion that "it was also my intention for the applications to match the boarding system" (Def. Mem. at 31) rings hollow.

In addition to showing that new fees were added when a customer signed up with CPS, the trial evidence also established that the defendant regularly tasked Devers and the entire customer service team with increasing the existing customer rates and fees in the billing system. These rate increases were called "projects" and they were "very frequent" (Tr. 1346; *see*, *e.g.*, GX 529). One of the most egregious examples concerned the manipulation of the "dues and assessments" rate.  Devers testified that, in or around December 2010, the defendant directed him to raise the dues and assessments rate to 0.95% (Tr. 1302-3; GX 595). Devers told the defendant that the merchant application should be updated to reflect the change and Mendlowitz promised, "I will handle it." *Id.* Devers testified that the next time he saw a merchant application, it reflected ".095%". *Id.* In fact, merchant applications after 2010 consistently listed "0.095%" as the dues and assessments rate when the rate charged was, in fact, .95%. (*See, e.g.*, GX 908 (2012

merchant application sent from Mendlowitz to Shamilov reflecting 0.095%); GX 711 (2012 merchant application from reflecting 0.095%); GX 596 (2013 merchant application reflecting 0.095%)).

The evidence at trial proved that the persistent "0.095%" dues and assessments rate reflected on the merchant application was no mere typo on the defendant's part. To the contrary, the defendant was acutely aware of the potential confusion that might result from misplacing the decimal point in the dues and assessments rate and specifically instructed CPS onboarding staff to be careful. "**DO NOT enter .0925 or 0.95** [in the CPS onboarding system for new customers] as that is only 9 basis points since it has a 0 in front of it . . . **We need to add 95 basis points so we need to have it say .950 or .925**". (GX 595 (emphasis added)). As the jury clearly inferred, the fact that the merchant application continued to reflect "0.095%" when CPS in fact charged 0.95% was not mere sloppiness or incompetence.  It was intentional overcharging and it was fraud.

In fact, in or around October 2013, EVO became concerned that Mendlowitz was overcharging customers for dues and assessments, and insisted that he lower the rate down to 0.13%. (Tr. 1312-13; 1314). Mendlowitz told Devers that "he was losing $100,000 a month on dues and assessments" (Tr. 1313) and asked Devers to raise the dues and assessments rate *back up* to .95% for certain high volume merchants, resulting in a renewed influx of $127,129 per month for CPS. (Tr. 1314-17; GX 546). Merchants never received notice of this change. (GX 548 (November 2013 email from Devers to customer service staff stating that "the dues and assessments has been changed back to 0.95 percent" and noting "it will be difficult to explain to the merchant the increase with no statement message")).

The defendant's sentencing submission fails to contend in any meaningful way with the varied and overwhelming record evidence of his efforts to overcharge CPS customers who were not his friends and family.  His self-serving claims that this systematic overcharging was the result of negligence and poor management should be rejected outright.

### 3. Statement Messages Were Inadequate

Both at trial and now in his sentencing submission, Mendlowitz asserts without support that statement messages effectively communicated to customers "changes in fees, or new fees" (Def. Mem at 36) and that he expected others (unnamed) at CPS to ensure such statement messages were sent out. (Def. Mem. at 30). These arguments are as unpersuasive now as they were at trial for the following four reasons.

*First*, statement messages could only effectively communicate to customers if customers *knew* that their rates were subject to change and how such changes would be communicated. But Mendlowitz intentionally withheld from customers the terms and conditions of their contracts, so victims did not know that they had to check their statements to discover changes to their rates and fees. (*See, e.g.*, testimony of victim Robert Gostl, Tr. at 142-44).

*Second,* Mendlowitz's sales team routinely signed up customers with the promise that rates were "guaranteed for life," or words to that effect, using scripts that Mendlowitz approved. (*See*, *e.g.*, testimony of Robert Gostl, who was told by CPS sales staff that "this rate was good and would never change." Tr. at 129-30).  By promising customers that their rates would not change, and withholding the terms of the contract that suggested rates would, in fact, change and how notice of such changes would be provided, the defendant deterred customers from scrutinizing their bills for new fees until it was too late.

*Third,* the largest fees—the $99 PCI fee, the $99 IRS fee, and the $34.95 membership fee—were not, in fact, "new" or "changed" fees at all. Devers testified that, when he began at CPS in 2010, Mendlowitz was already charging a $99 PCI fee (Tr. at 1239) and that Mendlowitz added the $99 IRS fee closely thereafter (Tr. at 1260). Moreover, as discussed *supra*, these annual fees were added to customer accounts *from the very moment they were created*; they just may not have been assessed immediately. By any measure, the PCI fee, the IRS fee and the membership were not, therefore, "new" fees or "changes" to CPS price structure. (*See, eg.e,* testimony of Devers, the PCI fee was charged annually every year that Devers worked at CPS but was never reflected on the merchant application, Tr. at 1234). The only fair inference is that Mendlowitz intended to charge these fees all along; he just wanted to hide them from customers.

*Fourth,* Mendlowitz typically resisted issuing statement messages.  Devers testified that Mendlowitz didn't like statement messages because he thought they would lead customers to cancel. (Tr. at 1209, 1239-1240, 1268-69). For example, no statement message was ever issued to advise customers of the ten-fold increase in their dues and assessments. (Tr. at 1302). When Devers proposed such a statement message to the defendant in November 2013—three years after the rate raise—the defendant did not respond. No statement message was ever sent for the increased dues and assessments rate. (GX 595).

The evidence at trial also revealed that Mendlowitz approved the use of statement messages only when he had to. David Devers explained that customers were apt to notice and complain when the larger fees, such as the $99 PCI fee, were assessed. Under those circumstances, Mendlowitz consented to the issuance of a statement message, although he never revised the merchant applications to reflect that CPS charged a $99 PCI fee, a $99 IRS fee, and a $34.95 membership fee.

Similarly, Mendlowitz authorized the issuance of a statement message if he sensed that EVO was paying attention. For example, at the end of September 2013, Mendlowitz personally directed a manual update of all customer accounts (except for friends and family) to add or increase a 2.95% "e-surcharge." (Tr. 1331). On or about October 8, 2013, at 10:50 a.m., EVO executive Kevin Lambrix questioned Mendlowitz about the sudden increase in revenue and whether it had come from the e-surcharge, noting that "I did not think it would happen this soon as Michael [Mendlowitz] still needs to alert the merchant to the pricing change." (GX 1413). At 11:08 am, the same day, the defendant replied "I will find out what our statement message was," suggesting falsely to Lambrix that a statement message had already gone out.  (*Id.*) Less than thirty minutes *after* the defendant's email to Lambrix, David Devers emailed Mendlowitz a proposed statement message for the e-surcharge increase and prefaced it with "How about this?" (GX 542). The clear inference from this evidence is that the defendant had not intended to issue a statement message until questioned about it by EVO, and, when caught, lied to EVO and quickly dispatched Devers to draft one.

