USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 12/20/2019

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------- X
                        :

UNITED STATES OF AMERICA,      :

                        :

      - against -          :

                        :

MICHAEL MENDLOWITZ,        :
   a/k/a "Moshe Mendlowitz,"     :

                        :

               Defendant.   :

                        :

--------------------------------------------------------------- X

S2 17 Cr. 248 (VSB)

**OPINION & ORDER**

VERNON S. BRODERICK, United States District Judge:

        Before me is the motion of Defendant Michael Mendlowitz ("Defendant" or

"Mendlowitz") for a new trial under Rule 33 of the Federal Rules of Criminal Procedure. (Doc.

197.) Mendlowitz seeks a new trial on the basis that I: (1) erroneously excluded the expert

testimony of Kevin Moran concerning general industry practices in the payment processing

industry; (2) erroneously excluded portions of recorded conversations that purportedly related to

his state of mind; (3) erroneously admitted in evidence an audit report prepared by EVO

Payments, Inc. ("EVO"); (4) unfairly limited the cross-examination of Kevin Lambrix, EVO's

Chief Operating Officer during the relevant time period; and (5) erroneously instructed the jury

on conscious avoidance. Because (1) Moran's proffered expert testimony, and the portions of

the recorded conversations were appropriately excluded; (2) the audit report was correctly

admitted as a business record; (3) the cross-examination of Lambrix was not improperly limited;

and (4) the conscious avoidance jury instruction was proper, Mendlowitz's motion for a new trial

is DENIED.

## I.    Background and Procedural History[1]

### A.    *The Indictments, Motions In Limine, and Evidentiary Rulings*

On April 24, 2017, the Government filed Sealed Indictment 17 Cr. 248, (Doc. 2), which was unsealed on May 2, 2017, pursuant to an order issued by Magistrate Judge Sarah Netburn on that same day, (Doc. 3).  The Indictment spanned some twenty-nine pages and charged Michael Mendlowitz and Richard D. Hart with conspiracy to commit mail and wire fraud, mail fraud, and wire fraud.  On March 27, 2019, Superseding Indictment S2 17 Cr. 248 was filed ("S2 Indictment").  (Doc. 98.)  The S2 Indictment charged Mendlowitz with conspiracy to commit wire fraud, wire fraud, and aggravated identity theft.[2]  (*Id.*)

### B.    *Motions In Limine*

On April 1, 2019, Defendant Mendlowitz and the Government each filed motions in limine and supporting documents.  (Docs. 103–05, 106.)  The only motion in limine implicated in connection with the instant motion is the Government's motion to preclude the expert testimony of Kevin Moran regarding general practices in the payment processing industry.  After reviewing the papers submitted by the parties and hearing oral argument on April 15, 2019, I ruled that

> . . . it's premature to give a ruling without having heard, first of all, what testimony comes in through the witnesses that are going to take the stand concerning what is done.  Presumably there are going to be witnesses who will have experience in the industry, who could testify about industry practice and the like.  The testimony, I think, has an aspect to it that is opinion, but has an aspect to it that is just factual.  So I think it's premature for me to make a ruling right now that the expert's

---

[1] In the Background and Procedural History section, I recount only the facts that are pertinent to the instant Opinion & Order, and do not attempt to summarize the extensive factual background related to the substance or procedural history of this case.

[2] On January 10, 2019, Defendant Hart pled guilty to charges contained in a superseding information.  (Docs. 86, 87.)

testimony would be relevant.

(Oral Arg. Tr. 44:8-17.)[3]

C.    *Trial*[4]

Trial commenced on April 29, 2019, with jury selection, and concluded on May 23, 2019, with the verdict.  The jury found Defendant Mendlowitz guilty on Counts One and Two—conspiracy to commit wire fraud, and wire fraud—and acquitted him on Count Three—aggravated identity theft.

## II.    <u>Legal Standard</u>

"Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  A district court has "broad discretion . . . to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice."  *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992).  However, the court must "strike a balance between weighing the evidence and credibility of witnesses and not wholly usurping the role of the jury."  *United States v. Ferguson*, 246 F.3d 129, 133 (2d Cir. 2001) (internal quotation marks omitted).  It is the jury's role to weigh the evidence and assess a witness's credibility, and a district court generally "must defer to the jury's resolution" of those issues.  *United States v. Bell*, 584 F.3d 478, 483 (2d Cir. 2009) (per curiam) (quoting *Sanchez*, 969 F.2d at 1414).  Indeed, only in "exceptional circumstances" may a trial judge "intrude upon the jury function of credibility assessment."  *Id.* (quoting *Sanchez*, 969 F.2d at 1414).

"The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice.  The trial court must be satisfied that competent, satisfactory and sufficient

---

[3] "Oral Arg. Tr." refers to the April 15, 2019 motion in limine oral argument transcript.  (Doc. 126.)

[4] The facts pertinent to each of the asserted basis for a new trial are discussed below in the sections addressing each such claim.

evidence in the record supports the jury verdict." *Ferguson*, 246 F.3d at 134 (internal quotation marks and citations omitted). In reaching a conclusion with regard to whether or not there has been a manifest injustice, "[t]he district court must examine the entire case, take into account all facts and circumstances, and make an objective evaluation." *Id.* "There must be a real concern that an innocent person may have been convicted. It is only when it appears that an injustice has been done that there is a need for a new trial in the interest of justice." *Bell*, 584 F.3d at 483 (quoting *Sanchez*, 969 F.2d at 1414). "The defendant bears the burden of proving that he is entitled to a new trial." *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009). Where a defendant fails to demonstrate that an erroneous evidentiary ruling resulted in "manifest injustice" he has not met his burden under Rule 33 and is not entitled to a new trial. *See McCourty*, 562 F.3d at 476–77; *see also* Fed. R. Crim P. 52(a) ("Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded.").

## III. Discussion

Mendlowitz claims that he is entitled to a new trial because I: (1) erroneously excluded the expert testimony of Kevin Moran concerning general industry practices in the payment processing industry; (2) erroneously excluded portions of recorded conversations that purportedly related to his state of mind; (3) erroneously admitted in evidence an audit report prepared by EVO Payments, Inc. ("EVO"); (4) unfairly limited the cross-examination of Kevin Lambrix, EVO's Chief Operating Officer during the relevant time period; and (5) erroneously instructed the jury on conscious avoidance. With regard to each of these claims, the Government argues that it was "well within [my] discretion to admit or preclude the challenged evidence and [that I] correctly gave a jury instruction on conscious avoidance." (Govt. Mem. 4.)[5] Because I

_____

[5] "Govt. Mem." refers to The Government's Memorandum of Law in Opposition to the Defendant's Post-Trial

4

find that Defendant Mendlowitz has not met the high standard necessary for a new trial pursuant

to Rule 33, Defendant Mendlowitz's motion for a new trial is denied.  Specifically, I find that

(1) Moran's proffered expert testimony and the portions of the recorded conversations were

appropriately excluded; (2) the audit report was correctly admitted as a business record; (3) the

cross-examination of Lambrix was not improperly limited; and (4) the conscious avoidance jury

instruction was proper under the facts presented to the jury.

## A. *The Expert Testimony was Properly Excluded*

### 1.  Motion in Limine

The Government moved in limine to preclude Moran's testimony, arguing:  (1) that

testimony about general industry practice was irrelevant; (2) that Moran's prospective testimony

concerning the roles or conduct of EVO and Commerce Payment Systems ("CPS") was improper

and would inappropriately invade the province of the jury; (3) the topics identified by Defendant

in his expert notice and supplementations to that notice did not require specialized knowledge

and could be explained by the fact witnesses who were scheduled to testify at trial; and (4) that

the expert notice and supplementations to that notice provided by the defense did not adequately

identify the opinions to be offered by Moran, nor the bases or reasons for those opinions.  (Doc.