Based on the foregoing record, the defendant cannot plausibly maintain that he believed or intended statement messages to provide customers with meaningful notice of changes to their rates and fees.

### 4.  *The Defendant Was the Driving Force Behind Deleting and Withholding Multiple Pages of the Consumers' Contracts*

The defendant's submission fails to address his role in a key part of the fraud: his decision to delete and withhold multiple pages of the consumers' contracts.  However, the defendant's decision to send incomplete contracts to thousands of customers was undisputed at trial.  (*See* GXs-901 and 902).

The defendant's protestation that he deleted the terms and conditions pages of the contract "to make the sales process less complicated" is flatly contradicted by the record. (Def. Ex. A at 5). Multiple witnesses testified that the defendant did not want customers to see those pages of the contract because it would "kill the deal." (Trial Tr. at 1194 (testimony of David Devers); 2237 (testimony of Benny Caban)).

The defendant's own lies also demonstrate that his intent in deleting a large portion of the contract was far from benign. In emails that the defendant sent to Iris (the software company which handled the web design of CPS's merchant contract), he specifically directed Iris to remove those three pages from the contract. In so doing, the defendant gives the same explanation for why he is deleting the terms and conditions. That explanation, however, is not among any of the explanations that the defendant now claims were driving his decision—that he wanted to make the sales process less complicated and that those pages were not applicable to CPS's customers. (See Def. Ex. A at 5). Rather, the defendant told Iris that he was deleting those pages because the terms and conditions were included in the welcome kit. (See GX-901 ("You can ignore pages 3-5. We send the T&C in our welcome kits."); GX-902 ("Pages 3-5 can be deleted. It's the terms and conditions which we send out in the welcome kit.")). This was a lie. Multiple welcome kits were introduced at trial, and none of them contained the terms and conditions pages of the contract. (See GXs-410, 558, 564). In fact, the evidence at trial clearly established that the first time that CPS sent out terms and conditions in the "welcome kit" was three days before an anticipated on-site audit from Evo, during which Mendlowitz knew they would require a demonstration of how CPS signed up new merchants. (See, e.g., GX 567). Before Evo auditors arrived, Mendlowitz instructed Devers "to log into IRIS, which is the CRM

[customer relationship management] system that we use, and to upload an attached terms and conditions to the welcome e-mail." (Tr. at 1481).

The evidence at trial makes clear that the defendant knew *at the time* that deleting those pages of the contract was wrong, and that is why he lied to Iris about it. His newfound, after-the-fact justifications for this decision are an unconvincing attempt to minimize his role in the fraud and to falsely portray his true intent in sending customers incomplete contracts.

### 5. The Defendant's Purported "Self-Correction"

The defendant also contends that the "record contains a number of significant examples of Michael trying to take remedial, self-correcting action." (Def. Mem. at 37). This contention is without basis. In fact, the record evidence demonstrated that it was only when the defendant was truly backed into a corner—after EVO had discovered various irregularities—that the defendant paid any lip service to addressing the overcharging problems. And even then, the defendant often continued to overcharge customers, despite EVO's directions to the contrary.

*First*, the defendant claims that he took steps at self-correction independent of EVO's intervention. This claim is contrary to the record. For example, in 2013, EVO discovered that the defendant was charging customers a 0.95% rate for dues and assessments, when the merchant agreement provided for a rate of 0.095%. (Tr. at 2549-2550). Kevin Lambrix testified that he told the defendant to lower that rate and make sure the appropriate disclosures were made. (*Id.*). That was consistent with David Devers's testimony that Mendlowitz had complained to him that EVO wanted him to lower the dues and assessments rate and was "up his ass" about it. (Tr. at 1311-12). EVO told the defendant to lower the dues and assessments by at least late August 2013. (*See* GXs-1405 and 1406). But in October 2013, after EVO had directed him lower the dues and assessments rate, the defendant *re-raised* the rate on certain high volume merchants.

(*See* GX-546).  In an email dated October 31, 2013, Devers told the defendant that if he re-raised

dues and assessments on all merchants with an average monthly processing volume of over

$10,000, that rate increase would bring in approximately $108,000 of additional revenue.  (*Id.*).

The defendant told Devers to re-raise the dues and assessments rate on all merchants with

processing volume over 7000 dollars.  (*Id.* ("Let's try to get over 7k per month now . . . how

many is that?")).  Devers eventually told the defendant that "[t]he 0.95 List has been complete

from 7k and up, total of 744 qualified merchants with a processing total of $13,382,041.91 *

.95% = 127,129.38."  (*Id.*)  These are not the actions of someone who is "self-correcting" the

overcharges on consumers, but is in fact actively disregarding the explicit direction of EVO to

stop overcharging customers.

The defendant also claims that he took a number of actions in August 2014 to "get

variance issues rectified."  (Def. Mem. at 38).  However, that claim does not square with actions

the defendant took in 2015, at the time of the EVO audit, to deceive EVO about communications

with consumers.  A few days before the audit was scheduled to begin, the defendant directed

Devers to add the terms and conditions to the welcome email.  (*See* GXs-533, 584, 587 (mock

welcome emails between Devers and the defendant with the added language about terms and

conditions); Tr. at 1486:14-18).  Devers testified that the defendant directed him to tell the

auditor that "we always sent out the terms and conditions via the welcome e-mail," which was a

lie.  (Tr. at 1494).

In addition, the evidence in the record demonstrated that, far from "self-correcting," the

defendant retained and promoted employees like Rick Hart, Guy Samuel, and Stephan Mahabir

*because* they were so good at lying to customers.  In an email in 2013, Rick Hart laid out the lies

that Hart and his sales teams were selling to customers.  (*See* GX-411).  Hart worked for the

defendant at CPS for another *two years* after that email.  Guy Samuel also testified that, after his arrest on another case, he lied less cavalierly to customers at CPS.  (Trial Tr. at 348).  The defendant subsequently told Samuel that he liked the "old Guy" better because he "used to close more deals."  (*Id.*).