106, at 21.)  According to Defendant Mendlowitz's memorandum of law in opposition to the

Government's motion to preclude the testimony of Patrick Moran, Mendlowitz intended to elicit

testimony from Moran "about standard practices in the payment-processing industry and how

CPS's and [EVO's] practices fit within those standard practices."  (Doc. 114, at 5.)  Mendlowitz

argued that (1) Moran's proposed testimony on general industry practices was relevant to

_____

Motion, filed on July 26, 2019.  (Doc. 202.)  Page numbers included in citations to this document refer to the ECF
header stamp page numbers.

Mendlowitz's state of mind; (2) Moran's proposed testimony about practices at CPS and EVO would not usurp the role of the jury and would concern matters beyond the range of comprehension of the average juror; and (3) the defense's expert notice and the supplementations provided to the Government were adequate under the Federal Rules of Criminal Procedure. (*Id.*)

On April 15, 2019, I held oral argument on the motions in limine, including the Government's motion to preclude Moran's testimony. At the beginning of this court proceeding, prior to hearing from the parties on the Government's motion to preclude Moran's testimony, I explained that I was going to reserve decision because it was premature to make a ruling without hearing the testimony of the witnesses who worked in the payment processing business and could potentially testify about industry practice. (Oral Arg. Tr. 44:8-17.) During oral argument Mendlowitz confirmed that Moran's expected testimony would include testimony about the general industry practice in the payment processing industry, including—based upon Moran's experience—"how do payment processors do things." (*Id.* at 43:2-3.) However, Mendlowitz clarified that Moran would not be providing testimony concerning (1) how the practices of EVO and CPS compared to general industry practices, (*id.* at 42:8-15, 44:18-23); (2) "whether something is fraudulent or misleading or not fraudulent or misleading," (*id.* at 45:1-3); or (3) whether the fees and prices charged by CPS were consistent with the fees and charges within the industry, (*id.* at 45:3-10): rather, Moran would describe where entities like EVO and CPS fit within the payment processing industry, (*see generally id.* at 42–45). The Government conceded that some testimony about terminology used in the industry, generally about payment card processors, and "what CPS did as a sort of middleman" would be relevant, but argued that such testimony could come from lay witnesses and did not require an expert. (*Id.* at 47–48.) The Government also argued that general practices in the payment processing industry would not be

relevant because "the question before the jury is going to be, what did the defendant do here, what were the practices of this company, [and] what does the defendant believe about the practices of the company." (*Id*. at 48:22-25.) Finally, the Government asserted that even if testimony about general practices in the industry was relevant, there was a likelihood of jury confusion that the standard against which Defendant's conduct was to be measured was industry practice rather than whether his conduct violated the wire fraud statute. (*Id*. at 49–50.)

On May 15, 2019—the tenth trial day and after the testimony of former CPS employees Guy Samuel, Mendy Greenblatt, David Devers, and Bienvenido Caban—I issued an oral ruling granting the Government's motion to preclude the expert testimony of Patrick Moran. Specifically, I stated that

> . . . before me is the motion of the government to preclude the testimony of Patrick Moran, the witness that defendant Mendlowitz intends to call as an expert to testify 'about the standard practices in the payment processing industry and how CPS and EVO Payments' practice fit within those standard practices.' The government initially moved in limine to preclude the testimony of Mr. Moran. The government asserted that such testimony should be precluded for several reasons: (1) that the testimony about general industry practice is irrelevant to any matter before the jury (2) that any testimony by Mr. Moran concerning the roles and conduct of EVO and CPS in this case is improper and inappropriately invades the province [of] the jury (3) the topics identified by defendant in his expert notice and supplementations to that notice do not require specialized knowledge and are easily explained by multiple fact witnesses who are or will testify at trial (4) that the expert notice and supplementations to that notice provided by the defense does not identify the opinions to be offered and the reasons for those opinions by Mr. Moran on the subjects identified nor the basis or reasons for those opinions. In response defendant Mendlowitz argues that: (1) [] Mr. Moran's testimony on general industry practice is relevant to his state of mind among other issues (2) Mr. Moran's testimony about practices at CPS and EVO does not usurp the role of the jury, and it concerns matters beyond the range of comprehension of the average juror and (3) the defense's expert notice and the supplementations provided to the government are adequate under the Federal Rules of Criminal Procedure. Because I find under the facts and circumstances of this case that Mr. Moran's testimony will not provide the jury with information that is beyond their range of comprehension and that the proffered testimony is something that could be obtained through the examination of fact witnesses that have been or will be called during the trial, that a reasonable jury would be able to understand them without the aid of someone with specialized

expertise, I am going exercise my discretion to preclude the testimony of Mr. Moran. Here, the majority of witnesses who have testified and will testify have knowledge not only about the practices of CPS and EVO, but many of the witnesses also have knowledge about standard practices in the payment processing industry since they were employed at other payment processors in various positions or, in the case of EVO witnesses, partnered with other entities like CPS that provide processing services. Unlike the proffered experts in Newkirk and Collins, who were going to provide testimony concerning the mechanics of mergers and acquisitions, the role of transactional lawyers, and the meaning of the terms such as 'restricted stock pledge agreement' and 'priority security interest,' and regarding materiality of certain types of documents in a leveraged buyout and generally about the work of transactional lawyers, areas that jurors would have little experience unless they were transactional attorneys. Laypersons generally do have knowledge concerning obtaining and using credit cards, including the processing of the charges that are made. I also note that, with regard to defendant Mendlowitz's state of mind during the relevant time period, contemporaneous documents and statements, some of which were authored by and/or made by defendant, have been admitted in evidence and been the subject of testimony on both direct examination and cross-examination. Since there are witnesses yet to be called who had direct contact with and communication in realtime with defendant, I expect there will be additional evidence related to the defendant's state of mind or from which his state of mind can be inferred that can be presented to the jury. I also note that with regard to the proffered testimony concerning how CPS's and EVO Payments' practices fit within the standard practices of payment processing industry, that Mr. Moran is not relying on any CPS or EVO documents to form his opinions and therefore would not be able to testify concerning the specific practices of CPS and EVO compared with the standard industry practices. Since I base my decision to preclude the testimony of Mr. Moran on the basis that it would not provide the jury with information that is beyond their range of comprehension, and that it would not be testimony that could be obtained and has been obtained through various fact witnesses, I need not reach the government's arguments related to inadequacy of the expert notice and disclosure.

(Tr. 2262–64.)[6]

## 2. Defendant's Rule 33 Motion – Moran's Proposed Testimony

Defendant argues that Moran's proposed testimony regarding general industry practices was relevant to his state of mind in that it "would have bolstered evidence of Mr. Mendlowitz's understanding of those practices and supported his effort to 'introduce a reasonable doubt as to

---

[6] "Tr." refers to the trial transcript in this matter. Continuously paginated transcripts of each day of trial are docketed on ECF as Documents 158, 160, 162, 164, 166, 168, 170, 172, 174, 176, 178, 180, 182, 185, 187, and 189.

his intent to defraud, *i.e.*, that he held an honest belief that his conduct was not improper or unlawful, a belief the jury may [find] more plausible in light of" evidence about common industry practices and Mr. Mendlowitz's understanding of and conformity with those practices. *Litvak*, 808 F.3d at 190." (*See generally* Def. Mem. 5–12.)[7] Mendlowitz also argues that Moran's testimony was appropriate in that it would have provided the jury with information that was "beyond their range of comprehension." (*Id*. at 12–13.) The Government argues that Moran's testimony was properly excluded for the following reasons: (1) testimony about common industry practice was not relevant and its admission would have risked confusing the jury, (Govt. Mem. 14–17); (2) testimony about general industry practice was not the proper subject for expert testimony, (*id*. at 17–19); (3) testimony about general industry practice was not relevant to Mendlowitz's state of mind, (*id*. at 19–22); and (4) Mendlowitz failed to provide "adequate notice as required under [Rule 16 of] the Federal Rules of Criminal Procedure," (*id*. at 8–14).