The defendant's purported efforts at "self-correction" are simply inconsistent with the actions he took to overcharge customers, to deceive EVO about the representations being made to customers by CPS, and to retain employees he knew to engage in fraud.

### C.     The Presentence Report Correctly Calculates the Guidelines Range

The defendant challenges a number of the Guidelines calculations in the Presentence Report.  For the reasons set forth below, those arguments are without merit and should be rejected.

#### 1.     *The Guidelines Loss Amount Exceeds $9.5 Million but Does Not Exceed $25 Million*

Mendlowitz is responsible for a Guidelines loss amount of $23,232,880.  (PSR ¶ 63). Accordingly, the PSR properly applies a 20-level increase, pursuant to U.S.S.G. § 2B1.1(b)(1)(K), for losses that exceed $9.5 million, but do not exceed $25 million.  (PSR ¶ 78).

"In calculating the amount of loss under the Guidelines, a sentencing court 'need only make a reasonable estimate of the loss.'"  *United States v. Rigas*, 583 F.3d 108, 120 (2d Cir. 2009) (quoting U.S.S.G. § 2B1.1 cmt. n. 3(C)).

##### a.     The $23,232,880 Loss Calculation

The loss amount set forth in the PSR is based on a reasonable estimate of the difference between what CPS collected from its victims and the fair market value of the payment-processing services those victims received from CPS. *See* U.S.S.G. § 2B1.1, cmt. n. 3(C)(i) ("The estimate of

the loss shall be based on available information, taking into account . . . factors such as . . . [t]he fair market value of the property unlawfully taken, copied, or destroyed . . . .").

To determine the fair market value of the services CPS provided, the Government consulted EVO. CPS was one of many EVO "Alliance Partners," which were smaller processors that used EVO's systems in exchange for EVO taking a percentage of their revenues. CPS's profit margins (i.e., the percentage of merchants' total processing volume taken by CPS) exceeded those of the other Alliance Partners. According to an EVO representative, other processors in the EVO portfolio collected average revenues of less than 3.0% of the value of the transactions their customers processed.

The Government's loss-amount calculation thus treated the fair market value of CPS's services as 3.0% of the processing volume of CPS customers' transactions, and counted the profits earned in excess of that amount as fraud losses. In doing so, the Government considered only 85% of the total processing volumes because, according to EVO, approximately 15% of the total processing volumes relate to American Express transactions, which are not relevant here. The calculation then multiplied 85% of the processing volume by the amount CPS earned above 3.0%. Those calculations produced the following results:

- 2009: CPS processing volume of $9,957,756 x .85 x .0173 (the difference between CPS's profit of 4.73% in 2009 and the fair market value benchmark of 3.0%) = $146,428

- 2010: CPS processing volume of $66,754,455 x .85 x .0099 (the difference between CPS's profit of 3.99% in 2010 and the fair market value benchmark of 3.0%) = $561,738

- 2011: CPS processing volume of $151,634,941 x .85 x .0161 (the difference between CPS's profit of 4.61% in 2011 and the fair market value benchmark of 3.0%) = $2,075,124

- 2012: CPS processing volume of $240,232,723 x .85 x .0143 (the difference between CPS's profit of 4.43% in 2012 and the fair market value benchmark of 3.0%) = $2,920,028

- 2013 to July 2015: CPS processing volume of $904,518,173.33 x .85 x .0228 (the difference between CPS's profit of 5.28% from 2013 to July 2015 and the fair market value benchmark of 3.0%) = $17,529,562

- Total: $23,232,880

The total loss amount attributable to Mendlowitz's offense is thus approximately $23,232,880, near the top of the loss range of $9.5 million and $25 million that triggers a 20-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(1)(K), and considerably more than two times the $9.5 million minimum to trigger the 20-level enhancement.

The $23,232,880 figure represents a conservative estimate that understates the Guidelines loss amount for at least two reasons. First, the Government's calculation assumes that CPS's customers expected to pay the same amount that CPS's competitors in the market charged, namely, the market value of 3.0% of the processing volume. But Mendlowitz deceived CPS's customers into believing they would pay far *less* than that. Mendlowitz promoted CPS aggressively as a low-cost alternative to others in the market, assuring potential customers that they could "save 20 to 40 percent compared to other providers." (GX 1502 at 27). Customers therefore expected to pay CPS costs amounting to 1.8% to 2.4% of total processing volume—i.e., 60% to 80% of the 3.0% figure others were charging. But the Government's loss calculation does not account for the difference between what CPS's competitors charged and what CPS's customers were promised. Second, although the Guidelines state that the loss amount should represent "the greater of actual loss or intended loss," U.S.S.G. § 2B1.1 cmt. n. 3(A)), the $23,232,880 figure loss figure ignores losses that CPS *intended* to take from its victims but was unable to obtain. Evidence at trial established that some victims closed or blocked transactions their bank accounts to prevent CPS from

withdrawing fraudulent payments automatically. (*See* Trial Tr. 1282). The revenues used to calculate the Guidelines loss total omits losses CPS intended to cause when it tried to withdraw funds from closed or blocked bank accounts.

        b.    Mendlowitz's Attacks on the Government's Calculation Are Unfounded

Mendlowitz's assertion that the Government's calculation overstates the loss amount is incorrect as a matter of simple math. He contends that the approach described above "treats all processing revenue (other than AMEX revenue)" as fraud proceeds even though some merchants "were not defrauded." (Def. Mem. at 42-44). He is wrong. Mendlowitz errs by conflating the loss-amount analysis, which considers the *total loss*, from the calculation of the *total number of victims*. The loss-amount analysis does not address how many customers CPS defrauded, nor is there any need to do so in the Guidelines analysis here because the Government and Mendlowitz agree that the Guidelines enhancement for defrauding at least 10 victims applies (*see* Def. Mem. at 46).

That does not mean the loss-amount calculation treats all CPS revenue as fraud proceeds. To the contrary, the loss calculation counts as fraud proceeds only the revenue that exceeded the market value of the services CPS provided. The Government agrees that CPS did not seek to defraud so-called "platinum" or "friends and family" merchants who had some personal connection to Mendlowitz. Those customers were not overcharged, so revenues from them and other customers who paid the market value would not add to the fraud total. Moreover, revenues from "friends and family" or other customers who paid less than market value *decrease* the loss total, even though the Guidelines do not call for fraud proceeds to be offset by losses or lower-than-market-value profits from legitimate business practices.