### 3. Applicable Law

Federal Rule of Evidence 702 permits the admission of expert testimony as long as:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. "[T]he admissibility of all expert testimony is governed by the principles of Rule 104(a)," and "the proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence." Fed. R. Evid. 702 advisory

---

[7] "Def. Mem." refers to the Memorandum of Law in Support of Defendant Michael Mendlowitz's Motion for a New Trial Under Fed. R. Crim. P. 33. (Doc. 198.)

committee's notes to the 2000 amendments (citing *Bourjaily v. United States*, 483 U.S. 171 (1987)).

"The law assigns district courts a gatekeeping role in ensuring that expert testimony satisfies the requirements of Rule 702. The inquiry is a flexible one, and district courts enjoy considerable discretion in deciding on the admissibility of expert testimony." *United States v. Farhane*, 634 F.3d 127, 158 (2d Cir. 2011) (internal citations and quotation marks omitted). As part of its gatekeeping role, a court must ensure the "reliability and relevancy of expert testimony" presented to a jury. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). Consistent with Rule 702, expert testimony is admissible when it "will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702; *see also*, *e.g.*, *United States v. Locascio*, 6 F.3d 924, 936 (2d Cir. 1993).

The party seeking admission of expert testimony is required to demonstrate that such testimony is based on the witness's specialized knowledge. *See United States v. Mejia*, 545 F.3d 179, 196 (2d Cir. 2008) (district court erred in allowing expert testimony "about matters that required no specialized knowledge"). Expert testimony that addresses "lay matters which [the trier of fact] is capable of understanding and deciding without the expert's help" is inadmissible. *Andrews v. Metro N. Commuter R.R. Co.*, 882 F.2d 705, 708 (2d Cir. 1989). Expert testimony should be limited to situations where the subject matter is beyond the knowledge of the average juror. *See Locascio*, 6 F.3d at 936–37; *United States v. Castillo*, 924 F.2d 1227, 1232 (2d Cir. 1991); *Andrews*, 882 F.2d at 708 (expert testimony is not proper if it concerns "matters which a jury is capable of understanding and deciding without the expert's help").

Even when an expert's proposed testimony is found to be relevant, "Rule 403 permits the exclusion of relevant evidence if its probative value is substantially outweighed by the danger of

unfair prejudice, confusion of the issues, or misleading the jury." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 595 (1993) (internal quotation marks omitted). Because "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it," a "judge in weighing possible prejudice against probative force under Rule 403 . . . exercises more control over experts than over lay witnesses." *Id.* (citation and internal quotations omitted.)

### 4. Application

Defendant Mendlowitz's motion for a new trial based upon the exclusion of the expert testimony of Kevin Moran must be denied. Moran's testimony was not admissible because: (1) it was not relevant; (2) it was not information that was outside of the jury's knowledge and therefore not appropriate testimony for an expert; and (3) it was not relevant or connected to Mendlowitz's state of mind. In any event, even if Moran's testimony were relevant and admissible, its relevancy is outweighed by the likelihood of juror confusion.

### a. Moran's Testimony Was Not Relevant

As a general matter, the jury did not need to understand general industry practices in the payment processing industry in order to reach a verdict in this case. The issue the jury was tasked with deciding was whether or not Defendant's actions and/or statements during the relevant time period violated the wire fraud statute. In other words, did Mendlowitz devise and/or intend to devise a scheme or artifice to defraud the merchant customers of CPS in order to obtain money or property by making false representations, or promises using interstate wire communications.

Under similar circumstances, courts in this district have precluded expert testimony concerning industry practice on the basis of irrelevance. *See United States v. Newkirk*, 684 F. App'x 95, 97 (2d Cir. 2017) ("Newkirk II") (affirming district court's exclusion of expert

testimony concerning industry practice as irrelevant to "attorney obligations not to convey information they actually know, or consciously avoid knowing, is false"); *United States v. Sanders*, No. 12 Crim. 0574 (LAK), 2013 WL 1421487, at *2 (S.D.N.Y. Mar. 27, 2013) (precluding proposed expert testimony as to "custom and usage in the insurance industry" as irrelevant to the question of whether "inaccurate information allegedly supplied by the defendant was not material to the insurance carriers" and unhelpful to the jury "given the abundant evidence thus far offered by percipient witnesses"). In *Newkirk*, Judge Jed Rakoff had precluded expert testimony related to "the mechanics of mergers and acquisitions, the role of transactional attorneys, and the meaning of terms like 'restricted stock,' 'pledge agreement,' and 'priority of security interest.'" *United States v. Newkirk*, No. 14-CR-534-02 (JSR), 2016 WL 1659149, at *2 (S.D.N.Y. Apr. 19, 2016). The Second Circuit affirmed Judge Rakoff in a summary order, explaining that because the trial involved "misrepresentations about the very identity of the person [the defendant] was representing," the district court was not required to admit "expert testimony regarding customary industry practices in the absence of such misrepresentations." *Newkirk II*, 684 F. App'x at 97. Here, as noted above, the issue before the jury was whether Defendant was involved in a scheme to misrepresent to CPS's customers the cost of CPS's services in rates and fees. Therefore, as in *Newkirk*, testimony regarding customary industry practices would have been similarly irrelevant to the jury. Moreover, the fact that certain conduct may be common or general practice in an industry was not relevant to the jury's consideration of the conduct of Defendant Mendlowitz, and is not a defense to wire fraud. *See United States v. Connolly*, No. 16 Cr. 370 (CM), 2019 WL 2125044, at *13 (S.D.N.Y. May 2, 2019) ("'[E]verybody is doing it' is not a defense to the crime of wire fraud or conspiracy to commit wire fraud; just as 'everybody speeds' is not a defense if your car happens to get picked

up on the radar."); *see also United States v. Oldbear*, 568 F.3d 814, 821 (10th Cir. 2009) (affirming district court's exclusion of testimony that other tribal members used tribal funds for personal expenses in case involving defendant charged with embezzling tribal funds by using such funds to pay personal expenses because "only [defendant's] actions and state of mind were material to her guilt . . . the fact that others may have been the beneficiaries of improper conduct does nothing to excuse [defendant].")

      b.   Moran's Testimony Was Not Appropriate Expert Testimony

As I noted in excluding Moran's testimony, "[l]aypersons generally do have knowledge concerning obtaining and using credit cards, including the processing of the charges that are made." (Tr. 2263.) Mendlowitz concedes that jurors would have general knowledge concerning "the use of credit cards and the fees charged to a consumer" but asserts that "it is decidedly untrue that the average juror could possibly know of the fees and contractual terms between card processors and merchants." (Def. Mem. 12.) Defendant's claim misses the mark in several ways.

First, it is not an accurate statement. Certain of the methods used by credit processors with merchant customers also are used with consumer customers, such as the use of statement messaging to communicate with both consumer and merchant customers concerning changes related to their accounts. Jurors would also have an awareness of the different players involved in credit card processing, such as consumers, merchants, credit card processors, merchant banks, card networks (MasterCard, Visa, American Express, etc.), and issuing banks. With this level of knowledge concerning credit cards, the jury did not need expert testimony to understand the role of credit card processors, or what a typical merchant agreement looks like.