A simple example illustrates how the Government's approach is useful for determining the loss total regardless of how many customers were defrauded. Imagine a hypothetical case in which

a company that committed fraud had 100 customers who paid a total of $200 for services with a total market value of $100. In that scenario, the reasonable estimated loss amount is $100 even if 100 or 50 or just 10 customers were actual victims and the rest were "platinum" customers who were not defrauded. The loss amount is $100 regardless of whether (i) all 100 customers were defrauded into paying $2 each; (ii) 50 customers were non-victims who paid a market value of $1 each, while the other 50 customers were defrauded into paying $3 each; or (iii) 90 customers were non-victims who paid a market value of $1 each, while the other 10 customers were defrauded into paying $11 each. In this case, the numbers are different but the concept is the same: The difference between what CPS collected from its customers and the market value of the services it provided to those customers gives us a reasonable estimate of the total Guidelines loss caused by Mendlowitz's fraud.

Mendlowitz's arguments that the loss calculation fails to consider that some CPS customers were "risky, startup businesses" and that some overcharges may have been attributable to "mistake" rather than fraud (Def. Mem. at 44-45 & n. 12) also fail. Risk and human error could affect revenue figures, but the movement should go in both directions—higher at times, lower at others. As to risk, a gamble may pay off in some years in the form of revenues that exceed those of competitors with a more stable customer base. But in other years, the risk would be realized in the form of bigger losses. Similarly, innocent mistakes in how merchants are charged would produce both overcharges and undercharges. In a large sample—like the multi-year revenue numbers underlying the loss calculation here—the numbers should even out. Fraud, not risk or mistake, explains why CPS outperformed other processors over a period of years.

c.      An Alternative Method for Calculating Loss Still Results in a 20-
        Level Enhancement

Mendlowitz's claim that an acceptable loss calculation requires a merchant-by-merchant analysis of "the actual rates and fees customers agreed to pay or were otherwise fairly advised of versus the rates and fees they were charged" (Def. Mem. at 45) is legally incorrect. Neither the Guidelines nor the case law requires the impractical approach of analyzing every agreement, monthly bill, and payment record for CPS's thousands of customers in order to tally up the loss amount with precision. Rather, the "sentencing court need only make a reasonable estimate of the loss." *Rigas*, 583 F.3d at 120 (internal quotation marks omitted).

Nevertheless, a loss calculation that follows Mendlowitz's preferred approach of adding up fraudulent charges, rather than starting with the overall revenue and subtracting the market value of the services CPS actually provided, still supports application of the 20-level Guidelines enhancement for losses exceeding $9.5 million, *see* U.S.S.G. § 2B1.1(b)(1)(K). And contrary to Mendlowitz's claim that "the evidentiary record presents an insufficient basis upon which to draw any conclusion about loss" (Def. Mem. at 41-42), the alternative loss calculation can rely solely on the existing record.

Year after year, CPS charged the vast majority of its customers—all but the "platinum" or "friends and family" group—a fraudulent PCI fee of $99, a fraudulent IRS Reporting fee of $99, and a fraudulent Membership fee of $34.95. (*See, e.g.*, PSR ¶¶ 34, 50; Trial Tr. 243, 1283-85, 1371, 2821). Those fraudulent fees totaled $232.95 per customer annually. The PSR notes that CPS had 4,613 customers in 2011, 7,141 customers in 2012, 12,115 customers in 2013, and 11,511 customers in 2014. Assuming—generously—that a full 10% of CPS customers were "platinum"

merchants who were not charged the fraudulent fees, that would mean the remaining merchants paid a total of $7,417,592 in fraudulent PCI, IRS, and membership fees from 2011 through 2014.[1]

That $7,417,592 figure is merely a portion of a much larger loss amount. It fails to account for, among other things:

- proceeds from fraudulent PCI, IRS, and membership fees charged in 2009, 2010, or the first half of 2015;

- proceeds from the fraudulent $39.95 "inactivity fee" that Mendlowitz charged some of the same "low processing or non-processing merchants" he highlights in his sentencing submission (Def. Mem. at 45) every *month* (*see, e.g.*, PSR ¶ 50; Trial Tr. 685-86, 689-90, 1153-54, 1272-77);

- proceeds from the fraudulent $12.95 "merchant club" fee Mendlowitz charged (*see, e.g.*, Trial Tr. 141-42, 2272-73, 2276);

- proceeds from the fraudulent "network access fees" that Mendlowitz charged at 10 times the amount disclosed in merchant agreements (*see, e.g.*, PSR ¶ 50; Trial Tr. 145-51, 318-21, 686-87);

- proceeds from the fraudulent "dues and assessments" that Mendlowitz charged at rates as high as 10 times what merchant agreements disclosed (*see, e.g.*, PSR ¶ 50; Trial Tr. 284-90, 680-84, 1301-02); and

- proceeds from the fraudulent surcharges Mendlowitz charged at higher rates and with higher transaction fees that those listed in merchant agreements, and in addition to qualified rates that were not supposed to carry surcharges (*see, e.g.*, PSR ¶ 50; Trial Tr. 329-35, 1202-03, 1329-30).

The trial record and PSR establish that Mendlowitz collected those fraudulent rates and fees from thousands of customers every year. That record demonstrates that if these additional

---

[1] The following arithmetic underlies that calculation:

| | | | |
|---|---|---|---|
| 2011: 4,613 x $232.95 x 90% | = | $967,138 | |
| 2012: 7,141 x $232.95 x 90% | = | $1,497,146 | |
| 2013: 12,115 x $232.95 x 90% | = | $2,539,970 | |
| 2014: 11,511 x $232.95 x 90% | = | $2,413,338 | |
| TOTAL: | | $7,417,592 | |

losses were added to the $7,417,592 in losses from PCI fees, IRS Reporting fees, and Membership

fees just from 2011 through 2014, the total losses would exceed $9.5 million by a substantial

margin.

### 2. *Mendlowitz Was the Indisputable Leader or Organizer of the Scheme*

Setting aside his title as CEO of CPS, Mendlowitz's control and direction of the scheme

qualifies him for a four-level leader or organizer enhancement. Section Application Note 4 to the

Commentary on U.S.S.G. § 3B1.1(a) sets forth the factors that courts should consider in applying

the leader or organizer enhancement.  These include:

> [1] the exercise of decision making authority, [2] the nature of
> participation in the commission of the offense, [3] the recruitment
> of accomplices, [4] the claimed right to a larger share of the fruits
> of the crime, [5] the degree of participation in planning or
> organizing the offense, [6] the nature and scope of the illegal
> activity, and [7] the degree of control and authority exercised over
> others.

Each factor weighs in favor of applying the four-level enhancement here.