Second, the claim ignores the fact that CPS and EVO witnesses—many of whom had

either prior experience working for credit card processors or, in the case of EVO employees Lyndsey Laspina and Kevin Lambrix, worked with independent sales organizations ("ISOs") like CPS—testified about certain practices in the credit card processing industry, fees, and contractual terms. For example, Guy Samuel testified about his role at CPS as a sales representative and described the work that credit card processors like CPS did in offering, among other things, "[t]he ability to accept credit cards for their business . . . and get the money from those credit card sales back to their bank account." (*See* Tr. 227.) Samuel also testified about the difference between swiped and keyed in rates, i.e., rates charged for in person transactions where the credit card would be present versus rates charged for transactions done online or over the telephone. (Tr. 235–36.) He also testified about the merchant application sent to customers and information that was typically included in such applications. (Tr. 248–49, 251–55.) Mendy Greenblatt worked for CPS during two different periods of time and also worked for another credit card processor. (Tr. 656.) Greenblatt—who was a direct supervisee of Mendlowitz and used the name Mark Green when he worked as a salesperson at CPS, (Tr. 660)—testified about, among other things, the sales, underwriting, and boarding process for new customers (Tr. 664–66). Greenblatt also testified about the various types of fees and rates CPS charged to merchant customers generally and with reference to various exhibits. (*See, e.g.,* Tr. 678–690, 737–747, 751–791.) David Devers worked for two credit card processors prior to working at CPS. (Tr. 1184.) Devers testified about, among other things, interchange rates, tier pricing, dues and assessments, PCI compliance fees, IRS reporting fees, membership fees, qualified and nonqualified rates, and inactivity fees.[8] (Tr. 1198–1206, 1256–57, 1260, 1272–75, 1737–38.)

---

[8] I note that at one point during Devers' testimony concerning statement messages, fees and rates, he began to answer a question by stating "I'm sorry. I worked at a processor before Commerce. I worked at a processor after Commerce, and I work at a credit card processor today. If and when rates and fees –." Defense counsel cut off the

Bienvenido Caban, another CPS employee, worked for three credit card processing companies before he began working at CPS. (Tr. 2207–08.) Caban testified about fees and rates from the perspective of dealing with customer complaints related to billing and other customer service issue. (*See, e.g.*, Tr. 2211–2237.) Based upon his experience in the credit card processing industry, Caban also testified about the different fees charged by MasterCard and Visa as well as about statement messages notifying merchant customers of fee or rate changes. (*See* Tr. 2327–2332.)

With regard to EVO, witness Lyndsey Laspina held various positions at EVO, including as an application processor entering merchant information on merchant applications into EVO's client resource management system or CRM, manager of application processors, credit analyst/underwriter responsible for approving or declining merchant accounts, manager of credit analysts, and a third party due diligence supervisor in EVO's audit department, responsible for insuring that EVO's alliance partners—of which there were approximately 40 between 2009 and 2015—followed EVO's policies and procedures. (Tr. 2383–85, 2387.) Laspina explained for the jury the role of ISOs, described how EVO was an ISO and a processor, and also explained how ISOs—like CPS—partnered with EVO. (*See, e.g.*, Tr. 2385–87.) Kevin Lambrix was the Chief Operating Officer for EVO, and at the time of trial was "the senior vice president, credit and risk global." (Tr. 2520.) Lambrix testified about, among other things, underwriting, EVO's role as it related to CPS, and merchant agreements. (*See* Tr. 2525–29.)

Because many of these witnesses had prior experience working for credit card processors or had knowledge generally about the industry because of their work history, there was no need

---

response and stated that he intended to move to strike the answer once given. (Tr. at 1827.) When the question at issue was repeated to Devers, he stated he disagreed with the premise of the question "since [he could not] explain [himself]." (Tr. 1828.) Defense counsel then moved on.

for expert testimony related to industry practice. In any event, even if such testimony were appropriately the subject for expert testimony, Moran's testimony would have been duplicative of the lay witnesses called during the trial. Mendlowitz claims—without citation to supporting case law—that "to preemptively require the defense to establish relevant evidence solely through adverse fact witnesses (many of whom were cooperating witnesses) was unfair." (Def. Mem. 11.) However, Mendlowitz was precluded only from calling an expert to testify about industry practice, not from calling non-cooperating lay witnesses.[9]

      c.   Moran's Testimony was not Relevant to Mendlowitz's State of Mind and Even if Relevant its Admission Would Have Been Prejudicial

Mendlowitz argues that "Moran's proposed expert testimony on standard practices in the payment-processing industry was relevant to [his] state of mind." (Def. Mem. 6.) "[G]ood faith on the part of [a] defendant is a complete defense to [wire fraud]," *United States v. Dupre*, 462 F.3d 131, 139 (2d Cir. 2006); therefore, "[a] defendant's honest belief in the truth of representations made by her is a complete defense [to crimes requiring fraudulent intent], however inaccurate the statements may turn out to be," *United States v. Dupre*, 339 F.Supp.2d 534, 540 (S.D.N.Y. 2004). Mendlowitz's argument lacks merit. First, Moran did not have any personal knowledge related to EVO, CPS or Mendlowitz's conduct. Therefore, he was incapable of testifying to facts that might shed light of Mendlowitz's state of mind during the relevant time period. Second, under Federal Rule of Evidence 704, "[i]n a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense," as "[t]hose matters

---

[9] Of course Mendlowitz was not required to call any witnesses or offer any other type of evidence. *United States v. Bahna*, 68 F.3d 19, 21 (2d Cir. 1995) (upholding the jury instruction that "the law never compels a defendant in a criminal case to call any witnesses or produce any evidence in his behalf" as proper and "verbatim from an accepted treatise on federal jury instructions.")

are for the trier of fact alone." Fed. R. Evid. 704(b). Therefore, Moran could not provide testimony concerning Mendlowitz's state of mind. Third, assuming that Moran's testimony was an appropriate subject for expert testimony, its relevance hinged on Mendlowitz's subjective knowledge of general industry practices in the payment processing industry. Mendlowitz does not identify evidence in the trial record of his subjective beliefs concerning general industry practices in the payment processing industry. The mere fact that Mendlowitz was an owner and executive of CPS is insufficient to establish an inference that Mendlowitz was aware of industry practices during the relevant time period, let alone to establish what his subjective beliefs were at that time.[10] Fourth, even assuming Moran's proposed testimony was relevant, any relevance was outweighed by the likelihood of confusion. Here, Moran had no personal knowledge related to CPS, EVO or Mendlowitz's conduct, thus making his proposed testimony attenuated from what actually occurred at CPS; therefore, requiring the jury to make several inferences to establish relevance. In other words, even when considered at its best the proposed testimony was only marginally relevant. However, the risk of prejudice was high since there was a likelihood of jury confusion that the standard against which Mendlowitz's conduct was to be measured was industry practice rather than whether his conduct violated the wire fraud statute. Therefore, any relevance of Moran's proposed testimony is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." *Daubert,* 509 U.S. at 595.

---

[10] *United States v. Litvak*, 808 F.3d 160 (2d Cir. 2015), cited by Mendlowitz, is inapposite. In *Litvak*, the district court precluded defense evidence that supervisors at the bank where the defendant worked, including the defendant's own supervisors, "regularly approved of conduct identical to that with which [the defendant] was charged." *Id*. at 189. The Second Circuit held that the district court improperly excluded this evidence and found that it was admissible because it supported an inference that the defendant "held an honest belief that his conduct was not improper or unlawful, a belief the jury may have found more plausible in light of his supervisors' approval of his colleagues' substantially similar behavior." *Id*. at 190. In *Litvak,* unlike here, there was a link between the precluded evidence and the defendant's subjective belief. Here, Moran's proposed testimony would have addressed practices of other payment processors, not CPS or EVO. As noted above, there is nothing in the record to support an inference that Mendlowitz was aware of those other payment processors' practices.