As CEO, Mendlowitz was far from a remote figurehead of CPS.  He worked on site every

day. He personally hired each of his co-conspirators—Mendy Greenblatt, David Devers, Guy

Samuel, Rick Hart, and Benny Caban. Mendlowitz promoted each of his co-conspirators to

managerial positions in sales and customer service in the CPS organization. Mendlowitz

determined their responsibilities, set their pay, and had the power to fire them. Among the co-

conspirators, Mendlowitz alone held an equity stake in CPS.

Mendlowitz also personally directed crucial aspects of the fraud. Mendlowitz insisted that

terms and conditions of customer contracts should be withheld. Mendlowitz approved sales

scripts replete with lies about rates being "guaranteed for life". Mendlowitz directed when rates

and fees would be assessed and how much. Mendlowitz determined whether statement messages

would be issued. Mendlowitz approved whether refunds would be issued and in what amounts.

On this record, the defendant cannot seriously contest the application of the four-level enhancement under U.S.S.G. § 3B1.1(a).

### 3. There is No Basis for a Downward Departure Based on the Defendant's Purported Lack of Personal Gain

The defendant contends that a downward departure is appropriate here because the defendant received "little or no personal benefit from the offense." (Def. Mem. at 48). However, the Second Circuit has rejected this precise argument as inconsistent with the Guidelines.

In *United States v. Cutler*, 520 F.3d 136 (2d Cir. 2008), the Second Circuit found that the district court erred in granting a downward departure where the defendant argued that "he performed only a few fraudulent acts and that his personal gain was minimal." *Id.* at 147. The Second Circuit noted that in the case of "a jointly undertaken criminal activity," the amount of loss attributable to a defendant "includes the reasonably foreseeable pecuniary loss caused by all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." *Id.* at 158 (citing U.S.S.G. § 1B1.3(a)(1)(B) (internal quotation marks omitted). Because the defendant "not only could foresee losses in that magnitude but also was well aware that losses in that magnitude were intended, the court, in departing on the ground that the amount of loss was disproportionate to the seriousness of Cutler's conduct and offense, failed to apply the principle set forth in § 1B1.3(a)(1)(B)." *Id.* at 158. Similarly, here, there is no argument that the defendant could not have foreseen the losses to the victims here—the trial record is replete with evidence the defendant knew of, and directed, the overcharges. There is, therefore, simply no basis for a downward departure.

Moreover, it is simply untrue that the defendant did not benefit personally from the fraud. Part of the defendant's annual compensation was based on the company's performance. More

importantly, the defendant owned an equity stake in CPS.  If the defendant's fraud had gone undetected, and the company had continue to grow at a rapid rate, the defendant's equity stake would have been extremely valuable.  As it happened, the defendant's fraud was discovered, and that stake is now likely worth significantly less.  But he certainly hoped and intended that his stake would eventually be worth a great deal—that is why committing the fraud was, for the defendant, a risk worth taking.  The fact that the defendant did not sell his stake prior to the discovery of the fraud—and thus realize those capital gains—is not a basis for a downward departure.

### 4.  *A Downward Departure Based on the Defendant's Family Circumstances Is Not Warranted*

Contrary to the defendant's assertions, his family circumstances are not so exceptional as to warrant a downward departure pursuant to the Family Ties and Responsibilities Policy Statement at U.S.S.G.§ 5H1.6. Although the defendant is, by all accounts, a devoted husband and father, this does not take his circumstances out of the heartland of such cases.

U.S.S.G. § 5H1.6 sets forth a general policy *opposing* the application of any departure based on a defendant's family ties and responsibility. It provides, in relevant part "family ties and responsibilities are *not* ordinarily relevant in determining whether a departure may be warranted." *Id.* (emphasis added). Accordingly, "[a] departure based on family ties and responsibilities is permissible only in exceptional circumstances" and is "a discouraged basis for departure." *U.S. v. Khan*, 95 Fed. Appx. 33, *38 2004 WL 819097 (2d Cir. 2004) (reversing downward departure where defendant's three brothers could support his wife and children if he were incarcerated) (citations omitted).

Although the impact of a lengthy sentence on the defendant's wife and children is an unfortunate collateral consequence of the defendant's actions, the defendant's role as a husband

and father is not, under prevailing case law, extraordinary. As an initial matter, the defendant's family appears to have adequate financial means. Despite the defendant's apparent lack of employment, in 2018 alone he reported approximately $598,000.  (PSR ¶ 134). In 2017, he reported approximately $713,000. *Id.* The defendant's wife is also gainfully employed. *Id.*[2]

Moreover, the defendant's two older children are 18 and 20, and therefore able to help care for the younger children. Both the defendant and his wife have close relationships with their parents and siblings, all of whom are able-bodied, stable, adults of means, almost all of whom appear to live nearby. Although the defendant's children, who attend private schools, each have their challenges, none is particularly vulnerable. Moreover, to judge from their continuous support at trial and the dozens of letters of support submitted on his behalf, the defendant's friends, family, and religious community could provide support to his family during his period of incarceration.

The foregoing circumstances simply do not rise to the level of "extraordinary circumstances" recognized by prevailing law in this circuit. *See*, *e.g.*, *United States v. Faria*, 161 F.3d 761, 763 (2d Cir.1998) (departure reversed where ex-wife able to care for minor children); *United States v. Johnson*, 964 F.2d 124 (2d Cir. 1992) (affirming departure to avoid "wreak[ing] extraordinary destruction on dependents where the defendant was *sole* caregiver for three children, including one infant and one institutionalized child, as well as an infant grandchild); *United States v. Alba*, 933 F.2d 1117 (2d Cir. 1991) (affirming departure where defendant worked two jobs to support wife, two minor children, grandmother, and physically disabled father who depended on defendant's strength to get him in and out of wheelchair); *U.S. v. White*,

---

[2] The Government notes that the defendant reported these substantial amounts as his adjusted gross income despite claiming that he has not received a salary from 2016 to present.  (*See* PSR ¶ 124).  Nor does the PSR reflect any financial assets that would generate such an income.  (*See* PSR ¶ 130).  Neither the PSR, nor the defendant's submission, addresses this discrepancy.

301 F.Supp. 2d 289, 295 (S.D.N.Y. 2004) (finding circumstances extraordinary and sentencing defendant to 24 months where defendant was the *sole* caregiver for six young children aged five to fourteen and Probation concluded children would be placed in foster care upon defendant's incarceration). Although the Government does not seek to minimize the disruption to the defendant's family routines and lifestyle based on his incarceration, "any hardship that befalls [the defendant's] family is a consequence not of [his] sentence but of [his] criminal actions and [his] failure to act in the best interests of [his] children." *Id.* at 296.