Based upon the above, Mendlowitz's motion for a new trial based on the preclusion of Kevin Moran's proposed expert testimony is DENIED.[11]

## B. *Mendlowitz's 2015 Recorded Statement Concerning Auto-initialing Was Properly Excluded*

### 1. Background

Mendlowitz also seeks a new trial on the ground that I improperly precluded him from introducing a portion of a recorded conversation he had with David Devers on May 26, 2015. (*See* Def. Mem. 13–19.) After agreeing to cooperate with the Government, Guy Samuel and David Devers agreed to make consensual recordings at CPS. Mendlowitz sought to introduce portions of these recorded calls as "non-hearsay evidence of [his] state of mind, or as exceptions to hearsay under Federal Rule of Evidence 803(3)." (Def. Mem. 14.) Mendlowitz concedes that I "admitted portions of recorded conversations under Rule 803(3)," but now argues that I improperly excluded one portion of a recorded call he had with David Devers.[12] The Government argues that the statement at issue was an explanation of past conduct being offered for the truth, not non-hearsay evidence of Mendlowitz's state of mind, (Govt. Mem. 22–23), and, even if erroneously excluded, the error was harmless, (*id.* at 23–24).

The evidence was essentially undisputed that CPS did not give the three "terms and conditions" pages from the five-page merchant agreements sent to new customers from approximately 2009 until late January 2015. (Govt. Mem. 20–21.) By way of explanation for withholding the terms and conditions, Mendlowitz independently told Benny Caban and David

---

[11] In light of the above findings, I do not reach the issue of whether the inadequacy of the expert notice and disclosure warranted the preclusion of Moran's proposed testimony. However, I note that the record supports a finding that the nature and scope of Moran's testimony was somewhat of a moving target and did not crystallize until trial.

[12] Mendlowitz offered the recording of the May 26, 2015 conversation during Devers' cross-examination. I denied admission of the recorded conversation on May 13, 2019. (Tr. 1917.)

Devers near the beginning of their respective employments that including the terms and conditions "would kill the deal." (*Id.*)

When EVO discovered, during an audit in January 2015, that CPS was withholding the three pages of terms and conditions from customers, it directed CPS to (1) include the three pages of the terms and conditions along with the rest of the merchant agreements sent to customers, and (2) get customers to initial each page of the terms and conditions to confirm that the customers received and reviewed those provisions. (*Id.* at 21.) Mendlowitz, instead of requiring merchants to review and initial each page, "contacted a vendor that provided IT-related support to CPS and worked with the vendor's employees to program CPS's online merchant agreements so that when a customer entered initials onto the first page of the agreement, those initials would be auto-populated onto pages 3, 4, and 5," containing the terms and conditions. (*Id.*)

After Devers agreed to cooperate with the Government, on May 26, 2015—after EVO's audit and approximately four months after the auto-population feature was implemented— Devers recorded a conversation he had with Mendlowitz. Specifically, during the conversation Devers told Mendlowitz about complaints received by customer-service representatives from merchants claiming they had not initialed the terms and conditions. Devers asked Mendlowitz whether sales representatives could have merchants initial each page of the terms and conditions. Mendlowitz responded stating, "We could. You know, it would be a little bit more intrusive." (Def. Mem. 15.) Mendlowitz sought to have this recorded exchange admitted in evidence.

## 2. Applicable Law

"When the defendant seeks to introduce his own prior statement for the truth of the matter asserted, it is hearsay, and it is not admissible." *United States v. Marin*, 669 F.2d 73, 84

(2d Cir. 1982).  The proponent of a hearsay statement bears the burden of demonstrating its

admissibility.  *See United States v. Camacho*, 353 F. Supp. 2d 524, 536 (S.D.N.Y. 2005) (that

proponents of evidence bear the burden of demonstrating its admissibility is a "general principle

[that] applies to all questions of admissibility that arise under the Federal Rules of Evidence.");

*United States v. Robbins*, 197 F.3d 829, 838 (7th Cir. 1999) (proponent of out-of-court statement

bears burden of proving it fits into hearsay exception); *see also United States v. Pluta*, 176 F.3d

43, 49 (2d Cir. 1999) (proponent of evidence bears burden of authentication); *Mendez v. United

States*, 379 F. Supp. 2d 589, 597 (S.D.N.Y. 2005) ("The burden of proof lies with the proponent

of the evidence.") (internal quotations omitted).

Pursuant to Federal Rule of Evidence 803(3), "[a] statement of the declarant's then-

existing statement of mind (such as motive, intent, or plan) . . . , but not including a statement of

memory or belief to prove the fact remembered or believed," is admissible and will not be

excluded as hearsay.  Fed. R. Evid. 803(3).  The plain text of this rule does not cover the

admission of statements regarding conduct or events that occurred earlier in time.  *See United

States v. Cardascia*, 951 F.2d 474, 488 (2d Cir. 1991) ("To admit statements of one's state of

mind with regard to conduct that occurred . . . earlier as in this case would significantly erode the

intended breadth of this hearsay exception."); *United States v. Lawal*, 736 F.2d 5, 8 (2d Cir.

1984) (statements of what the declarant "or someone else had done in the past" cannot be

statements of the declarant's "then existing state of mind" under Rule 803(3)).

### 3.  Application

Defendant argues that the statement—"We could.  You know, it would be a little bit more

intrusive."—was not offered for its truth.  Instead, Mendlowitz argues, "the statement was

offered to show circumstantial evidence of [his] state of mind."  (Def. Mem. 16.)  As an initial

matter, it is not clear what Mendlowitz meant by the term "intrusive," since initialing electronically in three places cannot be deemed onerous. Moreover, the statement itself is ambiguous since it could be understood to mean that the addition of the three pages could cause merchants to balk at signing up; in other words, "kill the deal". Mendlowitz's claim that the statement was not being offered for the truth is belied by his own argument that "the auto-population function was put in place primarily for convenience, and not to hide the terms and conditions from merchant-customers." (*Id*. at 17.)

In any event, even assuming the statement is admissible, Mendlowitz's argument that his statement demonstrates his state of mind with regard to the terms and conditions is of limited relevance and probative value. First, Mendlowitz's decision to exclude the terms and conditions from the merchant agreements was made in 2009—approximately six years before the recorded statement was made in 2015. The statement was also made five or six years after Mendlowitz independently told Caban and Devers that including the terms and conditions "would kill the deal." In addition, the statement was made after the audit where EVO discovered CPS had not been providing the terms and conditions to merchants and then insisted that CPS provide the terms and conditions and get merchants to initial each page. Mendlowitz was aware that Devers knew about the directives from EVO, since Devers participated in the audit and, at Mendlowitz's direction, lied about the terms and conditions to the EVO auditors.[13] (*See* Tr. 1478–1565.)

Based upon the above, Mendlowitz's motion for a new trial based on the exclusion of the May 26, 2015 recorded call is DENIED.

---

[13] In addition, for all of the reasons identified by the Government, (*see* Govt. Mem. 23–24), even if the exclusion of Mendlowitz's recorded statement was in error, it did not prejudice the defense, and its exclusion was harmless. The exclusion of Mendlowitz recorded statement either alone or in combination with the other purported erroneous rulings do not leave me with "a real concern that an innocent person may have been convicted" or that "there is a need for a new trial in the interest of justice." *Bell*, 584 F.3d at 483 (internal quotation marks omitted).