### D.   The Term of Incarceration Requested By the Government Is Necessary to Fulfill the Objectives of Sentencing

A substantial term of incarceration is necessary to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense and to afford adequate deterrence to criminal conduct.  *See* 18 U.S.C. § 3553(a).

#### 1.   The Seriousness of the Offense

The evidence at trial demonstrated that the defendant perpetrated a years-long fraud that affected thousands of customers.  The defendant gouged his customers constantly, and continually came up with creative ways to defraud them.  Among other things, he deleted the section of the contract that disclosed the $99 PCI fee, and then charged every customer a PCI fee.  He simply invented fees, such as the "membership fee."  He capped refunds at an arbitrary amount each month—regardless of the merits of customer complaints.  The defendant knew that customers were complaining constantly about misrepresentations from sales staff and overcharges, and did nothing.  And he lied to EVO repeatedly about CPS's business practices. This was a significant fraud, and the defendant encouraged, supervised, and directed it.

Notwithstanding the evidence at trial, the defendant argues for a variance on the ground that this was not a "serious fraud case" where "victims lost their principal or had their savings

wiped out." (Def. Mem. at 55). The defendant continues, "[i]ndividual merchants that were overcharged were generally overcharged in relatively small absolute amounts." (*Id.*).

This argument is, frankly, offensive. First, it is not the defendant's prerogative to pronounce that his customers were overcharged in "relatively small absolute amounts." What is a small amount to some, could be a significant amount to others. Many of CPS's customers were small businesses—as exemplified by Jason Meador, who sold barbecue sauce as a side job, and Robert Gostl, who owned a small bar in New Orleans. For a small business, being overcharged hundreds of dollars a year—and that is only accounting for the PCI, IRS, and membership fees, not the overcharges on dues and assessments or surcharges—can be a substantial burden and can significantly eat into profit margins. In fact, as Jason Meador testified, just in undisclosed fees alone, CPS overcharged him by $495.88 dollars. As he noted in a letter to the company, those fees amounted to *seventy percent* of his business's total revenue from credit card sales. (*See* GX-1203).

Moreover, it is absurd to suggest, as the defendant does, that his fraud must "wipe[] out" his victims financially, in order for it to be a "serious fraud." (Def. Mem. at 55). A consumer fraud, like the one perpetrated by the defendant, is different from an investment fraud or Ponzi scheme. That does not make it less serious. The nature of a consumer fraud is that it defrauds many consumers of small amounts of money, rather than simply taking all the money in a bank account. This model serves multiple purposes. First, consumers are less likely to notice when they are overcharged by small amounts of money, thus reducing the likelihood of detection. Second, when a consumer does detect an overcharge, it may be a small enough amount of money that he or she will not alert law enforcement or hire an attorney.

An important part of the consumer fraud model is that the perpetrators offer refunds to consumers who complain.  That was also part of the fraud at CPS.  Guy Samuel testified that the defendant told him not to refund any customer who was going to cancel, because CPS would be "sending money out the door."  (Trial Tr. at 352).  This testimony was corroborated by Mendy Greenblatt, who testified that "[r]efund decisions were based solely on the cost were based solely on the customer's volume and activity. [If] the customer was processing and he was making money, go ahead, and give them the refund.  If they were not making money, he wasn't making money, there was no activity, keep it, let them cancel." (Trial Tr. at 800; *see also id.* at 1434 ("If the merchant was closing, he would not refund the merchant at all." (testimony of David Devers)).

Benny Caban testified that, after one month in which Caban had processed $60,000 or $70,000 worth of refunds, the defendant was visibly upset and shortly afterwards started requiring Caban to come to him directly for refund approval.  (Trial Tr. at 2241:20 - 2242:17).  After that point, the defendant would approve only a certain amount each month for refunds— regardless of the merit of the customers' complaints.  (*See, e.g.*, GX-240 (Caban tells the defendant that the total amount of refunds is "22k," and Mendlowitz responds, "only will approve 5-7k this month");  GX-244 (Caban tells the defendant that the refunds "total approx. 42k," to which the defendant responds, "Can we knock this down to 20k?"); GX-245 (Caban tells the defendant that the total refund amount was about $22,000, to which the defendant responded, "10k max.");  GX-249 (Caban tells the defendant that the "June refunds up to now total $49,112.15.  Please let me know the amount approved?" The defendant responded, "25k max.")).  Thus, the CPS model was typical of other consumer frauds which, though different in kind from a Ponzi scheme or investment fraud, can certainly be as damaging as those schemes.

In some ways, consumer fraud schemes are more insidious because they are difficult to detect and tend to target unsophisticated, less affluent, victims.

The defendant also complains that the Government "views the conduct as benign enough not to warrant, to date any prosecution of EVO." (Def. Mem. at 55). The Government has charged six individuals for their role in the fraud at CPS. It does not view the conduct as "benign." The defendant once again points the finger at EVO to absolve himself of responsibility. If anything, the evidence at trial relating to EVO revealed that the defendant deleted key pages from the customer contract that EVO provided him and lied to EVO repeatedly about CPS's business practices. The trial was not, and this sentencing is not, about EVO. It is about the defendant's actions and his failure, even now, to take responsibility for those actions.

Similarly, the defendant's suggestion that his conduct was standard practice in the industry and only subject to civil liability (*see* Def. Mem. at 56-57) is yet another example of his utter failure to show remorse or accept accountability for his actions. He is still, to this day— after six people have been convicted of federal crimes for their participation in the fraud at CPS—claiming that his conduct was not criminal. This is not a person who has reflected on his conduct or acknowledged the significance of the harm he caused to others.

### 2. *The Defendant's History and Characteristics*

In seeking a downward variance, the defendant claims he "has led an extraordinary life premised on helping anyone who has had the good fortune of crossing his path." (Def. Mem. at 50). While it is admirable that the defendant is kind and generous to his friends, family, and community, it is not atypical or unexpected to treat those close to you with kindness and

generosity.  Unfortunately, the defendant did not extend even a bare minimum of that sentiment to the thousands of customers he defrauded.