### C.    *The Audit Report was Properly Admitted*

Mendlowitz argues that the audit report prepared by EVO, ("Audit Report"),[14] was improperly admitted as a business record pursuant to Rule 803(6) of the Federal Rules of Evidence.  (Def. Mem. 20–28.)  Mendlowitz argues that even if the responses prepared by Devers reflected in the Audit Report were properly admitted as co-conspirator statements, other portions of the Audit Report were hearsay and should not have been admitted in evidence.  The Government argues that the Audit Report "fit [sic] squarely within the business-records rule, and, in any event, it represented a small fraction of the Government's overwhelming proof of Mendlowitz's participation in the frauds charged in Counts One and Two.  The motion should therefore be denied."  (*Id.* at 24–25.)  The Government laid the appropriate foundation for the admission of the Audit Report as a business record and it was properly admitted in evidence.

#### 1.  Background

Prior to the admission in evidence of the Audit Report, several other documents related to the audit were admitted in evidence.  During the direct testimony of David Devers, the CPS employee who Mendlowitz tasked with the responsibility to interact and communicate with the auditors on behalf of CPS, the Government offered GX 588, a February 2015 email Devers sent Mendlowitz containing a copy of a "Pre-Close Report" from EVO and noting, "they have a lot of questions related to fees. . . . "  (GX 588.)  I admitted the exhibit with the instruction to the jury that the attachment to the email—the Pre-Close Report—was not being admitted for its truth, but as evidence of notice to the recipients and of state of mind.  (*See* Tr. 1511.)

Later that same trial day, also during the direct testimony of Devers, I admitted GX 1001,

---

[14] The Audit Report was admitted in evidence as GX 1005.  "GX" refers to Government Exhibit.

a cover email from an April 2015 message from EVO auditor Lyndsey Laspina to Mendlowitz and Devers attaching EVO's audit report.[15]  (Tr. 1533.)  In that cover email, Laspina told Mendlowitz and Devers that another CPS audit was tentatively "scheduled for January 2017," but that continued billing issues could result in an audit in January 2016.  (GX 1001; Tr. 1534.)  I also admitted—without objection—GX 1003, a version of EVO's audit report with the auditors' notes of the report redacted; however, CPS's responses to those findings, prepared by Devers, were not redacted.  (GX 1003; Tr. 1535–37.)  Devers testified that he discussed the responses to the findings by CPS with Mendlowitz prior to working on the document, and that many of the responses were false.  (*See* Tr. 1539–43.)

The entire, unredacted Audit Report came in evidence as a business record during the direct testimony of Lyndsey Laspina.  (Tr. 2420, 2423.)  Before its admission, Laspina testified about EVO's audit protocols and how the Audit Report was prepared.  She described for the jury how she had been a member of EVO's audit department since 2014 as a third-party due diligence supervisor responsible for ensuring that EVO's alliance partners and ISOs, including CPS, followed EVO's policies and procedures.  (Tr. 2384–87.)  Laspina also described how EVO created the audit department to oversee its alliance partners in 2014.  (Tr. 2399.)  As part of the creation of the audit department, EVO implemented procedures that included "annual audit reviews" of its alliance partners.  (*Id*.)  Laspina identified and discussed EVO's audit policy, the August 2014 version of which was admitted in evidence, without objection, as GX 1454.  (Tr. 2399–400.)  Laspina explained that under the policy, all of EVO's ISOs were supposed to be reviewed.  (Tr. 2401.)  Specifically, the audit policy noted that a "[t]horough onsite audit" and an "[o]utside party review" would be conducted for every ISO, and that the outside review would

---

[15] A copy of the Audit Report was not admitted with the cover letter.

include "[r]eputational checks" which were intended to check whether the ISO was the subject of any consumer complaints. (Tr. 2402–03; GX 1454.)

EVO conducted its first ISO audit pursuant to its new audit policy in November 2014, and CPS was audited pursuant to that same policy two months later. (Tr. 2404–07.) The CPS audit was conducted by three EVO employees, including Laspina. (Tr. 2407–08.) Laspina described the process undertaken during the audit. Specifically, EVO requested and examined approximately 30 CPS merchant applications, which Devers provided to EVO in hard copy. These documents were used by the EVO representatives to assess CPS's underwriting and billing procedures followed with respect to each of those CPS customers. (Tr. 2408–11.) The audit process also included a tour of CPS's offices, interviews of department heads, and a "system overview."[16] (Tr. 2410.)

Consistent with EVO's procedures, Laspina prepared a Pre-Close Report following the CPS audit. (Tr. 2416–17.) The Pre-Close Report highlighted the "discrepancies or findings" for CPS, which then had an opportunity to respond. (Tr. 2417.) An audit was only formally closed under EVO's policies when "all the exceptions ha[d] been closed out." (Tr. 2418.) Accordingly, after requesting and receiving responses from CPS to the exceptions, Laspina drafted the CPS audit report. (*Id.*)

Laspina testified that EVO followed the same procedures it had used in the earlier audit of an ISO in 2014, and the same procedures were used during the audits Laspina conducted in the months that followed the CPS audit. (Tr. 2418.) All of the audit reports Laspina participated in preparing for EVO during the relevant time period resulted in a final report like the Audit

---

[16] The system overview involved recreating the experience of a CPS merchant customer beginning with the filling out of a merchant application and following the application as it made its way through CPS. (Tr. 2413).

Report, GX 1005.  (Tr. 2419).  Laspina prepared the final CPS audit report in April 2015.  The

Audit Report—GX 1005—was then maintained on EVO's server, pursuant to EVO's regular

practice of maintaining final audit reports and related work papers.  Such reports and work

papers are stored on EVO's servers for approximately seven years.  (Tr. 2419–20).

## 2.  Applicable Law

Rule 803(6) of the Federal Rules of Evidence—the business records exception—is an

exception to the rule against hearsay.  The rule allows the introduction of

[a] record of an act, event, condition, opinion, or diagnosis if:

(A) the record was made at or near the time by—or from information transmitted
by—someone with knowledge;

(B) the record was kept in the course of a regularly conducted activity of a business,
organization, occupation, or calling, whether or not for profit;

(C) making the record was a regular practice of that activity;

(D) all these conditions are shown by the testimony of the custodian or another
qualified witness . . . ; and

(E) the opponent does not show that the source of information or the method or
circumstances of preparation indicate a lack of trustworthiness.

Fed. R. Evid. 803(6).

"Rule 803(6) favors the admission of evidence rather than its exclusion if it has any

probative value at all."  *United States v. Williams*, 205 F.3d 23, 34 (2d Cir. 2000) (internal

quotation marks omitted).  "The principal precondition to admission of documents as business

records pursuant to Fed.R.Evid. 803(6) is that the records have sufficient indicia of

trustworthiness to be considered reliable."  *Saks Intern., Inc. v. M/V Export Champion*, 817 F.2d

1011, 1013 (2d Cir. 1987).  "To lay a proper foundation for such a record, a 'custodian or other

qualified witness' must testify that the document was 'kept in the course of a regularly conducted

business activity and also that it was the regular practice of that business activity to make the [record].'" *Williams*, 205 F.3d at 34 (quoting *United States v. Freidin*, 849 F.2d 716, 719–20 (2d Cir. 1988) (internal quotation marks and citation omitted)).