The dichotomy between how the defendant treated his friends and family and how he treated non-friends and family is part of the trial record.  Multiple witnesses testified—corroborated by email evidence—that the defendant took steps to make sure that customers who were his friends and family were not overcharged in the way that others were.  In one email, the defendant directed his employees to add the dues and assessments, a merchant club fee, and to charge *two* authorization fees.  (*See* GX-595).  In last paragraph of that email, the defendant wrote, "<u>I highlighted approx. 50 accounts in yellow (see attachment).  Do not make any of the above changes to these accounts.</u> As a matter of fact please make sure that all of those accounts are clean . . . without Debit Access, Merchant Club and .25 bps in assessments."  (*Id.* (emphasis in original)).

Similarly, in 2012, the defendant was copied on an email where Mendy Greenblatt wrote to David Devers, "Would you please confirm that Steve's account (Michael's good friend) is setup, no reserve and overall a clean account?"  (*See* GX-741).  In large print above that email, is an attachment that was supposed to accompany the "clean" account to the onboarding department.  That attachment directed the onboarding department to take off the "additional fees" and the ".95 assessment" and "Please charge ONE auth fee and no additional item fee."  (*See id.*)  The fact that the defendant chose not to defraud his friends and family, but did choose to continue those overcharges for thousands of other people demonstrated that this was not simply a matter of negligence or lack of oversight over rogue employees.  It also demonstrates that the defendant's good works only applied to certain people in the defendant's orbit.  He did

not extend that same regard to the thousands of his customers whom he subjected to rampant overcharging and fraud.

### 3.    The Loss Guidelines Are Appropriate Here

As set forth *supra*, the defendant's fraudulent scheme resulted in approximately $23 million in actual losses to CPS customers over the five-year duration of the scheme. For the same reasons that support the imposition of a four-level leader or organizer enhancement, the resulting 20-point enhancement for the actual losses caused to consumers is entirely appropriate in this case.

Under Section 2B1.1 of the Guidelines, a defendant's offense level is based in part on the amount of "loss" involved in the offense. *See* U.S.S.G. § 2B1.1(b)(1)(A)-(P). "Loss" is defined by the Guidelines as "the greater of actual loss or intended loss." *Id*. § 2B1.1 cmt. n.3(A). The term "actual loss" is defined, in turn, as "the reasonably foreseeable pecuniary harm that resulted from the offense." *Id*. § 2B1.1 cmt. n.3(A)(i). The "offense" includes the defendant's "relevant conduct," and also all acts and omissions of a defendant and his co-conspirators (if reasonably foreseeable to him) "that were part of the same course of conduct or common scheme or plan as the offense of conviction." *Id*. § 1B1.3(a)(2). And "reasonably foreseeable pecuniary harm" is itself defined as "pecuniary harm" –that is "harm that is monetary or that otherwise is readily measurable in money"—that the "defendant knew or under the circumstances, reasonably should have known, was a potential result of the offense." *Id*. § 2B1.1 cmt. n.3(A)(iii), (iv).

In determining the appropriate loss attributable to a particular co-conspirator, a sentencing court must engage in a two-step inquiry. First, it must determine "the scope of the criminal activity agreed upon by the defendant." *United States v. Mulder*, 273 F.3d 91, 118 (2d Cir. 2001) (internal quotations and citations omitted). "Second—and only if it finds that the

scope of the activity to which the defendant agreed was sufficiently broad to include the conduct in question—the court 'must make a particularized finding as to whether the activity was foreseeable to the defendant.'" *Id*. In determining whether criminal activity has been jointly undertaken this Court has looked to whether "the participants pool their profits and resources and do not work independently" and whether "the defendant[ ] assist[s] in designing and executing the illegal scheme." *Id*. (emphasis in original). Furthermore, in calculating loss amount under the Guidelines, a sentencing court need only make a "reasonable estimate" given the available information. *See* U.S.S.G. § 2B1.1 cmt. n.3(C); *United States v. Rutkoske*, 506 F.3d 170, 178 (2d Cir. 2007). The "Guidelines do not require that the sentencing court calculate the amount of loss with certainty or precision." *United States v. Bryant*, 128 F.3d 74, 75-76 (2d Cir. 1997). The calculation of loss need only be determined by a preponderance of the evidence. See *United States v. Watts*, 519 U.S. 148, 156 (1997); *United States v. Gonzalez*, 407 F.3d at 125 (holding that a district court's authority "to resolve disputed facts by a preponderance of the evidence when arriving at a Guidelines sentence" "endures post-Booker").

As the leader and organizer of the fraud, the Government submits that the same facts that warrant the applicability of the leader or organizer enhancement support the 20-level enhancement for the actual losses caused by customers. The defendant not only agreed to the full scope of the overcharging at CPS, he controlled and directed it. The evidence at trial established clearly that the defendant closely tracked the increases in revenue that resulted from the various "projects"—rate increases—that he directed David Dever and his team to carry out. The defendant controlled which rates and fees were set forth on the merchant applications and which were not.  The defendant decided, early on, to withhold important terms and conditions of customers contracts from customers. Accordingly, the full scope of the loss amount caused by

the conspiracy was entirely foreseeable to the defendant.  Put another way, Mendlowitz should be held responsible for all actual losses caused by the conspiracy because he specifically directed or approved the activities of his co-conspirators that resulted in the systematic overcharging of CPS's clients.

### 4.   Defendant's Sentence Should Exceed the Sentences of His Co-Conspirators

Mendlowitz was the leader and organizer of a years-long scheme to defraud customers that resulted in actual losses of approximately $23 million dollars. He personally hired, promoted, and supervised his co-conspirators. Nevertheless, he asserts that his *subordinate*, Rick Hart, was a "worse offender" than him and that he, Mendlowitz, merits a lesser sentence. (Def. Mem at 66). The evidence at trial flatly contradicts this self-serving assertion and it should be rejected.

As an initial matter, Rick Hart accepted responsibility for his actions. The Court appropriately accounted for Hart's atonement, along with his far more significant personal challenges, in fashioning Hart's sentence. By contrast, the defendant continues to shirk responsibility for systematically stealing from his customers to grow his company's revenues. Instead, he pedals false contrition by attributing the malignant culture he cultivated to an improbable combination of excess kindness toward his employees, personal negligence, and the purportedly rogue actions of his co-conspirators (all of whom, however, were hired, promoted, and retained by Mendlowitz). The defendant's inability to reckon with the harm he indisputably intended to cause—as reflected in his own words in multiple emails admitted at trial—should give this Court pause as it considers whether Mendlowitz, in future, will be capable of conducting business with integrity. On this basis alone, justice demands that Mendlowitz serve a longer sentence than his co-conspirators, including Rick Hart.