### 3. Application

Lyndsey Laspina's testimony tracked the requirements of Rule 803(6), and laid a more than ample foundation to admit the Audit Report, GX 1005, as a business record. Laspina prepared the April 2015 report "at or near the time" the audit occurred, Fed. R. Evid. 803(6)(A), since the audit concluded with CPS's submission of responses to the Pre-Close Report in or about February to April 2015. (Tr. 2419.) Laspina was a person "with knowledge" of the events reported in the Audit Report, Fed. R. Evid. 803(6)(A), based upon her personal involvement and participation in the audit of CPS. (Tr. 2407–17.) Laspina's testimony demonstrated that the Audit Report "was kept in the course of a regularly conducted activity of" EVO, Fed. R. Evid. 803(6)(B). In addition, she testified that it is EVO's regular practice with respect to audit reports to maintain the reports and related work papers on its computer system for approximately seven years, and she confirmed that the Audit Report, GX 1005, is so maintained on EVO's server. (Tr. 2419–20.) Third, Laspina's testimony and the August 2014 EVO audit policy, GX 1454, demonstrated that the Audit Report was part of EVO's regular business practice. Fed. R. Evid. 803(6)(C). Specifically, in 2014, EVO implemented an audit policy pertaining to all of its alliance partners and ISOs, including CPS. (Tr. 2399–401.) EVO conducted its first audit pursuant to that policy in November 2014, two months before commencing its audit of CPS. (Tr. 2404–07.) The CPS audit, including the preparation of the final report reflected in GX 1005, followed EVO's audit practice, which has remained in place for years. (Tr. 2418–19.) Finally, Laspina's responsibility for EVO's audits and her knowledge of policies applicable to those

audits, (*see* Tr. 2384–87), unequivocally made her a "qualified witness" under Rule 803(6)(D).

Mendlowitz concedes that audit reports can be admissible as business records and that courts have found them admissible as such. (Def. Mem. 22.) Instead, Mendlowitz argues that the audit procedures were new and that the Audit Report is untrustworthy and unreliable. These arguments are meritless and I reject them for the reasons identified by the Government. (Govt. Mem. 32–34.) Indeed, Mendlowitz does not cite any precedent that categorically excludes audit reports based upon the fact that the underlying procedures may have been new. Mendlowitz misconstrues the record when he claims that the audit was reactive and therefore not part of EVO's regularly conducted business. (*See* Def. Mem. 24–25.) The testimony is clear that EVO's policy called for the audit of all of its ISOs, and that CPS was always scheduled to be audited. Finally, Mendlowitz's argument that the policy and processes was new and therefore not part of EVO's regularly conducted business activity is belied by the fact that EVO continued to use the same policy and processes that led to the creation for the Audit Report for years after the report was created.

In any event, even if the Audit Report was admitted erroneously, the admission of the Audit Report would not warrant a new trial because there was overwhelming evidence of Mendlowitz's guilt. Four cooperating witnesses testified at trial and admitted to their participation in the scheme to defraud CPSs merchant customers. In addition to the testimony of the cooperators, it was essentially undisputed that Mendlowitz caused CPS to remove the three "terms and conditions" pages from the five-page merchant agreements sent to new customers from approximately 2009 until late January 2015. (Govt. Mem. 20–21.) Mendlowitz independently explained to Benny Caban and David Devers in 2009 and 2010, respectively, that including the terms and conditions "would kill the deal." (Tr. 1189, 1194–95, 2208, 2236–37.)

In 2012, Mendlowitz told Paul Shamilov and Dimitri Akhrin from IRIS, CPS's computer software company, that they should "ignore pages three to five"—the three terms and conditions pages—from the interactive merchant applications IRIS was working on because the terms and conditions were sent by CPS in its welcome kits. (Tr. 2933–36.) However, Mendlowitz was lying to Shamilov and Akhrin since apparently none of the welcome kits from prior to 2015 contained the terms and conditions. (*See* GXs 410, 558, 564.) The jury also heard testimony that Mendlowitz created a website called "bestpaymentprocessors.com," a fake card payment processor ranking website to falsely rank CPS as a top ranked processor. (Tr. 339–342.) In light of the overwhelming evidence of Mendlowitz's guilt, I am not left with "a real concern that an innocent person may have been convicted" or that "there is a need for a new trial in the interest of justice." *Bell*, 584 F.3d at 483 (internal quotation marks omitted).

Based on the foregoing, Mendlowitz's motion for a new trial based on the admission in evidence of the Audit Report is DENIED.

### D. *The Cross-Examination of Kevin Lambrix was not Unfairly Limited*

#### 1. Background

As the Government points out, its direct examination of Lambrix took up less than 50 pages of transcript. (*See* Tr. 2520–65.) Mendlowitz's cross, on the other hand, lasted hours, spanned more than 200 pages, and covered a multitude of topics, including issues going directly to the potential bias of Lambrix and EVO. (*See id.* at 2565–2761.)

For example, Mendlowitz in his opening statement asserted that "the government gave EVO . . . a specific assurance, a promise that EVO was not the subject of any criminal investigations, that this has nothing to do with EVO." (Tr. 122.) Mendlowitz followed up on this theme during his cross-examination of Lambrix. Specifically, he asked Lambrix "Do you

know whether or not the government ever gave EVO an assurance that it was not suspected of wrongdoing?"  Lambrix answered succinctly "I do not."  (Tr. 2761.)  Mendlowitz asked several more questions in this vein, such as whether "the government ever g[a]ve you that assurance," to which the answer was "No"; whether Lambrix had "an agreement with the government," which he answered, "No"; whether "the government ever promised you that you won't be prosecuted," which he answered, "No"; and whether Lambrix was "concerned . . . that EVO collected money that the government thinks was generated by a fraud scheme," which Lambrix answered, "I guess I really haven't thought about it."  (Tr. 2757–61.)

## 2.  Applicable Law

The "trial judge has 'wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on . . . cross-examination based on concerns about, among other things, . . . interrogation that is repetitive or only marginally relevant.'"  *United States v. Maldonado–Rivera*, 922 F.2d 934, 956 (2d Cir. 1990) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)), *cert. denied*, 501 U.S. 1211 (1991).  "The scope and extent of cross-examination are generally within the sound discretion of the trial court, and the decision to restrict cross-examination will not be reversed absent an abuse of discretion."  *United States v. Rosa*, 11 F.3d 315, 335 (2d Cir. 1993).  "Cross-examination is not improperly curtailed if the jury is in possession of facts sufficient to make a 'discriminating appraisal' of the particular witness's credibility."  *United States v. Roldan–Zapata*, 916 F.2d 795, 806 (quoting *United States v. Singh*, 628 F.2d 758, 763 (2d Cir. 1980), *cert. denied*, 449 U.S. 1034 (1980)).  A trial court may therefore limit cross-examination on topics about which a witness lacks knowledge.  *See, e.g.*, *United States v. Perez*, No. 01 CR. 848 (SWK), 2003 WL 721568, at *7 (S.D.N.Y. Feb. 28, 2003) (rejecting Rule 33 motion holding "[t]he defendant's Sixth Amendment rights were not

violated by the Court's decision to limit cross-examination on this topic after several questions had been asked and answered by the witness.").

### 3. Application

Mendlowitz claims that his cross-examination of Kevin Lambrix concerning potential bias was unfairly curtailed. Nothing could be further from the truth. Mendlowitz was given wide latitude to cross-examine Lambrix as he saw fit. As the record demonstrates, Lambrix was asked several times in different ways whether he or EVO had received any assurances from the Government that either he or EVO was suspected of wrongdoing. Each time Lambrix responded, in effect, either no or that he did not know. Having allowed multiple questions in the same related area concerning whether or not EVO received assurances, it was well within my discretion to limit Mendlowitz from continuing to cross-examine Lambrix about a topic he testified he knew nothing about.