Moreover, by any objective measure, the record evidence establishes that Mendlowitz is, in fact, far more culpable than Hart. The scheme to overcharge customers pre-dated Hart's arrival at CPS in the fall of 2013, and it continued well past his termination for drug use (Tr. 361) in or around the first quarter of 2015 (Tr. 2788). For example, Stephan Mahabir testified that, when he took over as the Head of Sales after Hart's departure, he revised Hart's sales scripts in part but retained their core misrepresentations. Mahabir sent those scripts to Mendlowitz, who approved them. This is emblematic of Mendlowitz's role in the scheme. It was Mendlowitz who concocted it, Mendlowitz who endorsed Hart's contributions to it, and Mendlowitz who perpetuated the scheme after Hart's departure.

Importantly, unlike Hart (or any other co-conspirator) Mendlowitz was a part owner of CPS and, as such, had a significant incentive to increase CPS's profitability in the event of an eventual sale. Mendlowitz had far more to gain from the success of the scheme that Hart, and this incentive is reflected in that fact that Mendlowitz alone was there at its inception and when it ultimately came to an end. Accordingly, Mendlowitz deserves a far greater sentence than any imposed against his co-conspirators.

### 5.   *General and Specific Deterrence Demand a Significant Sentence*

The need for general deterrence also weighs in favor of a significant sentence of incarceration for the defendant. Consumer frauds such as this one, in which thousands of citizens are defrauded of smaller amounts, are pernicious because they are difficult to detect and their perpetrators, such as the defendant, often argue that their conduct is not a "classic, serious fraud" but rather, "benign." (Def. Mem. at 55). This wrongheaded assessment fails to recognize that most consumer frauds exploit less sophisticated members of society, such as the small business owners that were the typical victims of the defendant's scheme. Those smaller amounts, over

time, can have meaningful impact on small businesses. A strong message to promote respect for the law is needed to deter other, would-be perpetrators of consumer frauds. Moreover, specific deterrence is especially warranted here because Mendlowitz, in particular, appears incapable of recognizing his own exploitation of customers and continues to maintain that he has, at most, conducted business as usual in his industry (Def. Mem. at 56-57).

### E.   The Forfeiture Amount Sought by the Government is a Reasonable Estimate of the Defendant's Gains

#### 1.   Applicable Law

The Government bears the burden of proving the amount of proceeds by a preponderance of the evidence. *United States v. Capoccia*, 503 F.3d 103, 116 & n. 18 (2d Cir. 2007). "District courts are afforded broad discretion in calculating illicit gains based on the circumstances of a case." *United States v. Walters*, 910 F.3d 11, 31 (2d Cir. 2018) "The calculation of forfeiture amounts is not an exact science," *United States v. Treacy*, 639 F.3d 32, 48 (2d Cir. 2011), so "district courts may use general points of reference as a starting point for a forfeiture calculation and make reasonable extrapolations supported by a preponderance of the evidence," *United States v. Roberts*, 660 F.3d 149, 166 (2d Cir. 2011). The Second Circuit "will not disturb a district court's reasonable estimate of the [amount], given the available information." *Walters*, 910 F.3d at 31 (internal quotation marks omitted).

#### 2.   Discussion

The Government calculated the forfeiture amount as follows. According to EVO, an ISO with a portfolio similar to CPS would be expected to have margins of 3.0%. The difference between the actual and the expected profit is 2.28% (the amount which represents the proceeds due to fraud), which is approximately 43% of total profit (2.28 / 5.28).

According to a compensation analysis provided to the Government by EVO, between 2009 and 2015, the defendant was paid $1,435,153 for his work as CEO of CPS.  Extrapolating from the previous analysis, the Government attributes 43% of that compensation to fraud.  Thus, the Government intends to seek a forfeiture order in the amount of $617,115.79.

CPS's revenues (including the fraud proceeds, which amounted to millions of dollars) were processed through EVO accounts, and EVO paid the defendant a salary from those funds.  *See United States v. All Funds Presently on Deposit or Attempted to be Deposited in any Accounts Maintained at Am. Exp. Bank,* 832 F. Supp. 542, 558 (E.D.N.Y. 1993) (noting that fungible property remains subject to forfeiture, despite any apparent disbursement, because it can be replaced or reconstituted in identical form at any time).  The defendant's compensation—which was for work he did at CPS which ultimately included the fraud at issue—was therefore "traceable to the offenses of conviction" and subject to forfeiture.  This calculation is a "reasonable estimate" of the defendant's gains for the purposes of forfeiture.  *See Walters*, 910 F.3d at 32 (concluding that the district court did not err in calculating forfeiture, given "the complexity of calculating gains in insider trading cases and that the parties submitted detailed briefing as to this issue").

The defendant also argues that no forfeiture order may be issued by the Court because because "the appropriate procedures outlined in Federal Rule of Criminal Procedure 32.2 were not followed."  (Def. Mem. at 73).  Rule 32.2(b)(5)(A) provides that, "[i]n any case tried before a jury, if the indictment or information states that the government is seeking forfeiture, the court must determine before the jury begins deliberating whether either party requests that the jury be retained to determine the forfeitability of specific property if it returns a guilty verdict."

This rule is simply inapplicable here because the Government is seeking a money judgment, not the forfeiture of "specific property."  *See United States v. Curbelo*, 726 F.3d 1260,

1277, 1278 n. 10 (11th Cir. 2013) (the right to a jury under Rule 32.2(b)(5) applies only to specific property, not to the amount of a money judgment; the rule does not infringe on defendant's Sixth Amendment rights because there is no right to a jury under Libretti); *United States v. Phillips*, 704 F.3d 754, 771 (9th Cir. 2012) (there is no statutory right to a jury under Rule 32.2(b)(5) when government is seeking only a money judgment); *United States v. Reese*, 36 F. Supp. 3d 354, 361 (S.D.N.Y. 2014) ("Rule 32.2(b)(5)(A) applies only when the Government pursues forfeiture of specific property, not when it seeks a money judgment.").  This argument is, therefore, without merit.

## III.    CONCLUSION

For these reasons, and all the reasons set forth above, the Government respectfully submits that a Guidelines range sentence of imprisonment for this defendant is sufficient, but not greater than necessary, to achieve the legitimate goals of sentencing.


Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney


By: _____/s/_____
     David Abramowicz
     Jilan Kamal
     Dina McLeod
     Assistant United States Attorneys
     (212) 637-6525/ -2192/ -1040

cc:    Patrick J. Smith, Esq.
       Rodney Villazor, Esq.
       (by ECF)