Moreover, Mendlowitz has not identified any evidence that would lead one to believe that additional questioning of Lambrix would have elicited testimony helpful to Mendlowitz. Lambrix testified that he did not know whether the Government ever assured EVO that it was not suspected of wrongdoing. (Tr. 2761.) Although defense continues to speculate based on a Securities and Exchange Commission disclosure that the Government provided some assurance to EVO, this suspicion did not give Mendlowitz the right to ask the same or similar question repeatedly of Lambrix until Lambrix gave Mendlowitz an answer he deemed consistent with his theory. In any event, assuming that someone at EVO was given an assurance of some sort by the Government, Mendlowitz fails to identify evidence in the trial record that Lambrix had knowledge about that issue. Indeed, Lambrix's testimony conclusively demonstrated that he did not have any such knowledge, and the continued representations by the Government suggest that

no such evidence exists, (Govt. Mem. 37 n.1).

Therefore, Mendlowitz's motion for a new trial based upon the alleged curtailment of his cross-examination of Kevin Lambrix is DENIED.

### E.  *There was an Adequate Basis to Give the Conscious Avoidance Charge*

Finally, Mendlowitz argues that there was an insufficient basis to instruct the jury on conscious avoidance.  (*See* Def. Mem. 32–37.)  This argument cannot withstand scrutiny.  The facts established during the trial and Mendlowitz's defense at trial warranted charging the jury on conscious avoidance.

### 1.  Applicable Law

A "conscious avoidance" charge allows "a jury to convict a defendant for deliberately closing his eyes to what would otherwise have been obvious to him."  *United States v. Goffer*, 721 F.3d 113, 126 (2d Cir. 2013) (internal quotation marks and brackets omitted).  "A conscious-avoidance charge is appropriate when (a) the element of knowledge is in dispute, and (b) the evidence would permit a rational juror to conclude beyond a reasonable doubt that the defendant was aware of a high probability of the fact in dispute and consciously avoided confirming that fact."  *United States v. Cuti*, 720 F.3d 453, 463 (2d Cir. 2013) (internal quotation marks omitted).

The Second Circuit has explained that "this charge is appropriate when a defendant 'assert[s] what amounts to ignorance of the specific objectives alleged[.]'"  *United States v. Henareh*, 563 F. App'x 808, 811 (2d Cir. 2014) (summary order) (alteration in original) (quoting *United States v. Lanza*, 790 F.2d 1015, 1023 (2d Cir. 1986).  A conscious avoidance instruction "is not inappropriate merely because the government has primarily attempted to prove that the defendant had actual knowledge, while urging in the alternative that if the defendant lacked such knowledge it was only because he had studiously sought to avoid knowing what was plain."

*United States v. Hopkins*, 53 F.3d 533, 542 (2d Cir. 1995). "[T]he same evidence that will raise an inference that the defendant had actual knowledge of the illegal conduct ordinarily will also raise an inference that the defendant was subjectively aware of a high probability of the existence of illegal conduct." *United States v. Svoboda*, 347 F.3d 471, 480 (2d Cir. 2003) (internal quotation marks omitted).

"Red flags about the legitimacy of a transaction can be used to show both actual knowledge and conscious avoidance." *Goffer*, 721 F.3d at 127 (internal quotation marks omitted). Therefore, "[a] defendant's involvement in the criminal offense may have been *so overwhelmingly suspicious* that the defendant's failure to question the suspicious circumstances establishes the defendant's purposeful contrivance to avoid guilty knowledge." *Svoboda*, 347 F.3d at 480 (emphasis in original) (internal quotation marks omitted).

## 2. Application

Mendlowitz concedes that the element of knowledge was disputed at trial, (*see* Def. Mem. 33), so the first prong for giving a conscious avoidance charge was satisfied, *see Cuti*, 720 F.3d at 463. With regard to the second prong, as the Government points out, Mendlowitz's interaction with the first witness at trial, Robert Gostl, a Louisiana barkeeper, was more than sufficient to warrant a conscious avoidance charge. Gostl testified that after signing up for payment processing services from CPS in late 2010, he noticed he was being overbilled. (*See* Tr. 138–39.) Gostl exchanged emails with Mendlowitz concerning the overbilling, which were admitted as GX 1504. On August 8, 2011, Gostl sent Mendlowitz an email complaining about being billed for extra and excessive charges despite CPS's promises that it would not escalate rates or charge hidden fees. (*Id.*) Mendlowitz replied to the email the same day, writing, "I will handle this with my VP of Operations asap. I apologize for the inconvenience. . . ." (*Id.*)

However, after not receiving a response for over 10 days Gostl emailed Mendlowitz again to request an update. (Tr. 153–54; GX 1504.)

Gostl's testimony and the exhibits offered during his testimony alone merited a conscious avoidance charge. Gostl's testimony and GX 1504 established that red flags—namely, the billing issues and broken promises made to Gostl by CPS about which Gostl complained—were brought directly to Mendlowitz's attention by email, and he was plainly aware of these red flags as evidenced by his response to Gostl in which he pledged to "handle this . . . asap." However, Gostl heard nothing over the next 10 days, so he contacted Mendlowitz again to request an update. A rational juror easily could have inferred from this evidence that Mendlowitz was aware of a high probability of the fraud at CPS related to sales and billing practices, and rather than investigate the issue further he "consciously avoided confirming that fact," *Cuti*, 720 F.3d at 463. In essence, Mendlowitz looked the other way.

Indeed, the sales and billing issues that Mendlowitz argued to the jury were due to rogue salespeople, mistakes, or even his own well intentioned mismanagement, were all red flags that cried out for a conscious avoidance instruction. Multiple witnesses testified about their interactions with Mendlowitz concerning the fraud, including communications in which they discussed, among other things, complaints from customers or questions about charges that did not match sales pitches. (*See*, *e.g.*, Tr. 242–43, 680–81.) Each of these interactions was a red flag concerning the existence of fraud.

In addition, in June 2013, Kevin Lambrix sent an email thread to Mendlowitz—GX 1462—in which Lambrix forwarded a merchant application that listed a maximum dues-and-assessments rate that was one-tenth of what CPS was actually charging. (*See* Tr. 1541–45.) When Lambrix asked Mendlowitz in the email whether the listed rate was "a typo," adding,

"[r]egardless we need to correct this.  Let me know.  Thanks!"  Mendlowitz responded, in part, "I will get back to you on this. . . ." (GX 1462).  Lambrix, however, did not recall receiving any other email from Mendlowitz following up on this issue.  (*See* Tr. 2544.)

There is no doubt that the Government argued to the jury that the evidence proved Mendlowitz had actual knowledge of the fraud scheme.  However, that did not preclude my giving a conscious avoidance charge, *Svoboda*, 347 F.3d at 480 ("the same evidence that will raise an inference that the defendant had actual knowledge of the illegal conduct ordinarily will also raise an inference that the defendant was subjectively aware of a high probability of the existence of illegal conduct" (internal quotation marks omitted)), in light of the substantial evidence "that if the defendant lacked such knowledge it was only because he had studiously sought to avoid knowing what was plain."  *Hopkins*, 53 F.3d at 542.

Because there was more than ample evidence to warrant giving a conscious avoidance charge, Defendant's motion for a new trial based on my giving an allegedly prejudicial conscious avoidance charge is DENIED.

## IV.     <u>Conclusion</u>

For the reasons stated above, Defendant Mendlowitz's motion for a new trial is DENIED.

The Clerk of the Court is respectfully directed to terminate the pending motion.  (Doc. 197.)

SO ORDERED.

Dated: December 20, 2019
    New York, New York

Vernon S. Broderick
United States District Judge